JUDGE FORREST

# 13 CV 4596

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

HOUSSAM ALKHOURY, Individually and on : Behalf of All Others Similarly Situated,

                  Plaintiff,

     vs.

LULULEMON ATHLETICA INC., DENNIS
J. WILSON and CHRISTINE McCORMICK
DAY,

               Defendants.

———————————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

FILED
U.S. DISTRICT COURT
S.D. OF N.Y.
13 JUL -2 PH 2:56

Plaintiff Houssam Alkhoury, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by lululemon athletica inc. ("Lululemon" or the "Company"), as well as media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Lululemon between March 21, 2013 and June 10, 2013, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Lululemon and certain of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. The "Individual Defendants" include Lululemon founder and Chairman of the Board, Dennis J. "Chip" Wilson ("Wilson"), who owned nearly 30% of the Company's stock at the start of the Class Period, and Christine McCormick Day ("Day"), who was Lululemon's Chief Executive Officer ("CEO") until the end of the Class Period.

2.      Defendant Lululemon, based in Vancouver, British Columbia, was founded by defendant Wilson in 1998 and sells yoga wear that Wilson is credited with inventing. The Company's most iconic product offerings are its tight-fitting Luon yoga pants, which it sells for $98, and its tight-fitting tank tops, which it sells for $64. Priding itself on its high quality offerings, which have permitted Lululemon to command above-market prices for what it claimed was a superior product offering, the Company carved out a lucrative niche with its high-end, fashionable yoga wear, reporting quarter after quarter of stunning sales and profit growth.

3.     However, as Under Armour, Nike and others entered this niche market, the Company faced stiffer competition and began cutting corners to keep profit margins up.

4.     In January 2012, Wilson was forced to step down as Lululemon's Chief Innovation and Brand Officer, turning over those roles to CEO Day.  A few months earlier, Lululemon had printed an Ayn Rand slogan on its tote bags: "I Am John Galt," a reference to a character and phrase from *Atlas Shrugged*, one of defendant Wilson's favorite books.  Wilson then proclaimed the Tea Party icon an inspiration on his blog, prompting some to wonder whether he was alienating customers.  So when he stepped down on January 6, 2012, the price of Lululemon stock actually rose slightly.

5.     However, the Company suffered through several product quality issues.  For instance, during the summer of 2012, the Company disclosed a problem with dark colors bleeding.  The Company quickly addressed each problem and reassured investors that its quality-control measures were intact.

6.     Then, a new shipment of its Luon pant product hit the shelves on March 1, 2013.  The fabric used was very thin, overly translucent, and essentially rendered the yoga pants see-through ("See-through Yoga Pants") when wearers bent over – which is what those who wear yoga pants do.  Customers began complaining in droves.  After weeks of upheaval, Lululemon was forced to formally recall the See-through Yoga Pants and offer customers exchanges or refunds.  Initially, Lululemon blamed the defect on its manufacturers and suppliers.

7.     The Class Period starts on March 21, 2013, when Lululemon issued a press release announcing its fourth quarter and fiscal 2012 financial report for the period ending February 3, 2013, and its fiscal 2013 guidance.  That day, defendants conceded that defects in Lululemon's own quality-control procedures were the source of the problem with the See-through Yoga Pants.

- 2 -

According to defendant Day, there was no way for factory inspectors to determine whether pants were see-through, which she said could only be determined when a customer put the pants on and bent over. Defendant Day assured investors that the Company had put much more rigorous quality-control measures in place to address the problem and they were putting the product gaffes behind them.

