# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ ) | Civil Action No. 13-cv-4596 (KBF) |
| ) | |
| ) | |
| In re Lululemon Securities Litigation ) | CONSOLIDATED CLASS ACTION COMPLAINT |
| ) | |
| ) | |
| ) | |
| _____ ) | **JURY TRIAL DEMANDED** |

RECEIVED
2013 NOV -1 P 8: 41
U S DISTRICT COURT SDNY

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 4

III.   PARTIES ............................................................................................................. 4

IV.   BACKGROUND AND NATURE OF THE FRAUD AT LULULEMON ...................... 6

       A.     Lululemon's Success Is Predicated On The Purported "Premium Quality"
            Of Its Products ........................................................................................ 7

       B.     Lululemon's Purportedly "Superior" Quality Luon Products Spur The
            Company's Astronomical Growth ......................................................... 9

       C.     Even Before The Black Luon Recall, Lululemon Experienced A Series Of
            Serious Quality Control Failures, Putting Defendants On Notice Of
            Critical Problems With The Company's Quality Controls ................................. 12

       D.     Lululemon's Failure To Fix Its Quality Control Processes Results In The
            Most Damaging Product Recall In The Company's History ............................... 17

            1.     Following The Black Luon Recall, Lululemon Falsely Portrayed
                    The Problem As Minor And Isolated And Attempted To Pin The
                    Blame On Its Manufacturer ................................................................... 22

            2.     Lululemon Ultimately Is Forced To Admit That Its Poor Quality
                    Control Led To The Black Luon Recall ................................................... 24

             3.     Lululemon's Inadequate Supervision Over Its Manufacturing And
                    Testing Partners Also Contributed To The Black Luon Recall ............... 26

             4.     The Consequences Of The Black Luon Recall Were Highly
                    Material ............................................................................................... 27

       E.     Defendants Wilson And Day Reap $196 Million From Class Period Sales ........ 31

V.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD
       STATEMENTS .................................................................................................... 34

VI.   PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND
       THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD ............. 39

VII.  SUMMARY OF SCIENTER ALLEGATIONS .............................................. 47

VIII.  CLASS ACTION ALLEGATIONS ................................................................ 51

IX.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE
MARKET.................................................................................................................... 52

X.    LOSS CAUSATION/ECONOMIC LOSS ....................................................................... 53

XI.    CLAIMS FOR RELIEF ................................................................................................ 54

PRAYER FOR RELIEF ............................................................................................................ 56

JURY DEMAND ...................................................................................................................... 56

Lead Plaintiff, the Louisiana Sheriffs' Pension & Relief Fund, brings this securities class action on behalf of investors who purchased or otherwise acquired the stock of Lululemon Athletica Inc. ("Lululemon" or the "Company") on the NASDAQ between September 7, 2012 through June 11, 2013, inclusive (the "Class Period"), and were damaged thereby. The allegations herein are based upon Lead Plaintiff's personal knowledge with respect to themselves and, as to all other matters, upon Lead Counsel's investigation, which has included, *inter alia*, a review of: Lululemon's public filings with the Securities Exchange Commission ("SEC"); securities analyst reports; transcripts of Lululemon conference calls; Lululemon press releases; media reports concerning Lululemon; interviews with former Lululemon employees; and websites concerning Lululemon. Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      During the Class Period, athletic apparel company Lululemon was forced to recall all of its flagship product – its black "Luon" yoga pants – when it was revealed that those pants were so sheer and poorly-constructed that they were actually see-through (the "Black Luon Recall"). The Black Luon Recall, which involved pants that accounted for nearly 20% of the Company's sales of women's pants, had a devastating financial impact on the Company, wiping out $40-45 million in revenue over the first and second quarters of 2013. The Company subsequently admitted that, in contrast to its statements that it was "maniacal about protecting [its high quality Luon] standard," in reality the Company's quality control procedures were grossly deficient. Indeed, the serious flaws in the Luon pants would have been readily apparent had Lululemon employed the most rudimentary quality control practice: namely, having an individual try on the pants prior to their shipment, to ensure the integrity of the product.

2.      The importance of having the highest quality control procedures was well known to senior management.  Lululemon sold its products at prices far in excess of prices charged by competitors precisely because it warranted that its products were of "superior" quality.  Indeed, Lululemon claimed that the "key differentiating factor" that gave the Company a "competitive advantage" over its peers was that its product quality was "the highest in the industry."  Analysts warned if the Company did not maintain superior product quality, Lululemon customers would "switch to cheaper alternatives," noting that "persistent quality issues, even minor ones" could "risk damaging LULU's brand image" and "open[] the door for competition."

3.      The Company's claims regarding its strict quality standards were particularly important to investors because, prior to the Class Period, Lululemon had experienced a number of product issues, including being forced to recall products that had been inadequately constructed or did not perform as claimed.  Thus, at the beginning of the Class Period, the Company assured investors that it had corrected its quality control problems, put into place more comprehensive quality control processes, and that it was working "closely" with an outside testing company and its manufacturers to ensure that the quality of all of its products remained the "highest in the industry."  The Company also touted the quality of the Company's products and suppliers, stating that Lululemon's products "are created using the highest quality suppliers and manufacturers" and that "[i]n the end, quality is our key differentiating factor.  It is what we stand for and what we will always stand behind."   These claims were false.

4.      The truth began to emerge in mid-March 2013, when the Company recalled its core products from stores and shocked the market by announcing that its black-colored Luon pants not only failed to meet basic industry quality requirements, but were so sheer that they were transparent.  The Black Luon Recall – involving hundreds of thousands of pairs of pants –

resulted in the Company drastically cutting its earnings per share estimate for fiscal year 2013 by $0.25-$0.27, or 12%, and caused Lululemon's stock price to materially decline.

5.       As Defendants conceded in a series of announcements on March 21, 2013 and April 3, 2013, Lululemon's quality-control procedures and oversight over its manufacturing process were inadequate and caused the Luon product defects.  Specifically, Lululemon admitted that it did not appropriately use a live model test and that its "testing protocols were incomplete," causing an "unacceptable level of sheerness."  Lululemon also admitted that it lacked adequate tests for evaluating the stretch, weight and tolerances of its bottoms, that its quality assurance personnel were inadequately trained and inexperienced, and that it did not exercise sufficient oversight on the ground in Taiwan over its manufacturing processes.  The market was stunned by these admissions, with analysts and journalists commenting that the Company's quality control practices were at "ground zero" and that its manufacturing processes failed "Sourcing 101."

6.       The fallout from the Black Luon Recall claimed the members of Lululemon's senior management who were most directly responsible for Lululemon's failures in quality control. On April 3, 2013, the Company announced that its Chief Product Officer, Sheree Waterson, would be leaving the Company.  Then, on June 10, 2013, the Company's CEO, Defendant Christine Day, who had been with Company for more than five years, suddenly announced her "resignation."  Defendant Day's abrupt "resignation" announcement caused the Company's stock price to plummet 22% over two days, or $18 per share, causing massive losses to investors.

7.       While investors suffered massive losses, Lululemon insiders reaped enormous profits.  Indeed, during the Class Period, Defendants cashed in their Lululemon stock for proceeds of nearly $200 million.  Defendant Wilson – the Company's founder and Chairman of

3

the Board – sold over 2 million shares of Lululemon stock for over $184 million, including selling 607,000 shares for proceeds of $50 million one business day before Defendant Day publicly announced her departure from the Company.  Defendant Day also sold thousands of shares of Lululemon stock during the Class Period for profits of more than $11 million.

8.      By this action, Lead Plaintiff (on behalf of itself and the Class it seeks to represent) seeks to recover damages for the substantial losses it has suffered as the truth about Defendants' false and misleading statements came to light.

## II.    JURISDICTION AND VENUE

9.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the Company conducts business in this District and the Company's stock traded on the NASDAQ at all relevant times.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

12.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to more than 20,000 active and retired employees of the sheriff's offices in all 64 Louisiana parishes.  As of September 30, 2013, Louisiana Sheriffs' had net

4

assets in excess of $2 billion.   As set forth in the schedule attached hereto as Exhibit A, Louisiana Sheriffs purchased Lululemon common stock at artificially inflated prices during the Class Period and was damaged thereby.

13.     Defendant Lululemon is a Vancouver, British Columbia-based company that sells athletic wear, in particular the Company's iconic yoga wear.   Lululemon's apparel is marketed under the "lululemon athletica" and "ivivva athletica" brand names, and is principally sold through more than 200 stores located in, among other locations, the United States, Canada, Australia and New Zealand.   The Company's common stock is listed on the NASDAQ under the ticker symbol "LULU" and, as of June 5, 2013, the Company had more than 113.5 million shares of its common stock outstanding.

14.     Defendant Dennis "Chip" Wilson founded Lululemon in 1998 and has served as the Chairman of its Board of Directors since 1998.   Defendant Wilson served as the Company's Chief Innovation and Branding Officer from March 2010 to January 2012, as the Company's Chief Product Designer from December 2005 until March 2010, and as the Company's CEO from 1998 until December 2005.   Defendant Wilson signed Lululemon's Form 10-K for fiscal year 2012 filed with the SEC during the Class Period.   During the Class Period, Defendant Wilson sold over 2 million shares of his personally held Lululemon common stock during a short trading window and reaped proceeds of more than $184 million.

15.     Defendant Christine Day served as Lululemon's Chief Executive Officer ("CEO") throughout the Class Period, having joined the Company in 2008 and been promoted to CEO in July of that year.   Defendant Day signed all of Lululemon's Forms 10-Q and 10-K filed with the SEC during the Class Period.   During the Class Period, Defendant Day sold 155,000 shares of

her personally owned Lululemon stock during a short trading period and reaped proceeds of more than $11 million.

16.     Defendants Day and Wilson are referred to herein as the "Individual Defendants." Lululemon and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV.     BACKGROUND AND NATURE OF THE FRAUD AT LULULEMON

17.     Lululemon, founded by Defendant Wilson in 1998, is a designer and retailer of technical athletic apparel.  It is one of the fastest growing retailers in the nation.  The Company – which opened its first store in 2000 and went public in 2007 – derives virtually all of its revenue from designing and selling athletic apparel and accessories, such as yoga pants, shorts, and tops. Lululemon's business model is based on selling its garments at high prices (approximately $100 for one pair of pants and $60 for one shirt), offering minimal discounts, and keeping a very small inventory of products in its stores in order to drive demand.

18.     While Lululemon offers a comprehensive line of clothing, its most important and popular products are its women's fitness pants designed from a proprietary material known as "Luon," an amalgamation of 86% nylon and 14% Lycra.  All of the Company's tighter fitting silhouette "bottoms" (clothing worn on the bottom half of one's body), including the Company's popular Groove Pants, Wonder Crops, Astro Pants, Skinny Will Leggings and Gather & Crow Crops, are manufactured from Luon fabric.  Before the Class Period, black-colored Luon bottoms alone accounted for at least 17% of the Company's sales of women's bottoms, and 6% of the Company's total sales – or $80 million during 2012 alone.  In addition to being the Company's most popular products, black Luon bottoms also have one of the highest profit margins of any of Lululemon's products, and sales of these bottoms often result in additional "add-on" sales of other Lululemon products.

6

19.     While Luon is the primary fabric found in most of the Company's performance-wear products, it is not manufactured by Lululemon.   Rather, Lululemon outsources responsibility for production of all of its products, including Luon-based products, to manufacturers that are employed on a contract basis.  Lululemon's Luon-based garments have, for the past ten years, been produced by Taiwan-based Eclat Textile Co. ("Eclat").