8.     Upon these and other positive Class Period statements, the price of Lululemon stock would increase to $82.50 per share in intraday trading by June 10, 2013. Meanwhile, with the price of Lululemon stock artificially inflated, defendant Wilson cashed in, selling 2 million shares of his personally owned stock on the open market and receiving more than $163 million in gross proceeds during a very short trading window lasting from May 10, 2013 to June 7, 2013. These sales were unusual both in sheer size and timing, as defendant Wilson had not sold Lululemon stock since January 2013, and defendants were then aware of internal turmoil at Lululemon. Defendants also mailed out Lululemon's annual proxy statement to shareholders (the "2013 Proxy Statement") in connection with the Company's June 11, 2013 annual general shareholder meeting ("AGM") soliciting proxies in favor of, among other things, Wilson's re-election as a director, which investors had to return by 11:00 pm on June 10, 2013 at the latest. By holding off on disclosing the internal turmoil at Lululemon that would result in defendant Day either stepping down or being effectively fired until after the close of business on June 10, 2013, defendants ensured that Wilson's re-election would be less problematic. Defendants also disclosed that Lululemon had been forced to discount some of its product offerings during the Class Period, something Lululemon had long stated it did not do.

9.     Following the sudden announcement on June 10, 2013, *after the close of trading*, that defendant Day was "resigning," with no explanation or replacement in sight, the price of Lululemon

- 3 -

stock plummeted on June 11, 2013, falling $14.43 per share, or more than 17.5%, and ***erasing more than $1.6 billion in market capitalization***.

10.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The quality defects in the Luon yoga pants resulted in part from Lululemon's efforts to cut costs in order to raise profit margins to the detriment of product quality and brand reputation;

(b)     Lululemon was being forced to sell its yoga pants at a discounted price during the Class Period to obtain sales and protect market share; and

(c)     There were serious discussions concerning defendant Day's continued employment at the Company and the Company was considering replacing defendant Day.

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company conducts business in this.

13.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

- 4 -

## PARTIES

14.     Plaintiff Houssam Alkhoury, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the common stock of Lululemon during the Class Period and has been damaged thereby.

15.     Defendant Lululemon is a Vancouver, British Columbia-based company that markets athletic wear, in particular the Company's iconic yoga wear. The Company's common stock is listed on the Nasdaq, an efficient market, under the ticker symbol "LULU" and, as of June 5, 2013, the Company had more than 113.5 million shares of its common stock outstanding.

16.     Defendant Wilson founded Lululemon in 1998 and has served as the Chairman of its Board of Directors since 1998. Defendant Wilson served as the Company's Chief Innovation and Branding Officer from March 2010 to January 2012, and from December 2005 until March 2010, he served as its Chief Product Designer. Defendant Wilson was Lululemon's CEO from 1998 until December 2005. During the Class Period, defendant Wilson sold 2 million shares of his personally held Lululemon common stock during a very short trading window and reaped proceeds of more than $163 million.

17.     Defendant Day served as Lululemon's CEO throughout the Class Period, having joined the Company in 2008 and been promoted to CEO in July of that year.

18.     The defendants referenced above in ¶¶16-17 are referred to herein as the "Individual Defendants." Lululemon and the Individual Defendants are referred to herein, collectively, as "defendants."

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Lululemon during the Class Period (the "Class"). Excluded from the Class are defendants and their

families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lululemon common stock and other publicly traded securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lululemon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the Exchange Act was violated by defendants as alleged herein;

        (b)     whether statements made by defendants misrepresented material facts about the business, operations and management of Lululemon; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

25.     The Class Period starts on March 21, 2013.  On that day, Lululemon issued a press release announcing its financial results for the fiscal year ended February 3, 2013, and its guidance for fiscal 2013.  In addition to announcing that revenues had increased 10% year-over-year, defendants continued tacitly blaming its manufacturers/suppliers for the Luon fiasco and provided it would have a limited future impact on Lululemon, stating in pertinent part as follows:

> Christine Day, lululemon's CEO, stated: "*The fundamentals of our business are strong*, we delivered excellent results in 2012, and *we plan to continue to earn the loyalty of our customers and shareholders every day going forward*. As previously announced on March 18th, we pulled a selection of our black Luon pants from our stores. Delivering the top quality our guests expect is a critical factor in our differentiation in the market place. Our proprietary fabric, black Luon, is a very technical and sensitive product to manufacture. We have a long history with our manufacturers and as we have in the past, *we are working closely with them to resolve the current issues*. We have a team on site collaborating *with them* to identify the *root cause*. We have recently added strong leadership in Quality Control, our Liason Office and our commercialization and development teams, and expect these people and other investments to solidify our quality consistency and our delivery capabilities."