**A.     Lululemon's Success Is Predicated On The Purported "Premium Quality" Of Its Products**

20.     Throughout the Class Period, Lululemon's business model was based upon selling, at extremely high prices, fitness apparel that is commonly sold for much lower prices by its competitors.  For example, Lululemon's most significant and revenue-driving product – its black-colored Luon pants – retail for approximately $100 per pair, while its primary competitors sell very similar pants for 30% less.

21.     The Company justified its exorbitantly higher prices by emphasizing the supposed "premium quality" of its products.  In its Class Period SEC filings, the Company credited its "premium," "high quality" and "innovative, technical" products for its "competitive advantage" and "strong financial performance."  For example, in its Form 10-K for fiscal year 2012 filed on March 21, 2013, Lululemon stated that what "differentiates" the Company from its competitors and drives its "competitive strength" is that it offers "superior" and "high-quality premium apparel that is designed for performance, comfort, functionality and style."  On the Company's investor conference calls both prior to and during the Class Period, Lululemon's senior executives also regularly noted how its "high quality" products gave Lululemon a competitive advantage.  For example, on the Company's January 11, 2012 investor conference call, Defendant Day told investors that the Company's high product quality is a "point[] of differentiation" that "allows the Company to deliver that world-class business model."  Just days

7

later, on a January 20, 2012 investor conference call, the Company reported that the Company's product quality was what set it apart from its competitors, noting that "it is very difficult for competition to compete with [Lululemon] on quality."

22.    Maintaining high product quality was essential to the Company's "ability to maintain the value and reputation" of its brand.  Lululemon told investors that "maintaining, promoting and positioning its brand" depended largely on the Company's ability "to provide a consistent, high quality guest experience," and any "negative publicity regarding the production methods of any of our suppliers or manufacturers could adversely affect [its] reputation and sales."  As Defendant Day announced on the Company's September 7, 2012 investor conference call at the beginning of the Class Period, "[i]n the end, quality is our key differentiating factor.  It is what [Lululemon] stands for and what [Lululemon] will always stand behind."

23.    Given how significant the Company's Luon products were to Lululemon's financial success, maintaining high quality Luon products was particularly critical to the Company.  Indeed, on June 10, 2011, Defendant Day told investors that its "Luon has been the same for over 7 years" and that the Company was "maniacal about protecting that standard." Defendant Day also assured investors that the Company "monitor[s] the quality and feedback on [its Luon] items in particular."

24.    Because "superior," "high quality" products were so critical to Lululemon's "competitive advantage" and "strong financial performance," Lululemon also touted to investors its "close collaboration" with an independent product testing company and its suppliers and manufacturers.  For example, in its 2012 Form 10-K, Lululemon emphasized how closely its design team purportedly worked with "a leading independent inspection, verification, testing and certification company" – which former Lululemon employees confirmed was SGS S.A. ("SGS")

8

– to "conduct[] a battery of tests before each season on our fabrics, testing for a variety of performance characteristics including pilling, shrinkage, abrasion resistance and colorfastness." The Company also emphasized that it had "developed long-standing relationships with a number of [] vendors" and that it "take[s] great care to ensure that [such vendors] share [Lululemon's] commitment to quality and ethics."  Similarly, on the Company's pre-Class Period investor conference calls, Lululemon emphasized that it utilized "just a very small handful of factories" and "a very small base of manufacturers" so that it "can really control the quality of the fabric" and the products, and claimed that it conducted "multiyear capacity-planning exercises" with its factory partners to ensure that the factories met high quality standards.

25.     Analysts believed the Company's representations regarding the superior quality of their products and were particularly focused on the Company's quality controls.  For example, in a February 14, 2013 analyst report, Morgan Stanley noted that "persistent quality issues, even minor ones" could "risk damaging LULU's brand image" and "open[] the door for competition," and that if Lululemon customers "believe there is less of a quality difference between LULU's offerings and the competition's lower-priced ones," they would "switch to cheaper alternatives." The analysts continued, "[t]he Street is worried about competitors impacting LULU, but we are more worried about what LULU may do to itself . . . We believe <u>LULU must take steps to ensure it maintains the highest quality product standards in the industry in order to maintain its leadership position vs. competitors</u>."

### B.     Lululemon's Purportedly "Superior" Quality Luon Products Spur The Company's Astronomical Growth

26.     The Company's representations regarding its supposedly "highest in the industry" quality standards drove customers to purchase Lululemon's high-priced Luon products.  For example, in a nationwide survey of 300 Lululemon customers reported by the analyst firm

Wedbush, customers overwhelmingly cited "quality" as the reason why they buy Lululemon products:



27.    If Lululemon was unable to produce high quality products, however, there would be little justification for these Lululemon customers to pay 30% more for products that were very similar in design and functionality to those sold by Lululemon's primary competitors, like Gap's Athleta, Nike, and numerous others.  Indeed, Confidential Witness ("CW") 1, a former Assistant Manager for Specializing and Operations at Lululemon between September 2010 and February 2013, explained that because Lululemon's apparel was very expensive, customers found quality issues completely unacceptable.

28.    The Company's apparel sales led to enormous growth.  In just a few short years from 2009 to 2012, Lululemon quadrupled its annual revenues to $1.37 billion, quadrupled its gross profits to $763 million, and more than doubled its number of stores to over 200.  During this same time period, the Company nearly doubled its sales per square foot of retail space, increasing from $1,318 in fiscal 2009 to $2,058 in sales per square foot in fiscal 2012.  In 2012, Lululemon ranked third-highest in North America in sales per square feet, behind only Apple and Tiffany & Co.

29.    During the period from 2009 through 2012, Lululemon also met or exceeded analyst expectations for virtually all key financial metrics.  Specifically, Lululemon beat analyst expectations for sales, gross margin, and earnings per share ("EPS") for fiscal years 2009, 2010, 2011, and 2012.

30.    Fueled by its strong financial results, the price of Lululemon stock increased dramatically, from approximately $4 per share at the beginning of 2009 to approximately $70 per share at the end of 2012, an increase of more than 1,650% in only four years.  Lululemon's black-colored Luon products, a significant driver of the Company's sales, contributed substantially to this success.

31.    While Defendant Day claimed that Lululemon's growth did not come "at any cost," in reality, the Company sacrificed quality control in its quest for expansion.  Numerous former employees describe how Defendants were singularly focused on growing the Company at the expense of quality control.  For example, CW 2, a Vice President of Product Operational Solutions at Lululemon's headquarters from September 2011 through December 2012, stated that the Company failed to make quality control a priority because it was "focus[ed] on growth, growing stores … and expanding their reach[.]"  CW 3, a Sourcing Manager at Lululemon between August 2012 and July 2013 who was responsible for the Company's Run and Tripod categories (which included swim, underwear, cycling and seamless products), agreed, stating that while Lululemon's marketing achievements were impressive, "they just didn't put the structures in place for quality procedures." CW 4, who worked as a Sourcing Manager at Lululemon's headquarters from July 2007 through July 2012 and was responsible for managing part of Lululemon's supply chain, for sourcing finished goods and managing factory relationships, similarly explained that the Company's quality team was "strained" because Lululemon "was

growing so fast," resulting in a number of instances in which quality was negatively impacted. CW 5, Lululemon's Lead Raw Material Developer from July 2011 through January 2013, who worked from the Company's headquarters with both designers and the development team to find and test fabrics for use in Lululemon's products, also reported that the Company's aggressive growth plan "definitely" impacted product quality, describing Lululemon as "a house of cards; it just grew too fast."

32.     Indeed, both Defendant Wilson and Defendant Day have admitted that Lululemon "sacrificed" quality control in order to grow the Company.  For example, Defendant Wilson conceded after the Class Period to *Fortune* magazine that, "we probably weren't growing that quality-control part of the company as fast as the company."  Similarly, CW 6, who was a Quality Assurance Manager in IT at Lululemon's headquarters from September 2008 through August 2013, reported that Defendant Day admitted internally to employees in the winter of 2012-2013, in so many words, that "quality was sacrificed" because of the "sheer volume and the vast growth" of the Company.

### C.     Even Before The Black Luon Recall, Lululemon Experienced A Series Of Serious Quality Control Failures, Putting Defendants On Notice Of Critical Problems With The Company's Quality Controls

33.     Prior to the Black Luon Recall, Lululemon suffered from a series of quality failures that put Defendants on notice that there were serious problems with the Company's quality controls.

34.     Beginning in 2007, Lululemon produced and sold products that failed to contain, as Lululemon claimed at the time, beneficial "marine amino acids" from seaweed that "release[d] marine amino acids, minerals and vitamins into the skin upon contact with moisture," and could reduce stress and provide anti-inflammatory, antibacterial, hydrating and detoxifying benefits to wearers.  In a November 2007 exposé entitled "'Seaweed' Clothing Has None, Tests Show," *The*

*New York Times* (the "*NY Times*") reported that it had commissioned an independent lab to test Lululemon's VitaSea products and that the lab found no significant difference in mineral levels between the VitaSea shirts – which sold for $59 each – and ordinary $20 cotton T-shirts.

35.     As a result, Defendant Wilson – who was serving as the Company's Chief Product Designer and Board Chairman at the time – was forced to admit that the Company had <u>not</u> tested the VitaSea material to see whether it lived up to Lululemon's claims.  Instead, according to Defendant Wilson, Lululemon simply trusted the claims of its suppliers.  Defendant Wilson explained that the "only test" Lululemon conducted was to feel that the VitaSea material is "different from cotton."

36.     The fallout over the *NY Times*' findings was severe.  Citing Canada's Textile Labeling Act, Canada's Competition Bureau forced Lululemon to remove all claims that alleged therapeutic benefits from its VitaSea line of clothing, stating that Lululemon's claims of alleged benefits were "questionable."   Analysts were stunned by the *NY Times*' findings and the Company's admissions.  William Blair & Co. stated that "It's frankly up to the companies to do sporadic quality tests to make sure everything is manufactured to the parameters they set.  At the end of the day, it's Lululemon's name on the line."   Laura Wallace, managing director at Coleford Asset Management in Toronto, said that "[b]eing in the public spotlight means you can't make these new-age kind of claims without having documented proof.  It's kind of like Mr. Smith goes to Washington, only in this case it's Chip [Wilson] goes to Wall Street."

37.     In December 2010, Lululemon suffered from a second high-profile quality failure. This time, the Company, which claims to be green-minded and organic, shipped and distributed shopping bags that were printed using ink that contained high levels of lead.  According to the Company, the problematic bags were used for more than a year and were made by a supplier

located in China.  Notably, Lululemon employees were told the bags contained an unknown amount of lead and were instructed to return the bags days <u>before</u> notices went out to the public informing customers of the product defect.  Indeed, according to the *Edmonton Journal*, Lululemon notified the public only <u>after</u> the newspaper contacted the Company about the lead issue.  In a press release issued on December 21, 2010, Defendant Day assured Lululemon's customers and investors that such product quality issues would not occur in the future, and that Lululemon  "choose[s its] partners carefully and the manufacturer of the [bags] is known for its green practices, and is cooperating fully with our review."

38.    In 2011 and 2012, Lululemon experienced still more quality control issues. Specifically, in late 2011 and early 2012, numerous Lululemon customers complained that Lululemon's garments were defective because their colors bled during exercise.  This leaching dye stained customers' skin and hair, required multiple washes to remove, and caused serious health concerns.  These problems affected several of Lululemon's fabrics, including Luon, and were so pervasive that the Company placed warnings on the defective items and/or pulled them from store shelves, and stated that it would accept returns, carte-blanche, for any affected item. Former Lululemon employees confirmed the severity of this quality control failure.  According to CW 7, a Women's Designer at Lululemon headquarters from June 2011 through May 2012, the color-bleeding issue was a significant problem for the Company, affecting a large amount of product.  CW 1 similarly stated that "color fastness was a huge issue for a long time," and impacted "all [Lululemon's] colored pants."  CW 1 explained that the color fastness issue was particularly problematic because it often impacted customers' other property, leading to "a lot of irate customers."