> **Updated Outlook**

> For the first quarter of fiscal 2013, we expect net revenue to be in the range of $333 million to $343 million based on a comparable-store sales percentage increase between 5% and 8% on a constant-dollar basis. Diluted earnings per share are expected to be in the range of $0.28 to $0.30 for the quarter. *This outlook reflects our current expectations of the impact from the black Luon issue, including lost*

*revenue in the range of $12 million to $17 million, additional costs expected to be incurred and the write down of affected product on hand and expected to be received during the first half of 2013, resulting in a negative impact on EPS of $0.11 to $0.12.* This guidance also assumes 146 million diluted weighted-average shares outstanding and a 30% tax rate.

*For fiscal 2013, we expect net revenue to be in the range of $1.615 billion to $1.640 billion and diluted earnings per share to be in the range of $1.95 to $1.99 for the full year. This outlook reflects our current expectations of the impact from the black Luon issue, including lost revenue in the range of $57 million to $67 million, additional costs expected to be incurred and the write down of affected product on hand and expected to be received during the first half of 2013, resulting in a negative impact on EPS of $0.25 to $0.27.* This guidance also assumes a tax rate of 30% and 146.6 million diluted weighted-average shares outstanding.

26.     The conference call held later in the day on March 21, 2013, was hosted by defendant

Day who spoke on behalf of the entire Lululemon Board and again tacitly blamed the Luon fiasco on

the Company's manufacturers/suppliers, stating in pertinent part as follows:

I'm joining you from Australia today where it's actually just after midnight. *Our board meeting was held here this quarter, and we have just finished a few days of meetings with our board and our team here in Australia.*

*Before we talk about our fourth quarter and full year 2012 results I will give you an update to the announcement made on Monday of this week, regarding the sheerness in certain styles of our women's black Luon bottoms.*

Following my comments, John will speak to our guidance. We have not yet determined the specific cause for the sheerness and are pursuing several hypotheses in parallel with our manufacturing partners to determine the root cause. What is clear to us is that this is not the Luon that we and our guests have come to love.

*The process for creating Luon is complex and involves a specific set of proprietary ingredients and a multi-step production process. Even the slightest changes to the process can create meaningful changes in the fabric. We had already begun putting more stringent specifications in place on the production of Luon, and we will be redoubling our efforts in this area.*

*We currently have a dedicated team working with our suppliers to identify and resolve the issue.* We have recently added strong leadership in quality control, our liaison office and our commercialization and development teams, and I expect these people and other investments to solidify our quality consistency and delivery capabilities.

- 8 -

*Our company is rooted in integrity, and we are ready to make the tough decisions and do the right thing for our guests and our communities. I am confident that we will recover from this setback and be stronger than ever. Our confidence is based on the history of strong performance that the team here as produced, including what we achieved during the past year.*

27.      Later in the call, when questioned by a research analyst, defendant Day stated that Lululemon did not "want to call attention to any one particular vendor, because it would be unfair until [the Company had] completed the diagnostics." Defendant Day also stated that the Company "should have two additional sources up ready for manufacturing [its] key fabrics by the fall." Finally, discussing the source of the Company's stellar fourth quarter 2012 results, defendant Day emphasized that the Company "*achieved these results in a very brand-appropriate way, and did not buy our comps through discounting, which ultimately would have harmed the brand.*"

28.      During the March 21, 2013 conference call, Lululemon also provided first quarter 2013 guidance of "revenue in the range of $333 million to $343 million," gross margins of "approximately 48% to 49%," and earnings per share ("EPS") of $0.28 to $0.30. For fiscal 2013, the Company issued guidance of net revenues of $1.615 billion to $1.64 billion, gross margins of 53% to 54% and EPS of $1.95 to $1.99.