39.   The Company's quality control procedures again failed to catch the color-bleeding problems prior to shipment.  At no point were any of the affected products laundered, treated with water, or subjected to sweat – all typical and expected uses of the products – to see how they performed prior to shipment to stores.  Indeed, according to CW 8, who served as Lululemon's Technical Operator of its ecommerce website from 2011 through March 2013 and worked for Lululemon for more than 7 years, the Company did not even know what caused the color-bleeding issue to occur until weeks after the products had been on store shelves and sold to "guests."  Rather, the only reason that Lululemon learned that a significant portion of its apparel had significant color-bleeding problems was that customers who purchased the defective apparel called Lululemon's guest education center ("GEC") to complain about dye leaching onto their skin.  CW 8 was responsible for working closely with the business side of Lululemon to pull product from the website in response to quality control problems reported by customers.  In one disturbing incident, CW 8 recounted that a woman who recently had a child called in to the Company's GEC to report that the color dye in her Lululemon clothing had bled onto her and her baby.

40.   According to former Lululemon employees, Defendant Day and other senior Company officers, including Chief Product Officer Sheree Waterson, who reported directly to Defendant Day, were aware of the color-bleeding product quality issues – like they were of all quality control issues – shortly after they came to light.  For example, CW 2 recounted that Defendant Day was well aware of the color-bleeding product quality issues as they occurred, and CW 1 recounted that at the Company's annual manager conference in October 2012, Defendant Day "made a commitment" to resolve the Company's color fastness issues.

41.     In yet another product quality failure, in the Spring of 2012, Lululemon shipped swimwear with both color bleeding and sheerness problems.  Specifically, certain swimwear bled when in contact with sweat or water, while other swimwear became completely sheer when it became wet – in other words, when the product was used for its intended function.

42.     Lead Counsel's investigation uncovered yet another product failure that occurred shortly before the Class Period, one which Lululemon did not publicly disclose to its "guests" or investors.  In June 2012, shortly after the color-bleeding issues came to light, the Company changed the type of elastic it used in the waistband of its men's athletic shorts.  According to CW 9, a Merchant in Lululemon's Men's Division from January 2012 through September 2012, the new elastic did not retain its elasticity, which would result in the shorts falling down once the customer put anything into the pockets of the shorts.  CW 9 explained that Lululemon's quality controls did not catch this problem before the shorts were shipped to stores.  Rather, Lululemon learned about the problem through feedback from store managers and customers.  Because the Company did not know which product batches were defective, CW 9 explained that corporate headquarters asked its store managers to test the shorts to determine whether they were affected. If the product contained the problematic elastic, the store managers pulled them from the store. As was the case with the black Luon pants, had the Company used a live model to try on the shorts prior to shipment, the defect would have been readily discovered.

43.     Notably, Lululemon's senior executives were informed about and involved in each of these quality control breakdowns.  CW 2 stated that beginning in late 2011 when the "severity of the [product quality] issues" started to become clear, Defendant Day "would be notified" about "pretty much everything that happened" with respect to product quality issues in regular reports.  CW 10 also reported that when a product quality issue was "bad," it would be

elevated to Defendant Day.  Both of these former Lululemon employees confirm that these practices continued throughout their tenures at the Company and during the Class Period. Defendant Wilson also knew about, or recklessly disregarded, the Company's quality control failings.  According to press reports and as confirmed by CW 2, even after he resigned from Lululemon's management (but while he was serving as Chairman of the Board during the Class Period), Defendant Wilson continued to "dip[] in and out of daily affairs at Lululemon" and "his fingerprints are all over the company's policies and principles."

### D. Lululemon's Failure To Fix Its Quality Control Processes Results In The Most Damaging Product Recall In The Company's History

44.    As a result of these issues, Lululemon went to great efforts to assure its customers that the quality problems were fixed.  For example, after the color-bleeding issues became public and Lululemon's customers demanded answers, Lululemon apologized for these product problems in a July 2012 letter from Chief Product Officer Sheree Waterson that was posted on Lululemon's Facebook page.  In the letter, Lululemon assured its customers that "quality is [its] hallmark," that the Company had put "stringent testing procedures in place" to rectify the problem, and that all of the Company's products now "met [Lululemon's] performance requirements."  Lululemon also claimed that it had "brought in the leading fabric and dye expert, along with additional on-site quality inspection at every stage to identify potential causes" of its color-bleeding issues.

45.    Then, on September 7, 2012, the first day of the Class Period, in response to questions about the widespread color bleeding of Lululemon's products, Defendant Day told investors that while the Company may have "pushed" the color limit too far, its products were "created using the highest quality suppliers and manufacturers," and that the Company now "stood behind" its supposed high quality products.  Defendant Day further represented that the

17

color-bleeding defect was a small, isolated issue, and assured investors that the Company was closely monitoring its supply chain, that its mills were making investments in new equipment and employees, and that the Company was focused on its suppliers' "capability and [the Company's] capability delivering quality every step of the way."  As a result, going forward the Company was "very comfortable now with the product and being able to do our strategic intent, which is push colors and maintain quality," and that the "silver lining" was that the quality issues "created actually more opportunity" for the Company.

46.     Defendants understood that the market was relying on their representations regarding the quality of their products.  Analysts and investors credited the Company's representations, recognizing how critical high quality products were to the Company's growth and financial success.  For example, in a September 7, 2012 analyst report, Janney Capital Markets noted that "customers of lululemon depend on the company's efforts to make high-quality, technical and innovative products."  Similarly, an October 3, 2012 Wedbush analyst report noted that Lululemon's "intense focus on innovation and product quality is critical to LULU's leading market share position in the core yoga market."  And a December 3, 2012 Conaccord/Genuity analyst report noted that, "any issues with quality are unacceptable as consumers have come to expect high performance along with the high price points."

47.     Notwithstanding Defendants' assurances, in February and March 2013, senior management became aware of yet another serious quality issue, this time involving Lululemon's core product – its Luon fabric.  Specifically, customers began to report that certain bright colored Luon pant fabrics were sheer when worn.  Recognizing that recalling the pants would alert customers to these serious quality control issues, Lululemon instead put the products on sale and offered them with the following disclaimer: "You may experience sheerness with some of our

18

bright-coloured bottoms because of the lightweight nature of the fabric. We recommend you do a couple of Down dogs [a yoga position] in your bright-coloured bottoms to ensure you're happy with the fit and coverage."

48.     However, the problems with Lululemon's signature fabric were so severe they could not be rectified by a disclaimer, and, ultimately, Lululemon's failure to implement fundamental quality controls led to the most serious quality issue in Lululemon's history.  After the close of trading on March 18, 2013, Lululemon announced in a press release that its highly popular black Luon pants and crops, which accounted for nearly 20% of all sales of women's bottoms, not only failed to meet basic quality requirements, but were so sheer that they were see-through, offering little more coverage than pantyhose.  As a result of these defects, the pants were unsaleable, and the Company had no choice but to recall and offer refunds for all of the affected products – hundreds of thousands of pairs of pants – and to significantly reduce its expected revenue guidance for the first quarter of 2013 by approximately $20 million, or 5%, from $350-$355 million to $333-$343 million.  As the Company announced three days later, Lululemon expected to lose $57 - $67 million in revenue and $0.25 - $0.27 in earnings per share during the 2013 fiscal year due to the Black Luon Recall, a negative 12% impact on its 2013 EPS guidance.

49.     As the Company ultimately admitted, the Black Luon Recall occurred because, in contrast to Defendants' statements, the Company did not employ the most basic and rudimentary of all quality control measures used by other retailers.  Specifically, notwithstanding the Company's representations about its quality control procedures, Lululemon did not even require samples of its clothing to be tried on before shipping the products.  According to an industry expert in production and manufacturing, who has acted as a manufacturing executive at several

global apparel companies and who teaches university courses in apparel production and management, including courses at the Fashion Institute of Technology in New York, it is standard industry practice for a retailer to require its apparel manufacturer to provide it with no less than <u>three</u> product samples of every product shipment for testing – a "pre-production" sample, a "top of production" sample, and before the products are shipped, a "shipment sample" for approval.  According to this expert, it is further standard industry practice to subject these samples to a battery of tests, including, at an absolute minimum, a "live model" examination.  In other words, for each product sample, it is standard industry practice for a retailer to make sure that a person tries on the product <u>before</u> it is offered for sale to the public, so that the garment can be inspected for any flaws, including sheerness when the fabric is stretched through normal movement.  According to this expert, failure to inspect each sample, including through live model tests, is a fundamental flaw in the retailer's quality assurance processes.

50.    As the Black Luon Recall made apparent, Lululemon did not perform this most basic quality control test.  CW 10, a Quality Manager in Lululemon's Hong Kong office from September 2009 through July 2013, confirms that the Company failed to comply with this standard and fundamental industry practice.  According to CW 10, Lululemon did <u>not</u> regularly employ industry standard testing whereby a live model tries on sample products from every shipment to ensure that all visible flaws are detected before the products are shipped and sold.  Similarly, CW 3 explained that the Company did not conduct live model testing with every shipment of product and did not test a certain sample size from each batch, calling the Company's live model testing "random at best."  While the Company did sometimes conduct live model testing on a new style, it would not conduct live model testing on "regular luon that we'd been running for a while."

20

51.     Notably, while in the March 18, 2013 press release the Company claimed not to have been aware of any product defects in its black Luon bottoms until March 11, 2013, a number of former Lululemon employees stated that the Company and the Individual Defendants had been well aware of sheerness issues in black Luon pants long before that date.  According to CW 5 the sheerness problem had "definitely" been "percolating" for a while, and the Luon pants were "see through before it came out [publically]."  CW 1 reported that as early as October 2012 – five months before the Black Luon Recall – Defendant Day "acknowledged" internally at the Company's annual manager conference that the Company had a "sheer luon" issue.  At that conference, which CW 1 attended, Defendant Day attributed the problem to excess demand and "not being able to keep up."  CW 11, most recently a store manager in Palo Alto, California and who worked at Lululemon from October 2009 through August 2013, similarly explained that in the winter of 2012-2013 – months before the Black Luon Recall – corporate management informed store managers about widespread sheerness issues.  CW 11 also explained that she and numerous other employees could tell just by feeling the product that the pants were not the same quality as they had previously been, and that customers had been complaining for a number of months about the sheerness of Lululemon's pants.  CW 5 attributed this sheerness problem to the fact that "a lot of [Lululemon's] quality control and standards had got[ten] too wide."