29.      On March 21, 2013, the Company also filed its 2013 Annual Report to Shareholders on Form 10-K with the SEC. The Form 10-K was signed by defendants Wilson and Day and was certified under the Sarbanes Oxley Act of 2002 by defendant Day. Concerning the importance of the Company's management team to its future, the Form 10-K stated in pertinent part as follows:

*Our future success is substantially dependent on the continued service of our senior management.*

*Our future success is substantially dependent on the continued service of our senior management and other key employees. The loss of the services of our senior management or other key employees could make it more difficult to successfully operate our business and achieve our business goals.*

- 9 -

We also may be unable to retain existing management, technical, sales and client support personnel that are critical to our success, which could result in harm to our customer and employee relationships, loss of key information, expertise or know-how and unanticipated recruitment and training costs.

We do not maintain a key person life insurance policy on Ms. Day or any of the other members of our senior management team. As a result, we would have no way to cover the financial loss if we were to lose the services of members of our senior management team.

30.     While conceding that defendant Day's departure ***could*** be damaging – in a hypothetical sense – the Form 10-K concealed what defendants then knew about her departure being probable if not imminent.   Yet, with the investment community satisfied with Lululemon's explanations and the promises that Day and her management team had everything under control, the price of Lululemon stock closed at $64.70 per share on March 21, 2013.  Credit Suisse analyst Christian Buss stated in his client note that day that he thought it was "'a relief about ***the magnitude of the potential impact***,'" stating, "'If we strip away this recall, the core business is still healthy, and we have a validation of that with these results.'"  Oppenheimer & Co. analyst Brian Nagel also emphasized that "'[e]ncouragingly, the company is moving to address its quality issues and ***guided to a normalized selling environment*** by the fall.'"

31.     On April 3, 2013, Lululemon issued a press release entitled "lululemon Announces luon Production Update," designed to further mollify the investment community.  The press release stated in pertinent part as follows:

> After an evaluation of lululemon's previously disclosed black luon production issues, the company concluded that the current specification and testing protocols for the signature fabric luon that were developed in 2006 have not materially changed. However, production of luon is a complex process with a number of different inputs, and fabric is the key factor. While the fabric involved may have met testing standards, it was on the low end of lululemon's tolerance scale and we have found that our testing protocols were incomplete for some of the variables in fabric characteristics. When combined with subtle style changes in pattern, the resulting end product had an unacceptable level of sheerness.

*lululemon had taken steps prior to the black luon issue to bolster its internal product expertise, including the addition of senior level capabilities in quality, raw materials and production. This new team was instrumental in determining the root cause of the issue and has initiated three work streams to address what we believe are the contributing causes*.

Work streams and actions include:

1.      **Testing & processes**: lululemon's quality team is assessing all luon products in the production pipeline according to newly implemented rigorous testing and quality processes that includes [sic] revised specifications for modulus (stretch), weight and tolerances.

2.      **Factory oversight**: lululemon employees have been stationed in factories to monitor and test products and will educate internal teams and manufacturing partners on new testing standards and methodologies.

3.      *Leadership and structure: lululemon is building a stronger internal structure with new leadership and cross-functional team capability that we believe will create a more robust organization to support our long-term growth strategy*.

"Our stand for differentiation is the quality of our product. We have been building capacity in the product organization, and we recognize that continued investment in this segment of the business is required to support our future," said lululemon CEO Christine Day. "*We are committed to continually developing best in class fabrics, and are committed to only putting product in our stores that meets our stringent standards*."

*Based on our evaluation to date there is no change to the company's first quarter and fiscal 2013 earnings guidance that was provided on March 21st, 2013*.

32.      In a separate press release issued on April 3, 2013, Lululemon disclosed that Chief Product Officer Sheree Waterson had been terminated effective April 15, 2013.