52.     Analysts and journalists were shocked by the Black Luon Recall, with *Streetsweeper* indicating that Lululemon had failed "Sourcing 101" and analyst Cowen & Co. noting that, with regard to quality control, the Company was "at ground zero."  Significantly, these analysts also made clear that there were "serious lapses" in Lululemon's quality controls and quality assurance programs.  For example, Jennifer Black & Associates stated in a March 19, 2013 report that "[w]e find it hard to understand how a problem of this magnitude was not

21

detected during wear testing and inspection.  We also wonder if the quality control team is separate from the supply chain team."  Similarly, a March 19, 2013 BMO Capital Markets analyst report entitled "Lowering Estimates: Quality Continues to Suffer," stated that Lululemon's "quality issues may not have a quick fix," and, as a result, it recommended proceeding "with caution" until "quality issues are contained and remedied."  In a March 19, 2013 analyst report, Stern Agnee noted that Lululemon clearly did "not have the appropriate presence in and around the factories.  It appears that there is not appropriate oversight in place."  The same day, Cowen & Co. noted in an analyst report that Lululemon's black Luon issue "points to a significant execution issue in the company's supply chain management," and stressed that Lululemon's "customers should not be LULU's QA, or Quality Assurance, program":

> [I]t appears that it was customers who reported the [black Luon product] problem to store managers, who in turn reported it back to management.  If this is indeed the case, we suspect a <u>serious lapse in LULU's supply chain, quality control and vendor management, and specifically in its quality assurance program</u>. . . .  We think that a high-end brand like LULU, which prides itself on the quality and durability of its products, should have had in place a strong quality assurance program that should have detected the problem much earlier - even before the material was made into product.  As in any complex supply chain, quality MUST be checked at each step of the manufacturing process, starting with raw materials, through intermediate products (such as luon), up to and including the final product.

### 1.    Following The Black Luon Recall, Lululemon Falsely Portrayed The Problem As Minor And Isolated And Attempted To Pin The Blame On Its Manufacturer

53.    Although Lululemon was forced to recall its black Luon products, the Company still did not acknowledge that there were a number of issues with its quality controls.  Indeed, in announcing the recall on March 18, 2013, the Company characterized it as a mere "inconvenience."  The Company further reassured investors that it was "committed to providing the highest quality products to our guests" and that Lululemon would "accept nothing less than

the very highest quality we are known for."  Lululemon also attempted to shift the blame to its supplier, Eclat.   According to Company's press release, Lululemon had "used the same manufacturing partner on key fabrics since 2004. . . . [and the defect] is not the result of changing manufacturers or quality of ingredients.  [Lululemon is] working closely with them to understand what happened during the period this fabric was made."

54.     Eclat immediately refuted Lululemon's claim that it was to blame for the black Luon problems.  In an article entitled "Yoga-Pants Supplier Says Lululemon Stretches the Truth" published by *The Wall Street Journal* on March 19, 2013, Eclat's CFO placed the responsibility for the defect squarely on Lululemon, indicating that the Company lowered quality standards for its pants.  Specifically, Eclat's CFO stated that the Luon pants Eclat produced and shipped to Lululemon were in full compliance with the Company's production guidelines.  According to Eclat's CFO, "all shipments to Lululemon went through a certification process which Lululemon had approved.  All the pants were manufactured according to the requirements set out in the contract with Lululemon."  Similarly, on March 20, 2013, *The Globe* reported Eclat's position in an article entitled "Supplier insists it stuck to Lululemon design, Eclat Textile says it 'did follow their instructions' as fallout over recalled pants leads to analysts downgrading company."  This article quotes Eclat's CFO as stating that Eclat had "checked our orders this morning and indeed, we did follow their instructions to make the product.  Lululemon introduced the product to the market and their customers are not comfortable with its opacity."  In the article, Eclat's CFO also noted that Lululemon had not even contacted Eclat yet – at that point at least <u>nine days</u> after Lululemon admitted to learning about the black Luon product issues and notwithstanding Lululemon's claim to be "working closely" with Eclat – to discuss the black Luon issues.

### 2. Lululemon Ultimately Is Forced To Admit That Its Poor Quality Control Led To The Black Luon Recall

55. After the publication of *The Wall Street Journal* article, on March 21, 2013 and April 3, 2013, Lululemon was forced to concede that defects in its own quality-control procedures and poor oversight over the manufacturing process had caused the black Luon product defects. Specifically, Lululemon admitted that its "testing protocols were incomplete for some of the variables in fabric characteristics," which caused the "unacceptable level of sheerness." Lululemon also admitted to a number of specific failures in its quality control and assurance procedures.

56. <u>First</u>, according to Defendant Day, Lululemon did not have a satisfactory mechanism in place for factory inspectors to determine whether the Luon pants were transparent. The Company did not bother to have a tester "put the pants on and bend over," prior to shipment, which, as discussed above, was standard in the retail industry. Analysts reacted with astonishment to revelations that Lululemon did not even have a live model try on its clothes before shipment, asking Defendant Day "How did it get to shipping without somebody trying on a pair of pants [and] stopping it before it got so out of control?"

57. <u>Second</u>, Defendant Day admitted that the Company had significant "gaps" in how it evaluated its products during the quality control process. Specifically, the Company lacked "rigorous testing and quality processes" to test for "modulus (stretch), weight, and tolerances," and adequate mechanisms in place to measure the "fluff" of its pants or to determine whether the Lycra chips used to create the Luon was stale. In other words, the Company's quality control procedures were unable to adequately measure fabric density or determine whether the Lycra used in its Luon fabric was faulty, both of which could cause a serious product issue.

24

58.     Numerous Lululemon employees reported that the "gaps" in the Company's quality controls were even more significant than the Company admitted.  According to CW 5, nothing "on the quality side was very rigorous.  Just every now and then we'd have a review."  Instead, CW 5 reported that the Company only had "very generic" quality standards in place and had an ineffective, ad hoc system to catch quality issues.  As a result, sometimes a product quality problem would be discovered during the manufacturing process and sometimes it would not be discovered until a product was out on the shelves.  It was, according to CW 2, essentially a "catch as catch can" system.  Indeed, according to CW 5, there was no real focus on quality at the Company until the product quality issues reached a high magnitude, causing the Company to "freak[] out" and "scramble to solve the problem."

59.     Third, the Company admitted that it had not stationed adequate numbers of Lululemon employees at the Eclat plant to ensure that the products being produced were of sufficiently high quality.  Lead Plaintiff's manufacturing and production expert has confirmed that it is typical industry practice for retailers to station at least one or two employees on location with the manufacturer producing the retailer's garments in order to monitor production and quickly detect quality control breakdowns.  Defendant Day admitted, however, that it was not until after the Luon issue they had finally "put a person on the ground in Taiwan" (where Eclat is located), who would "build[] a team there that will actually be at the factories where we produce" to "monitor and test products," and "educate internal teams and manufacturing partners on new testing standards and methodologies."

60.     Not only did Lululemon not have adequate personnel on the ground at Eclat, but the Company woefully understaffed its quality team, and, according to CW 4, lacked personnel with expertise in quality control.  CW 3 agreed, stating that Lululemon's quality team was so

inexperienced that they did not even know the correct questions to ask vendors and "didn't really understand the performance of the fabric" – both of which were necessary to ensure high product quality.  Further, CW 5 explained that just a six person team located in Hong Kong was responsible for "manag[ing] all production for the entire company."  Thus, Lululemon relied on just six people to review testing for the <u>over thirty million Lululemon products produced each year</u>.  That meant that each member of Lululemon's Hong Kong-based quality control team was responsible for overseeing five million units per year, or nearly 14,000 units per day.  Unsurprisingly, then, according to CW 5, "the Hong Kong team did not have the manpower" to oversee the Company's quality control testing.  Further, according to CW 5, the person in charge of the Hong Kong team left the Company in early 2012 and was not replaced until September 2012.  Thus, not only was the Hong Kong team understaffed, but for the critical months leading up to Class Period – when Lululemon had supposedly fixed all of its quality control problems – this key team was without a leader and had only five employees.

> **3.     Lululemon's Inadequate Supervision Over Its Manufacturing And Testing Partners Also Contributed To The Black Luon Recall**

61.     In addition to Lululemon's admitted quality control failures, the Company did not disclose that its Luon manufacturer, Eclat, was also not performing basic quality tests.  In fact, despite claiming that the Company "really control[led] the quality of [its] fabric" by working closely with its Luon products manufacturer, Eclat, the Company knew that Eclat was not conducting testing on its black Luon bottoms that would have shown that the bottoms were sheer.  Sourcing Manager CW 3 reported that the Company's monitoring of Eclat was "very, very lax."  Indeed, according to CW 5, in September or October 2012, the Company learned that Eclat was sending it test reports on its Luon products that "<u>weren't actually accurate</u>," causing the Company to lose trust in Eclat.  Nonetheless, products manufactured by Eclat, including the

defective black Luon pants, continued to "get put through [by Lululemon] anyway," and were ultimately sold to Lululemon customers.

62.     Lululemon also knew that its "independent" testing provider, SGS, was not testing the Company's products for sheerness.   Specifically, rather than "close[ly] collaborat[ing]" with SGS to "conduct[] a battery of tests before each season on [its] fabrics" as the Company claimed in its SEC filings, CW 5 explained that Lululemon knew in 2012 that SGS often failed to inspect or test the Company's black Luon bottoms and other products before they were shipped to stores.  Because the black Luon sheerness problem was so glaring, had such products been inspected or tested in any way, the black Luon pants never would have even left Lululemon's manufacturing plants.   According to CW 5, the problem grew so bad that the Company internally decided to fire SGS.   Nonetheless, Lululemon kept using SGS and touting that their partnership ensured the Company's "superior" products, even though SGS "didn't really fix the issues."

### 4.     The Consequences Of The Black Luon Recall Were Highly Material

63.     The Black Luon Recall had a devastating impact on Lululemon.  As a result of the recall, Lululemon lost more than $40-45 million in revenue, including a $17.5 million write-off of defective Luon fabric.  This lost revenue constituted nearly 7% of the Company's reported revenue for the first and second quarters of 2013.  In addition to the direct cost of the impacted inventory, much of which had to be recycled or destroyed, Lululemon also had to incur additional costs including, but not limited to: costs of returns, customer service costs, and airfreighting of raw materials, fabrics and finished product in effort to replenish inventories once the problem was resolved.  As a result of the recall, the Company also announced it would need to spend an additional $5 million each year in order to bring its quality control practices up to

27

industry standards.  The Company also indicated that it would have to slow down production, increase product inspections, and heighten the Company's standards in order to "correct for quality."  Finally, the Company lost out on significant "add-on" sales as a result of not having its core yoga pants in stock.

64.     In the wake of the Black Luon Recall, Defendants assured the market that they were taking decisive action to ensure that it would have no such problems in the future.  Among other things, the members of Lululemon's senior management who were directly responsible for the Black Luon Recall were jettisoned.  On April 3, 2013, the Company announced that its Chief Product Officer, Sheree Waterson – who was responsible for product development and product operations during Lululemon's quality control failures – would be departing the Company, tacitly admitting that she had failed to properly oversee the Company's product quality processes.  As an April 3, 2013 Canaccord analyst report stated, "[g]iven the two product issues in the last nine months (color bleeding and sheer luon) we are not surprised by the company directed move" to fire Waterson, and an April 4, 2013 RBC Capital Markets analyst report stated that, "[s]ince Ms. Waterson led the product organization, the current Luon issue, as well as other recent quality issues, are ultimately her responsibility; likely contributing to her departure."

65.     Similarly, Lululemon instituted new, more comprehensive quality control tests:

> [W]e added tighter new standards and specifications to our testing and development.  In fact, your stretchy pants go through about 15 tests to make sure you get great ass coverage (that's the scientific term).  And speaking of science, we even got some university scientists to help us develop[] a 'sheer-o-metre' which measures the amount of light coming through the fabric while being stretched at varying degrees.  We've also re-engineered our luon bottom patterns in each and every style to minimize the stretching of the fabric.  Basically, that means there's now more fabric across the bum so it's not stretched from the get-go.