33.      On the positive news that the Company was reiterating earlier guidance and had seemingly successfully navigated its oversight problems, the price of Lululemon stock price rose 1.2% to $65 per share by 9:40 a.m. on April 4, 2013, and would close at $65.66 per share that day. However, at least two research analysts made it clear to their clients and Lululemon in a client note – seen by Lululemon and its executives – that the termination of the Chief Product Officer saddled Lululemon with "'a new level of uncertainty,'" causing Howard Tubin and Courtney Willson of

RBC Capital Markets to downgrade Lululemon's stock rating from Outperform to Sector Perform and to lower RBC's price target from $80 to $70 per share. According to their client note issued that day, "'[i]t is Waterson's departure that is the impetus for our downgrade.'" They also stated that "'Waterson ha[d] been at the company since 2008 and, in [RBC's] view, ha[d] been a strong creative asset,'" that "'she was instrumental in the design process for the last five years and was also a strong creative leader,'" and that "'the loss of her creative leadership add[ed] a new level of uncertainty to the story.'" This put defendants on notice that further management changes would not be looked favorably upon by the investment community. Yet other analysts were mollified by defendants' positive statements, including Janney Capital Markets' Adrienne Tennant and Roxanne Meyer of UBS Investment Research who maintained their respective ratings citing defendants' positive statements.

34.     On April 30, 2013, Lululemon issued its 2013 Proxy Statement, setting a June 11, 2013 annual shareholder meeting and attaching a proxy directing that shareholders fill out and return the proxy statement *prior to* the June 11, 2013 AGM. Among other things, the 2013 Proxy Statement sought the re-election of defendant Wilson for a three-year term as a director. The 2013 Proxy Statement allowed for Internet voting, but stated that "[p]roxies submitted by Internet or telephone must be received by 11:00 p.m., Central Time, on June 10, 2013." And while investors were invited to attend the annual meeting in person, the proxy stated, "we encourage you to sign and return the proxy card even if you plan to attend the Annual Meeting."

35.     Describing defendant Day, the 2013 Proxy Statement stated the following in pertinent part:

> ***Christine M. Day*** has been a member of our board of directors since July 2008. She served as our company's Executive Vice President, Retail Operations, from January 2008 through April 2008, was appointed to the offices of President and Chief Operating Officer in April 2008, and was named Chief Executive Officer in

July 2008. . . . Ms. Day received her BA in Administrative Management from Central Washington University, and is a graduate of Harvard Business School's Advanced Management Program. *Our board of directors selected Ms. Day to serve as director because she is our Chief Executive Officer and she has extensive experience in sales and marketing, managing retail-focused operations, international operations, corporate finance and strategic planning*.

36.     Describing defendant Day's purported independence from defendant Wilson, the 2013 Annual Proxy Statement stated the following in pertinent part:

> *Currently, the positions of Chairman of the Board and Chief Executive Officer are held by separate persons because our board of directors has determined that this structure aids in the oversight of management and is in the best interests of our company and our stockholders at this point in time.* Dennis J. Wilson currently serves as Chairman of the Board. Our board of directors believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and that his role as Chairman of the Board enables him to be more effective in this role.

37.     On May 8, 2013, stock analyst Sterne, Agee & Leach issued a report upgrading its price target to Buy from Neutral and establishing a $90 price target, stating "[b]rand and *long-term strategy* appear healthy following management meetings." According to Sterne, Agee & Leach's report, "[f]ollowing meetings with the chief executive and chief financial officer we would be buyers of Lululemon," emphasizing that "[t]he transparent-pant problem is a serious growing pain, *but should not cause long-term brand damage*." The price of Lululemon stock surged as the market received and digested this report, increasing from its open of $75.45 per share on May 9, 2013 to trade as high as $81.25 per share and closing at $79.07 per share that day.

38.     Indeed, the price of Lululemon stock continued escalating on these positive statements, trading as high as $82.50 per share in intraday trading on June 10, 2013. Meanwhile, with the price of Lululemon stock artificially inflated, defendant Wilson cashed in, selling 2 million shares of Lululemon stock between May 10, 2013 and June 7, 2013, receiving more than $163 million in gross proceeds. These sales were unusual both in sheer size and timing, as defendant

Wilson had not sold Lululemon stock since January 2013 and defendants were then aware of internal turmoil at Lululemon.