66.     Lululemon's assurances that the Company had instituted stricter quality standards had a calming effect on the market, as analysts and investors believed that the Company's new

testing procedures would prevent any further quality control issues.  For example, the April 3, 2013 report by Canaccord Genuity stated, "LULU also announced the creation of more stringent control measures that oversee the testing of product throughout the production pipeline as well as greater factory oversight – all managed by a stronger internal leadership.  Again, we believe LULU is doing the right things to prevent further quality concerns from happening."

67.     However, the Company's quality control problems were far from over.  On April 12, 2013, Lululemon quietly posted on its Facebook page that it was forced to recall from its stores all pants known as Candy Stripe Wunder Under Crops, which are also made from Luon. Like the Company's black-colored Luon pants, these crops were completely see-through. Remarkably, this was the <u>third</u> separate incident during a period of less than three months in which Lululemon was forced to admit that its core Luon-based products were sheer and thus defective.  Following this recall, an April 18, 2013 *Streetsweeper* article quoted Peter Cohan, an author and Forbes contributor, as stating that if the company loses a significant number of customers as a result of its quality issues, "the board should definitely consider replacing (Day)."

68.     By this point, Lululemon's quality control problems were causing its customers to question the quality of Lululemon's products.  In a May 3, 2013 report, Wedbush downgraded Lululemon following a national survey performed of 300 Lululemon customers, citing, among other things, "consumer perception of quality erosion, which has not been properly addressed by management."  Wedbush went on:

> **Consumer perception of quality deterioration and inaction from management to address the issues.** With quality cited as the #1 reason for shopping at LULU, we believe -30% of participants citing quality deterioration in the past several months presents a significant headwind.  Most alarming, -50% of dissatisfied customers believe management has not appropriately addressed quality concerns.

*     *     *

> Most alarming, we note that despite public apologies via press releases and social media outlets as well as product recalls, nearly half of dissatisfied respondents believe that the company has not appropriately addressed quality concerns.

69.     Similarly, in a June 10, 2013 report, BMO Capital Markets stated that, based on its "consumer research," "[w]e continue to believe the company faces quality-control issues outside of the black luon pants."

70.     As a result of these ongoing quality issues, on June 10, 2013, Defendant Day abruptly and without explanation announced that she would be leaving the Company.  Defendant Day did not leave the Company for a new job, and neither she nor the Company provided any explanation for her unexpected departure.  When questioned by *Fortune* regarding the reasons for her "mysterious departure," Defendant Day responded "[m]y values include discretion," and refused to comment further.

71.     Numerous media reports tied Day's departure to the Company's recent product scandal.  Analysts, including from RBC Capital Markets, "assume[d Defendant Day's] pending departure [wa]s in some way related to the sheer pant issue," notwithstanding Day's silence on the subject, stating that Day's departure was "just too close to [the Black Luon Recall] issue to remove it from the reason why she's leaving."  Industry observers agreed, including Brand I.D., a major apparel supplier, which stated in a June 11, 2013 post on its website titled "Lululemon CEO Christine Day Resigns Over Quality Control Issues":

> This story highlights the importance of supply chain management for global apparel brands. For quite some time, consumers have taken to blogs and widely acknowledged the tendency of Lululemon yoga pants to be at least somewhat see-through when the wearer bends down. The company's unwillingness to address this major supply chain issue on their own terms is what led to the massive recall and eventual resignation announcement of CEO Christine Day.

> Whether the blame is on Lululemon or their suppliers, the undeniable fact remains that stronger preventative quality control measures would have made this mishap largely avoidable.

30

72.     Because the Company had warned in its 2012 Form 10-K that its "future success [was] substantially dependent on the continued service of our senior management," including Defendant Day, numerous analysts and major news outlets stated that Day's departure portended an uncertain future for the Company and downgraded the Company on June 11, 2013.  For example, UBS downgraded Lululemon on June 11, 2013 on the news of Defendant Day's departure to Neutral and stated, "'[w]e prefer to revisit the story when there is greater visibility, particularly around management succession," adding that the leadership changes make the Company more "'vulnerable to product misses in the near future.'"  In total, these disclosures caused the price of Lululemon stock to plummet 22%, or $17.98 per share, from $82.28 per share on June 10, 2013 to $64.30 per share on June 12, 2013, wiping out $2 billion in market capitalization.

**E.     Defendants Wilson And Day Reap $196 Million From Class Period Sales**

73.     During the Class Period, Defendant Wilson cashed in on the Company's artificially inflated stock price by selling more than 2 million shares of Lululemon securities for approximately $184 million.

74.     Specifically, in order to capitalize on the increase in Lululemon's stock price during the Class Period, Wilson entered into a Rule 10b5-1 plan in December 2012 (the "2012 Trading Plan").  This was months after the beginning of the Class Period, and long after it was evident to Lululemon's senior executives that the Company had significant product quality issues.  Defendant Wilson then moved extremely quickly to unload a substantial portion of the shares he had allotted in the 2012 Trading Plan, and to profit from the market's ignorance of the true state of the Company's quality assurance program.

75.     Defendant Wilson's insider sales were suspiciously timed.  A significant portion of Defendant Wilson's Class Period sales – 1,000,000 shares for a profit of $81 million – took

place mere days before Lululemon announced on June 10, 2013 that Defendant Day was stepping down as CEO and the Company's stock price plunged.  Indeed, on Friday, June 7, 2013, the date that (according to Day's public statements) Defendant Day formally told the Board of Directors that she planned to resign, Defendant Wilson sold over 607,000 shares for approximately $50 million – realizing over $8 million in profits that he would not have received if he had sold those shares after this news was disclosed to all investors.  This single day sale exceeded any other one-day sale that Defendant Wilson ever made before the Class Period since the Company's IPO by 145%.  Moreover, Defendant Wilson executed his four largest stock sales in the Company's history as a publicly traded company in May and June 2013.  Notably, there is no indication that Defendant Wilson's 2012 Trading Plan limited Defendant Wilson's discretion regarding the size of his trades.

76.    In addition, Defendant Wilson's January 2013 sales – 300,000 shares for a profit of more than $21 million – occurred shortly after the Company informed its store managers that it was first having sheerness issues with its Luon pants.

77.    Defendant Wilson's insider sales were also suspicious in amount.  During the Class Period, Defendant Wilson sold 2.3 million shares in just 17 transactions in two clusters during January 2013 and May-early June 2013, with multiple trades of more than 250,000 shares at one time and averaging more than 135,000 shares per trade.  By way of comparison, under Defendant Wilson's prior 10b5-1 plan entered into more than two years earlier in June 2010, Defendant Wilson sold 3 million shares of Lululemon stock over the course of two years in 105 separate transactions spread out over the period of nearly two years, never selling more than 250,000 shares at one time and averaging just 37,000 shares per transaction.  A chart of Wilson's Class Period sales of Lululemon stock, including for each sale the number of shares sold, the

price per share, the number of shares held by Wilson after each transaction, the percentage of total holdings sold, and the total proceeds, follows:

| TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE | RESULTING SHARES | PERCENT SOLD | TOTAL SALES |
|---|---|---|---|---|---|
| 1/10/2013 | 87,200 | $70.35 | 31,761,756.00 | 0.27% | 6,134,877.52 |
| 1/10/2013 | 12,800 | $70.92 | 31,748,956.00 | 0.04% | 907,786.24 |
| 1/11/2013 | 55,600 | $70.40 | 31,693,356.00 | 0.18% | 3,913,967.56 |
| 1/11/2013 | 44,400 | $70.83 | 31,648,956.00 | 0.14% | 3,144,634.44 |
| 1/14/2013 | 68,800 | $72.00 | 31,580,156.00 | 0.22% | 4,953,544.96 |
| 1/14/2013 | 31,200 | $71.19 | 31,548,956.00 | 0.10% | 2,221,081.20 |
| 5/10/2013 | 18,675 | $81.25 | 31,530,281.00 | 0.06% | 1,517,394.17 |
| 5/13/2013 | 2,977 | $81.25 | 31,527,304.00 | 0.01% | 241,895.54 |
| 5/14/2013 | 397,351 | $81.38 | 31,129,953.00 | 1.26% | 32,336,583.32 |
| 5/15/2013 | 159,188 | $81.40 | 30,970,765.00 | 0.51% | 12,958,587.71 |
| 5/16/2013 | 6,532 | $81.30 | 30,964,233.00 | 0.02% | 531,054.21 |
| 5/17/2013 | 37,862 | $81.26 | 30,926,371.00 | 0.12% | 3,076,635.83 |
| 5/20/2013 | 2,201 | $81.25 | 30,924,170.00 | 0.01% | 178,831.25 |
| 5/21/2013 | 375,214 | $81.68 | 30,548,956.00 | 1.21% | 30,645,640.97 |
| 6/4/2013 | 369,128 | $81.84 | 30,179,828.00 | 1.21% | 30,210,948.94 |
| 6/4/2013 | 23,327 | $82.31 | 30,156,501.00 | 0.08% | 1,919,933.40 |
| 6/7/2013 | 607,545 | $81.50 | 29,548,956.00 | 2.01% | 49,515,160.52 |
| | **2,300,000** | | | **7%** | **$184,408,557.78** |

78.    Defendant Day also realized substantial profits from sales of Lululemon stock during the Class Period, selling over 155,000 shares for $11.5 million.  Notably, unlike Defendant Wilson, Defendant Day did not even bother to trade pursuant to a Rule 10b5-1 plan. Defendant Day's insider sales were similarly suspiciously timed.  For example, Defendant Day sold nearly 83,000 shares for $6.2 million dollars in the days following her false and misleading statements to investors on September 7, 2012, in which Defendant Day falsely claimed that the Company had corrected its quality assurance problems.  Defendant Day then went on to sell an additional 71,000 shares for $5.2 million in December 2012, just weeks before the Company would admit that its quality control programs were still deficient and that it would be required to

33

recall a significant portion of the Company's products.  Indeed, as set forth above, Defendant

Day had already internally acknowledged as early as October 2012 – well before these sales –

that the Company had a "sheer Luon" issue.

79.    A chart of Day's sales of Lululemon stock due to the disposition of her Company-

granted options, including for each sale the number of shares sold, the price per share, the

number of shares held by Day after each transaction, the percentage of total holdings sold, and

the total proceeds, follows:

| TRANSACTION DATE | SHARES SOLD | PRICE PER SHARE | TOTAL SALES |
|---|---|---|---|
| 9/24/12 | 28,474 | $74.57 | $2,123,306.18 |
| 9/25/12 | 41,668 | $74.64 | $3,110,099.52 |
| 9/25/12 | 13,194 | $74.25 | $979,654.50 |
| 12/10/12 | 2,334 | $73.00 | $170,382.00 |
| 12/11/12 | 30,000 | $72.25 | $2,167,515.00 |
| 12/11/12 | 17,666 | $73.00 | $1,289,618.00 |
| 12/14/12 | 21,666 | $75.00 | $1,624,950.00 |
| | 155,000 | | **11,465,525.20** |

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

80.    Throughout the Class Period, Defendants falsely and repeatedly emphasized the

superior quality of Lululemon's products.  For example, the Company prominently displayed on

its website throughout the Class Period its "Quality Stand," which states that "[q]uality is at the

heart of everything we do, from the technical features we (sometimes literally) weave into our

products, to the people we work with and the relationships we build."   The Company also

claimed on its website that with respect to "product development / quality assurance":

> lululemon's assured quality level is the highest in the industry and it's our job to
> ensure every product is made to its truest form. If a garment doesn't pass our
> standards at any point in production, it's back to the drawing board. Along the

way, we get a lot of help from our developers, product testers and QA partners overseas.