39.     On June 10, 2013, *after the close of trading*, Lululemon issued a press release announcing its "financial results for the first quarter ended May 5, 2013," and announcing that defendant Day was stepping down as CEO as soon as her replacement could be selected. Defendants conceded that day that Lululemon had resorted to price discounting during the Class Period. The Company's stock price plummeted on this news, closing down $14.43 per share, more than 17.5%. According to UBS's Roxanne Meyer, who downgraded Lululemon on this news to Neutral and cut her price target 20% to $72 per share, "'[w]e prefer to revisit the story when there is greater visibility, particularly around management succession,'" adding that the leadership changes make the Company more "'vulnerable to product misses in the near future.'" Similarly, Sterne, Agee & Leach analyst Sam Poser also lowered his stock rating to Neutral from Buy and cut his price target to $75 from $90 commenting on the Company's "'hazy future.'"

40.     The true facts, which were known by defendants, but concealed from the investing public during the Class Period, were as follows:

(a)     The quality defects in the Luon yoga pants resulted in part from Lululemon's efforts to cut costs in order to raise profit margins to the detriment of product quality and brand reputation;

(b)     Lululemon was being forced to sell its yoga pants at a discounted price during the Class Period to obtain sales and protect market share; and

(c)     There were serious discussions concerning defendant Day's continued employment at the Company and the Company was considering replacing defendant Day.

- 14 -

41.     Following the June 10, 2013 disclosure that defendant Day was resigning as Lululemon's CEO, the price of Lululemon stock, which had traded as high as $82.50 per share during the Class Period, plummeted *more than 17.5%* to close at $67.85 per share on June 11, 2013, *erasing more than $1.6 billion in market capitalization*.

42.     The market for Lululemon common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions as set forth above, Lululemon common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Lululemon common stock relying upon the integrity of the market price of Lululemon common stock and market information relating to Lululemon, and have been damaged thereby.

43.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Lululemon common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Lululemon's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Lululemon and its business, prospects, and operations, thus causing the Company's

common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing Lululemon common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Lululemon common stock was removed and the price of Lululemon common stock declined dramatically, causing losses to plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

45.     As alleged herein, Lululemon and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Lululemon, their control over, and/or receipt and/or modification of Lululemon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lululemon, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

46.     Lululemon's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

47.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Lululemon who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

48.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Lululemon common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

49.     At all relevant times, the market for Lululemon common stock was efficient for the following reasons, among others:

(a)      As a regulated issuer, Lululemon filed periodic public reports with the SEC;

and

(b)      Lululemon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

50.      During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lululemon common stock and operated as a fraud or deceit on Class Period purchasers of Lululemon common stock by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls.  As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Lululemon common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Lululemon common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

51.      Plaintiff incorporates ¶¶1-50 by reference.

52.      During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Lululemon common stock during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lululemon common stock.  Plaintiff and the Class would not have purchased Lululemon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     The Individual Defendants acted as controlling persons of Lululemon within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Lululemon stock, the Individual Defendants had the power and authority to cause Lululemon to engage in the wrongful conduct complained of herein.  Lululemon controlled the Individual Defendants and all of the Company's employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead
Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil
Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members
against all defendants, jointly and severally, for all damages sustained as a result of defendants'
wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this
action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the
Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 2, 2013                          ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             DAVID A. ROSENFELD


                                             _____
                                             DAVID A. ROSENFELD

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)
                                             srudman@rgrdlaw.com
                                             drosenfeld@rgrdlaw.com

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| LULU | 6/10/2013 | 7500 | $82.11 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| LULU | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___29___ day of ___June___, 2013 in ___Natick___, ___Ma___.

City                 State

(Signature) X _____

(Print Name) ___Houssam Alkhouri___

2