Lululemon, Defendant Day as the Company's CEO, and Defendant Wilson as Chairman of the Board at all times had control over the statements on Lululemon's website.

81.     The Company's statements on its website promoting the purportedly exceptional quality of its products were materially false and misleading because, in reality, Lululemon failed to employ the most rudimentary of quality assurance practices and thus failed to ensure high product quality and that its products were made to their "truest form."  Further, these statements were false and misleading because, as discussed above at Section IV, in reality:

     a.  The Company failed to implement even a standard "live model" test for its products;

     b.  The Company's quality specifications were so deficient that they allowed for transparent bottoms to be sold without adequate testing;

     c.  The Company's "testing protocols were incomplete";

     d.  The Company suffered from significant "gaps" in its quality control process, requiring new "rigorous testing and quality processes that includes revised specifications for modulus (stretch), weight, and tolerances";

     e.  The Company had inadequate manpower on the ground with its manufacturers to monitor production;

     f.  The Company continued to rely on both SGS and Eclat, notwithstanding the fact that Defendants knew that SGS and Eclat were not performing necessary quality control tests; and

     g.  The Company's senior-most executives responsible for quality control – Defendant Day and Sheree Waterson – had failed to appropriately oversee the Company's quality control processes and improperly sacrificed product quality in the pursuit of growth.

82.     In addition to its statements on the website, the Company also made false and misleading statements during its conference calls with investors and in its filings with the SEC. On September 7, 2012, the Company held a conference call with analysts to discuss its results for the second quarter of 2012.  On that call, in response to questions from analysts regarding the

35

Company's response to the color-bleeding dye issue, Defendant Day misleadingly stated that Lululemon's products "are created using the <u>highest quality suppliers and manufacturers</u>." Defendant Day further emphasized that "<u>[i]n the end, quality is our key differentiating factor.  It is what we stand for and what we will always stand behind</u>."  Defendant Day represented that, with some minor remedial measures to address the color-running defect, the Company was "very comfortable" with its ability to maintain quality.  Specifically, Day stated: "by changing some simple rinse agents and a couple of other things that we've worked on with the manufacturers and the mills, <u>we feel very comfortable now with the product and being able to do our strategic intent, which is push colors and maintain quality</u>."  With regard to Lululemon's supply chain, Defendant Day assured that "Our current mills are growing with us. . . . we've always been very careful about where their investments are to keep pace with us and that partnership is really important. And we always forecast in the numbers that we give are based on their capability and our capability <u>delivering quality every step of the way</u>."

83.     These statements were materially false and misleading because Lululemon'a quality control issues were not isolated or limited to a small, dye bleeding problem.  Indeed, contrary to Lululemon's representations, the Company was not "delivering quality every step of the way."  Rather, Lululemon's quality control problems were systemic, longstanding, and ongoing and Defendants knew or were reckless in failing to discover that:

> a.  The Company failed to implement even a standard "live model" test for its products;
>
> b.  The Company's quality specifications were so deficient that they allowed for transparent bottoms to be sold without adequate testing;
>
> c.  The Company's "testing protocols were incomplete";
>
> d.  The Company suffered from significant "gaps" in its quality control process, requiring new "rigorous testing and quality processes that includes revised specifications for modulus (stretch), weight, and tolerances";

    e.   The Company had inadequate manpower on the ground with its manufacturers to monitor production;

    f.   The Company continued to rely on both SGS and Eclat, notwithstanding the fact that Defendants knew that SGS and Eclat were not performing necessary quality control tests; and

    g.   The Company's senior-most executives responsible for quality control – Defendant Day and Sheree Waterson – had failed to appropriately oversee the Company's quality control processes and improperly sacrificed product quality in the pursuit of growth.

84.    That same day, Lululemon filed with the SEC its Form 10-Q for the second quarter of 2012 (the "September 7 Form 10-Q"), in which the Company misleadingly claimed that Lululemon was the "<u>leader in technical fabrics and quality construction</u>. This has made our product desirable to our consumers and has driven demand." Defendant Day signed this filing and certified that the contents of the filing were accurate.

85.    These statements were false and misleading because the Company was not the industry "leader" in "quality construction." Further, these statements were false and misleading for the reasons set forth in ¶83 above. Indeed, far from being a "leader" in "quality," the Company failed to employ basic industry quality control standards and tests.

86.    Unaware of the true state of the Company's quality control practices, analysts responded favorably to the Company's reassurances regarding the Company's efforts to address the product quality issues. For example, a September 7, 2012 Cowen and Co. report stated that "We believe LULU's Q2 results should allay investor concerns regarding product quality issues[.]" Similarly, Janney Capital Markets reported that "[m]anagement continues to relay a message of measured, steady and controlled growth as they invest in new products, new markets, and infrastructure for future growth. . . . customers of lululemon depend on the company's efforts to make high-quality, technical and innovative products." In a September 10, 2012 report, Morgan Stanley reported that the Company's "commentary adequately addressed quality

concerns."  Based on the Company's reassurances, Lululemon's stock price rose from $68.60 on

September 6 to close at $77.14 on September 7.

87.     On December 6, 2012, the Company issued its earnings for the third quarter of

2012, reporting a 37% increase in net revenue to $316.5 million and earnings per share of $0.39,

exceeding analysts' consensus.  On an investor conference call with analysts to discuss those

results, Defendant Day again falsely reassured investors that Lululemon was not sacrificing

quality in pursuit of growth and putting into place processes to prevent serious problems from

occurring.  Specifically, Defendant Day stated:

> [I]t is far better to spend your money on the infrastructure and getting ready to
> build a profitable business model when you go in rather than to build a loss
> leading market and then cleaning it up afterwards by putting the fixes in place. So
> we're being very disciplined about creating a healthy business model. It's not
> growth at any cost.

88.     That same day, the Company reported its quarterly financial results to the SEC on

Form 10-Q (the "December 6 Form 10-Q"), which Defendant Day signed and certified was

accurate.  This filing repeated the Company's misleading representation that Lululemon was the

"leader in technical fabrics and quality construction" set forth in ¶84 above.  Based on the

Company's false and misleading representations on December 6, 2012, Lululemon's stock price

rose from $68.59 on December 5, 2012 to close at $73.57 on December 6, 2012.

89.     Defendant Day's statement that the Company was investing in infrastructure and

avoiding "growth at any cost," and the Company's statement regarding purported product quality

in its December 6 Form 10-Q were materially false and misleading because, as set forth above in

Section IV, the Company was recklessly sacrificing quality in order to grow the Company.

Indeed, as set forth above, Defendant Day admitted as early as the winter of 2012-2013 in so

many words that "quality was sacrificed" because of the "sheer volume and the vast growth."

Further, the Company's repeated statements regarding its role as an industry "leader" in "quality construction" were false and misleading for the reasons set forth in ¶83.

90.     As set forth below, even after the "see through pants" scandal erupted, Defendants continued to mislead investors regarding the full impact of the Company's failure to maintain "premium" product quality practices, and hid that the Company's product quality problems were still pervasive.

## VI.     PARTIAL DISCLOSURES, FURTHER MISLEADING STATEMENTS, AND THE GRADUAL EMERGENCE OF THE FULL IMPACT OF THE FRAUD

91.     The truth about Lululemon's "premium quality" products began to emerge over the weekend of March 16-17, 2013.  As the Company later stated, it was notified of the "extent" of the black Luon sheerness problem by store managers on March 11, 2013.  The Company then removed the pants from stores nationwide over the weekend of March 16-17, 2013, before the official announcement of the Black Luon Recall on March 18, 2013.  As the news of the recall leaked to the market, the price of Lululemon stock declined sharply, dropping from $68.48 on Friday, March 15, 2013 to close at $65.90 on Monday, March 18, 2013.  After the close of trading that Monday, the Company issued its official press release announcing the recall and informing the public more broadly about its product defects.  The Company also announced that, as a result, it was significantly reducing its expected revenue guidance for just the first quarter of 2013 by approximately $20 million, from $350-$355 million to $333-$343 million.  Lululemon's stock price declined further on this news, to close at $64.08 per share on March 19, 2013.  Over these days, Lululemon's stock price declined 6.4% on the news of the Black Luon Recall.

92.     Analysts were dismayed by the Company's admission of yet another product quality problem, particularly given the apparent breakdown in basic quality assurance that should have caught this obvious flaw in the products before they reached customers.  For example,

Sterne Agnee downgraded the Company to "neutral," noting that "We are concerned that LULU does not have the appropriate presence in and around its factories.  While the factories in question have been producing fabrics for LULU since 2004, it appears that there is not appropriate oversight in place."  Similarly, in a March 19, 2013 report titled "Does LULU have a material problem?" Cowen and Co. noted that while the analysts agreed with the Company's recall decision, "we think this should not have happened in the first place and points to significant execution issue[s] in the company's supply chain management.  **Customers should not be LULU's QA, or Quality Assurance, program**." (emphasis in original).  BMO Capital Markets, citing prior "quality issues" that it had discovered through its consumer research, warned investors to "proceed with caution on the name, until quality issues are clearly identified, contained, and remedied."

93.     While Lululemon acknowledged that its black Luon bottoms were defective, it attempted to downplay the problem, framing it as a minor, discrete issue, and not indicative of larger problems with Lululemon's quality control protocols.  In its March 18, 2013 press release, Defendant Day characterized the Black Luon Recall as a mere "inconvenience," and assured the market that "[i]t is always our first priority to protect the quality of our fabrics that keep our guest so loyal to our products. We will accept nothing less than the very highest quality we are known for."  The same day, the Company posted a FAQ ("frequently asked questions") on its website, which falsely stated that "the quality of our products are paramount" and "we are committed to providing the highest quality products to our guests."  Defendants' statements were false and misleading, because they failed to disclose that these quality control issues were not isolated to this single batch of black Luon products and instead were pervasive.  Moreover, the Company's claim on March 18 that it only learned of the black Luon sheerness problem on

March 11 was false because, as discussed above, Defendant Day acknowledged internally in October 2012 that the Company had a "sheer Luon" issue and former employees confirmed the issue had been "percolating" for a while before the Company publicly disclosed it. However, Defendants' efforts to minimize the issue were successful, and a number of analysts believed the Company's false statement that the Black Luon Recall was, in fact, isolated. For example, Canaccord Genuity kept its "buy" recommendation, stating in a March 19, 2013 report that it "believe[d] these issues are transitory" and that the firm remained believers in Lululemon's value.

94.     Lululemon also sought to shift the blame for the recall to its Taiwanese supplier, Eclat. According to the Company, the manufacturing of the bottoms did not "meet [its] technical specifications," and, with respect to Eclat, the Company was "working closely with them to understand what happened during the period this fabric was made." However, Lululemon's attempt to place responsibility for the see-through pants on Eclat was short-lived. On March 19, 2013, *The Wall Street Journal* published an article titled "Yoga-Pants Supplier Says Lululemon Stretches Truth," in which Eclat's CFO corrected the record. Specifically, Eclat's CFO stated that the products Eclat produced and shipped to Lululemon were in full compliance with the Company's production guidelines. Moreover, contrary to Lululemon's claim to be "working closely" with Eclat to discover the source of the problem, Eclat's CFO informed both *The Wall Street Journal* in another article published that same day and *The Globe* that Lululemon had not yet even contacted Eclat.

95.     Nevertheless, Lululemon continued to emphasize its supposedly high-quality products while downplaying the serious quality issues it was facing. Two days later, on March 21, 2013, Lululemon announced its year-end and fourth quarter 2012 earnings results and filed

its 2013 Annual Report on Form 10-K with the SEC, which was signed by both Defendant Day and Defendant Wilson.  In this filing, Lululemon emphasized the Company's "high-quality" processes and products.  For example, Lululemon stated that it "partner[ed] with a leading independent inspection, verification, testing and certification company, which conducts a battery of tests before each season on our fabrics, testing for a variety of performance characteristics including pilling, shrinkage, abrasion resistance and colorfastness," and that it had "developed longstanding relationships with a number of our vendors and [took] great care to ensure that they share our commitment to quality and ethics."  Moreover, Lululemon stated that the Company's "core values" include "developing the highest quality products," and attributed its ability to offer "superior products," and "high-quality premium apparel" to its "close collaboration with our third-party suppliers," among other things.  With respect to the Black Luon Recall, the Company stated that "[d]elivering quality to our customers is a critical factor in our market place differentiation and removing items that do not meet our standards is key to maintaining our brand reputation."

96.      These statements in the Company's 2012 Form 10-K were false.  The Company did not conduct a "battery of tests" on its products.  Indeed, it did not even employ a live model test – the most rudimentary quality test used by retailers.  These statements were also false and misleading because Lululemon knew that both Eclat and SGS often did not test "for a variety of performance characteristics," including sheerness.   Further, these statements were also false and misleading because the Company did not institute even the most minimal quality controls to ensure that it produced the "highest quality," "superior," and "premium" products.

97.      On a conference call held on the same day, CEO Day stated that the Company had not yet determined the specific cause for the sheerness issue, though, as discussed above, it had

identified certain discrete "gaps" in the Company's quality controls.  However, Defendant Day reiterated that it had a "dedicated team" working with Lululemon's suppliers to identify and resolve the problem.  During the call, Sterne Agnee analyst Sam Poser questioned "how this exactly happened . . . how did it get to where [the products were] shipping without somebody trying on a pair of pants, like the first batch, to make sure that this wasn't an issue . . . and stopping it before it got so out of control?"  In response, Defendant Day admitted "the only way that you can actually test for the issue is to put the pants on and bend over," which the Company had not done.  Cowen & Co. analyst Faye Landes also questioned Defendant Day, stating that it seemed that, with respect to quality control, the Company was "starting at sort of ground zero" compared to other retailers, where "the idea that you have to put the pants on and bend over to test them out is something that would happen before they hit the stores[.]"  In response, Defendant Day could only maintain that the sheerness problem was purportedly a "very complex thing to test for."

98.    While Defendants minimized the true causes of the Black Luon Recall, some analysts expressed concerns regarding the Company's quality controls.  On March 22, 2013, Crédit Agricole cut Lululemon's rating from underperform to sell, citing risks associated with the Company's Luon quality issues and Lululemon's growth.  Similarly, Morgan Stanley reported that "product quality concerns" remain "a very serious issue," stating that the firm had "lowered our view of the investment opportunity because we think quality issues are one of the few things that can stop the LULU story and we now see more problems than previously thought."  However, Defendants' remarks largely had their intended effect.  For example, Oppenheimer & Co. analyst Brian Nagel stated approvingly in a March 21 report that "'[e]ncouragingly, the company is moving to address its quality issues[.]'"  Similarly, Credit

Suisse stated in a note that day that it was '"a relief about the magnitude of the potential impact.'"  Accordingly, while the price of the Company's stock dropped from $64.70 per share on March 21 to $62.35 per share, or approximately 4%, on March 22, 2013, the Company's false and misleading reassurances prevented an even steeper stock price decline.

99.    As discussed above, on April 3, 2013, the Company admitted to a number of significant quality control deficiencies and announced that Waterson would be leaving the Company.  At the same time, however, the Company also attempted to mollify investors by claiming that the Company was taking significant actions to ensure that no such product quality failures would occur in the future, stating in its April 3 press release that "[o]ur stand for differentiation is the quality of our product," and that the Company was committed to producing "best-in-class" fabrics and only putting product in stores that meet Lululemon's "stringent standards."  In the press release, Lululemon also insisted that the current specification and testing protocols for Luon had not changed since 2006, and that the Company had taken steps prior to the Black Luon Recall to "bolster its internal product expertise, including the addition of senior level capabilities in quality, raw materials and production."  These statements continued to mislead the market, because they failed to disclose the fact that the Company's quality control problems continued, were not limited to the black Luon bottoms, and were not fully corrected by the Company's purported remedial measures.

100.    Analysts believed the Company's assurances.  For example, Canaccord Genuity wrote in an April 3, 2013 report that "we believe LULU is doing the right things to prevent further quality concerns from happening."  Similarly, Janney Capital Markets wrote in an April 4, 2013 report that "we believe the company's Luon quality issue is 'short term, identifiable, and solvable'" and reiterated its "Buy" recommendation.

101.    Notwithstanding these reassurances, on April 12, 2013, the Company quietly withdrew its Candy Stripe Wunder Under Crops from stores because of significant sheerness defects.  Less than one week later, on April 18, 2013, a report by *The Streetsweeper* indicated that Lululemon's quality issues were more serious and widespread than investors realized.  In the *Streetsweeper* report, a fabric industry expert explained that "[e]ven more [colored] clothes may need to be recalled because of the sheerness problem [that] would be as bad or worse than the black Luon garments because of the characteristics of the fabric."  Following this report, the price of Lululemon stock dropped 4%, from $71.34 per share on April 17, 2013 to $68.85 per share on April 18, 2013.

102.    Following the release of the *Streetsweeper* article, Defendants again assured investors that there were no ongoing quality control problems at Lululemon, including by meeting with analysts and convincing them that the Company had corrected its quality issues. On May 8, 2013, following meetings with Lululemon senior management, including Defendant Day, Sterne Agnee issued a report reversing its downgrade of the Company and upgrading its price target to Buy from Neutral, stating "[b]rand and long-term strategy appear healthy following management meetings."  According to the Sterne Agnee report, "[f]ollowing meetings with the chief executive and chief financial officer we would be buyers of Lululemon," emphasizing that "[t]he transparent-pant problem is a serious growing pain, but should not cause long-term brand damage."  The price of Lululemon stock surged as the market received and digested this report, increasing from its open of $75.45 per share on May 9, 2013 to close at $79.07 per share that day.  The price of Lululemon stock continued to increase through June on these misleadingly positive statements, trading as high as $82.50 per share on June 10, 2013.

103.    As was ultimately revealed however, the reassurances from Company management were materially misleading as the Company had not fully addressed its product quality deficiencies.  After the market closed on June 10, 2013, along with with announcing the Company's first quarter 2013 financial results, including the $17.5 million write off the Company had to take due to the Black Luon Recall and further quality control improvements undertaken by the Company, Lululemon announced that CEO Day was leaving the Company, remaining in her position only until a successor was found.  Immediately after the Company announced Day's resignation, media outlets and analysts linked Day's resignation to Lululemon's recent product recalls.  For example, RBC Capital Markets attributed Day's pending departure to the "sheer pant issue," stating that Day's departure was "just too close to [the Black Luon Recall] issue to remove it from the reason why she's leaving."  MSN News reported on June 11 regarding Defendant Day's departure as the "fallout from the latest wardrobe malfunction" at Lululemon, stating that, "a number of stumbles in quality control have raised questions about whether [Day] would be the right person to lead a global expansion of the company into China and Europe."

104.    Similarly, Brand I.D. stated:

Following the announcement of a Q1 $17.5M write-off on a recall of their popular workout pants, CEO Christine Day will step down.

This story highlights the importance of supply chain management for global apparel brands. For quite some time, consumers have taken to blogs and widely acknowledged the tendency of Lululemon yoga pants to be at least somewhat see-through when the wearer bends down. The company's unwillingness to address this major supply chain issue on their own terms is what led to the massive recall and eventual resignation announcement of CEO Christine Day.

Whether the blame is on Lululemon or their suppliers, the undeniable fact remains that stronger preventative quality control measures would have made this mishap largely avoidable.

*        *        *

46

Lululemon (LULU) CEO Christine Day announced on Monday, June 10th that she will be stepping down once a suitable replacement is found. This news comes in conjunction with Lululemon's posting of a $17.5 million write-off on the highly publicized March 2013 recall of over 17% of their popular Luon leggings.

105.     Lululemon's stock price immediately declined nearly 18%, or $14.43 per share, from $82.28 per share on June 10, 2013 to $67.85 per share on June 11, 2013.

106.     Further, according to media reports, including the *Associated Press Newswire* and *Investor's Business Daily*, Lululemon's stock price continued to drop an additional 5% on June 12 after analysts downgraded the Company on the news of Day's departure.  For example, UBS downgraded Lululemon on June 11, 2013 stating "CEO Day's unexpected departure was a tipping point following the recent loss of the Chief Product Officer, quality control issues, and internal Q4 execution issues."  In total, these disclosures caused the price of Lululemon stock to plummet approximately 22%, or $17.98 per share, from $82.28 per share on June 10, 2013 to $64.30 per share on June 12, 2013.

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

107.     As alleged above, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants Lululemon, Wilson, and Day knew or recklessly disregarded that their statements and omissions set forth above were materially false and misleading when made. Specifically, Defendants knew, or recklessly disregarded, that Lululemon's product quality was not "superior" and that the Company did not employ "highest in the industry" quality standards, as a result of the following:

108.     First, the fact that the sheerness causing the Black Luon Recall was so obvious and widespread – affecting hundreds of thousands of pair of pants across North America – supports a strong inference of Defendants' scienter.  This defect would have been discovered if the Company had instituted the most rudimentary quality test; namely, having a live model try on

sample pairs of pants from every product shipment to inspect the products for flaws.   As confirmed by former Lululemon employees, the Company failed to do so.   The fact that Lululemon did not test these products for such an obvious flaw – while Defendants represented that Lululemon's quality standards were the "highest in the industry" – was severely reckless at a minimum.

109.   Second, the fact that the Black Luon Recall concerned the Company's core product, accounting for nearly 20% of the Company's sales of women's bottoms, and nearly 7% of the Company's total sales – $80 million in 2012 alone – is further strong evidence of Defendants' scienter.   As explained above, black Luon bottoms are the Company's: (i) signature and most popular products; (ii) products with one of the highest – if not the highest – profit margins of any of Lululemon's products; and (iii) sales of these bottoms result in additional "add-on" sales of other Lululemon products.   Black Luon products drove the Company's explosive growth and was so important to the continued success of Lululemon that Defendant Day specifically represented that the Company was particularly focused on the quality control standards for its Luon products, stating that the Company was "maniacal about protecting" those standards.   The fact that the misstatements and omissions at issue here related to Lululemon's primary product further supports a strong inference of Defendants' scienter.

110.   Third, Defendants' scienter is further demonstrated by the fact that the Company's quality assurance programs and, in particular, the quality of its Luon products, were central to the Company's success as a premier brand.   The Company's sales were dependent on customers' willingness to pay exorbitant prices for Lululemon's products based on Defendants' representations that the Company's products were "superior" in quality to their competitors.   The fact that the misstatements and omissions at issue here went directly to the single factor that gave

48

the Company its competitive advantage further supports a strong inference of Defendants' scienter.  This is particularly true given that Defendants held themselves out as knowledgeable regarding Lululemon's quality control practices in the Company's SEC filings and on its conference calls.

111.   Fourth, Lululemon experienced a series of high profile product quality issues prior to the Black Luon Recall, including severe sheerness issues with their core Luon product as well as problems that required the Company to recall certain of its products.  Each of these quality control problems put Defendants on notice that Lululemon's quality control procedures were deficient and not "superior" and "premium" as Defendants claimed.  Moreover, after each of these product issues, Defendants Lululemon, Day, and Wilson falsely assured investors that the Company had corrected its product quality problems and that the Company's products now "met [Lululemon's] performance requirements."   For example, Defendant Day specifically represented that she had made herself "very comfortable" with Lululemon's ability to maintain quality going forward.  The fact that Defendants were on notice – repeatedly – of Lululemon's serious quality control issues and represented that they had investigated and corrected the problems supports a strong inference of Defendants' scienter.

112.   Fifth, the Company's attempt to pin the blame for the recall on Eclat supports a strong inference of Defendants' scienter.  It was only after *The Wall Street Journal* published Eclat's denial of Lululemon's accusation that the Company was forced to admit that the Black Luon Recall was due to the Company's own poor quality control practices.

113.   Sixth, Defendants knew that, in direct contradiction to their public representations that Lululemon worked "closely" with Eclat and SGS in order to ensure product quality, neither Eclat nor SGS were performing necessary quality tests.  Specifically, Eclat, which produced all

49

of Lululemon's Luon products, was not conducting the quality tests required by Lululemon and was providing Lululemon with test reports that "weren't actually accurate."  Further, SGS often was not testing the Company's products for sheerness and other product quality defects, leading the Company to consider terminating this key relationship.  The fact that Defendants knew that these third parties – which Defendants specifically represented to investors were vital to the Company's quality control program – were not performing necessary testing supports a strong inference of Defendants' scienter.

114.  <u>Seventh</u>, Defendants' scienter is demonstrated by their involvement in the Company's deficient quality control procedures.  Specifically, Defendant Day was directly involved in the Company's lax quality assurance program, yet recklessly misled investors regarding Lululemon's product quality.  As discussed above, former Lululemon employees confirmed that, beginning in late 2011 when the "severity of the [product quality] issues" became clear, Defendant Day was regularly notified of and involved in the quality control problems.  The Company's senior executives, including Defendant Day, also regularly received reports on the severity and breadth of product quality issues.  Similarly, "pretty much all" of the senior management of the Company were on monthly calls to discuss customer product quality complaints.  Indeed, Defendant Day admitted no later than the winter of 2012-2013 that the Company sacrificed product quality in order to grow the Company.  Finally, Defendant Day abruptly and suspiciously announced her departure in June 2013, directly following the Company's worst product quality disaster in its history.  Defendant Day's direct knowledge of the Company's past and ongoing quality control problems, leading to her sudden departure, all support a strong inference of her scienter.

115.     Similarly, Defendant Wilson "dipped in and out of daily affairs at Lululemon" and "his fingerprints are all over the company's policies and principles," including its quality control programs.   Indeed, former Lululemon employees like CW 5 report that Defendant Wilson "still ha[d] his hands in the pot."   CW 5 explained that Defendant Wilson's aim is to "dominate" and do it "through design but not good business sense."   Accordingly, Defendant Wilson was well aware of the Company's failure to implement adequate policies, procedures, and manpower necessary to ensure Lululemon only sold high quality products.

116.     <u>Finally</u>, during the Class Period, Defendants Wilson and Day suspiciously sold their personally owned Lululemon stock, reaping nearly $200 million in proceeds.   In particular, on the day before Day disclosed her imminent departure from the Company to the market, causing a significant stock price decline, Wilson sold over 607,000 shares for approximately $50 million.   This single day sale exceeded any other one-day sale that Defendant Wilson made before the Class Period by 145%.   Furthermore, Day's significant stock sales were made well after she internally acknowledged that the Company had a "sheer Luon issue" and weeks before this fact was disclosed to investors.   The suspicious timing and amounts of these sales further support a strong inference of Defendants Day's and Wilson's scienter.

## VIII.   CLASS ACTION ALLEGATIONS

117.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure Rules 23(a) and (b)(3) on behalf of all persons who purchased Lululemon common stock on the NASDAQ during the Class Period and were damaged thereby.   Excluded from the Class are Defendants, Lululemon's directors and officers, and their families and affiliates.

118.     The members of the Class are so numerous that joinder is impracticable.   Per Lululemon's Form 10-Q filed June 10, 2013, Lululemon had over 113.5 million shares of common stock outstanding during the Class Period.

119.    Common questions of law and fact exist as to all Class members, and predominate over any questions affecting solely individual Class members.  Such common questions include:

   a.  whether Defendants' conduct as alleged herein violated the federal securities laws;

   b.  whether the SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

   c.  whether Defendants acted with scienter;

   d.  whether and to what extent the market prices of Lululemon's common stock was artificially inflated during the Class Period; and

   e.  whether Class members suffered damages as a result of the conduct complained of herein, and the appropriate measure of damages.

120.    Lead Plaintiff's claims are typical of those of the other Class members, as Lead Plaintiff's and Class members' damages were both caused by Defendants' common course of conduct.

121.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

122.    A class action is superior to other available methods for the fair and efficient adjudication of this matter, as the burden of individual litigation makes it impracticable for Class members to seek individual redress for the wrongful conduct alleged herein.

## IX.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

123.    Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

   a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The Company's stock traded in an efficient market;

d.   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

e.   Plaintiff and other members of the Class purchased Lululemon common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

124.   At all relevant times, the market for Lululemon common stock was efficient for the following reasons, among others:

a.   Lululemon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

b.   Lululemon common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

c.   As a regulated issuer, Lululemon filed periodic public reports with the SEC and the NASDAQ;

d.   Lululemon securities were liquid and traded with moderate to heavy volume during the Class Period.  The average weekly trading volume during the Class Period was over 12,000,000 shares; and

e.   During the Class Period, Lululemon was followed by multiple securities analysts who wrote reports about Lululemon that were distributed to their clients.  Each of these reports were publicly available and entered the public marketplace.

## X.   LOSS CAUSATION/ECONOMIC LOSS

125.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses.  As set forth above in Section IV.D.4 and Section VI, the price of Lululemon's common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks

that had been fraudulently concealed by Defendants materialized.  Specifically, Defendants'
false and misleading statements misrepresented Lululemon's quality control processes and
resulting product quality, and investors suffered losses as the price of Lululemon stock declined
when those statements were corrected and the risks concealed by them materialized, including
when the recall of Lululemon's black Luon products and Defendant Day's resulting departure
were disclosed to the market.

126.    Accordingly, as a result of their purchases of Lululemon's common stock during
the Class Period, Lead Plaintiff and other members of the Class suffered economic loss and
damages.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

127.    Lead Plaintiff realleges every allegation set forth above as if fully set forth herein.

128.    During the Class Period, Lululemon and the Individual Defendants carried out a
plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:
(i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged
herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Lululemon
common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and
course of conduct, these Defendants took the actions set forth herein.

129.    Lululemon and the Individual Defendants: (i) employed devices, schemes, and
artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material
facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a
course of business which operated as a fraud and deceit upon the purchasers of the Company's

common stock in an effort to maintain artificially high market prices for Lululemon common stock in violation of Section 10(b) and Rule 10b-5.

130.    Lululemon and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in a continuous course of conduct to conceal adverse material information about the true state of the Company's quality control processes and product quality, as specified herein.  These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

131.    As a direct and proximate result of Lululemon's and the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of Lululemon common stock during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against All Individual Defendants**

132.    Lead Plaintiff realleges every allegation set forth above as if fully set forth herein.

133.    The Individual Defendants acted as controlling persons of Lululemon within the meaning of §20(a) of the Exchange Act.  By virtue of their high level positions, participation in, awareness of, direct control of and/or supervisory involvement in Lululemon's day-to-day operations during the Class Period, the Individual Defendants had the power to, and did, control and influence the decision-making of the Company and the conduct of Lululemon's business, including the content and dissemination of the statements that Plaintiffs allege to be materially false and misleading.  In addition, the Company explicitly warned in its Form 10-K filed March 21, 2013 that Defendant Wilson "is able to influence or control matters requiring approval by our stockholders, including the election of directors and the approval of mergers, acquisitions or

other extraordinary transactions." Moreover, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Lululemon's operations to correct any previously issued statements that had become untrue so that the market price of Lululemon's securities would be based upon truthful and accurate information.

134.   Lululemon and the Individual Defendants participated in writing or reviewing Lululemon's statements, reports, press releases and SEC filings alleged herein to be misleading prior to and/or shortly after they were issued and thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

135.   As a direct and proximate cause of Lululemon's and the Individual Defendants' wrongful conduct as set forth in this Count, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Lululemon securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding Lead Plaintiff and the Class members damages, including interest;

C.   Awarding Lead Plaintiff reasonable costs, including counsel fees and expert fees; and

D.   Awarding such equitable/injunctive or other relief for the Class as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury for all issues so triable.

Dated: November 1, 2013

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

By: _____

Hannah G. Ross
Laura H. Gundersheim
Katherine M. Sinderson
1285 Avenue of the Americas
New York, New York 10019
Tel:      (212) 554-1400
Fax:     (212) 554-1444
Email: Hannah@blbglaw.com
          Laurag@blbglaw.com
          Katherine@blbglaw.com

*Lead Counsel for Lead Plaintiff the Louisiana Sheriffs' Pension & Relief Fund and the Class*

**KLAUSNER,   KAUFMAN,   JENSEN   & LEVINSON**

Robert D. Klausner, Esq.
10059 N.W. 1st Court
Plantation, FL 33324
Tel: (954) 916-1202

*Additional Counsel for Lead Plaintiff the Louisiana Sheriffs' Pension & Relief Fund and the Class*

57

# EXHIBIT A

**Louisiana Sheriffs' Pension & Relief Fund**
Transactions in Lululemon Athletica Inc.
Between September 7, 2012 through June 11, 2013, inclusive

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/22/2013 | 1,100 | $72.9411 |
| Purchase | 4/22/2013 | 3,600 | $72.3601 |
| Purchase | 4/22/2013 | 600 | $70.4434 |
| Purchase | 4/23/2013 | 300 | $74.9092 |
| Purchase | 4/23/2013 | 900 | $76.3816 |
| Purchase | 4/23/2013 | 300 | $75.2562 |
| Purchase | 4/23/2013 | 1,300 | $75.8551 |
| Purchase | 4/23/2013 | 700 | $75.9072 |
| Purchase | 4/23/2013 | 2,700 | $75.3090 |
| Purchase | 4/24/2013 | 400 | $74.9785 |
| Purchase | 4/24/2013 | 300 | $74.0053 |
| Purchase | 4/26/2013 | 200 | $74.0423 |
| Purchase | 4/26/2013 | 100 | $74.0440 |
| Purchase | 5/1/2013 | 300 | $75.6845 |
| Purchase | 5/1/2013 | 300 | $75.9500 |
| Purchase | 5/1/2013 | 100 | $75.3305 |
| Purchase | 5/2/2013 | 100 | $75.9392 |
| Purchase | 5/2/2013 | 100 | $76.4848 |
| Purchase | 5/2/2013 | 200 | $76.8495 |
| Purchase | 5/3/2013 | 100 | $76.7658 |
| Purchase | 5/3/2013 | 100 | $76.1807 |
| Purchase | 5/3/2013 | 400 | $76.5352 |
| Purchase | 5/7/2013 | 400 | $74.6210 |
| Purchase | 6/3/2013 | 200 | $78.6811 |
| Purchase | 6/3/2013 | 600 | $78.1680 |
| Purchase | 6/4/2013 | 200 | $81.5739 |
| Purchase | 6/10/2013 | 400 | $81.8671 |
| Purchase | 6/10/2013 | 1,300 | $75.0908 |
| | | | |
| Sale | 6/11/2013 | (1,800) | $68.9511 |