**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | Case No. 13-CV-4596 (KBF) |
| ) | |
| ) | |
| ) | |
| In re Lululemon Securities Litigation ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

WEIL, GOTSHAL & MANGES LLP

767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Telephone)
(212) 310-8007 (Fax)

*Attorneys for Defendants lululemon athletica,
inc. and Christine Day*

February 18, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    Period 1:  September 2012 – February 2013 (Pre-Luon Announcement) ..............4

    B.    Period 2:  March & April 2013 (Announcement of Sheer Luon Issue & Related Quality Control Improvements) ...................................................................4

    C.    Period 3:  June 2013 – January 2014 (Post-Luon Announcement) .......................5

ARGUMENT ..........................................................................................................................8

I.    PLAINTIFF FAILS TO PLEAD ACTIONABLE FALSE STATEMENTS OR OMISSIONS ...............................................................................................................8

    A.    Plaintiff Fails to Plead That Defendants' Statements Were False .........................9

    B.    Many of the Alleged Misstatements Constitute Non-Actionable Puffery or Opinion Statements .............................................................................................15

II.    PLAINTIFF FAILS TO PLEAD SCIENTER .............................................................16

    A.    Motive and Opportunity ......................................................................................18

    B.    Conscious Misbehavior or Recklessness ............................................................19

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION .................................................24

CONCLUSION .....................................................................................................................25

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Agnico-Eagle Mines Ltd. Sec. Litig.,*
2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom.*
*Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) .......... 23, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007) ......................................................................................18

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.,*
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .......................................................16

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG,*
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ................................8, 9, 11, 16, 24

*Cent. States, S.E. & S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.,*
2013 WL 5911476 (2d Cir. Nov. 5, 2013) ..............................................................25

*In re Citigroup, Inc. Sec. Litig.,*
330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom.*
*Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) .......................11, 12

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.,*
2013 WL 4505256 (S.D.N.Y. Aug. 23, 2013) .......................................................19

*Denny v. Barber,*
576 F.2d 465 (2d Cir. 1978) ......................................................................................9

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009) ......................................................................... 15, 16, 18

*In re eSpeed, Inc. Sec. Litig.,*
457 F. Supp. 2d 266 (S.D.N.Y. 2006) ....................................................................12

*Fait v. Regions Fin. Corp.,*
655 F.3d 105 (2d Cir. 2011) ......................................................................... 9, 10, 16

*George v. China Auto. Sys., Inc.,*
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .........................................................18

*In re Gildan Activewear, Inc. Sec. Litig.,*
636 F. Supp. 2d 261 (S.D.N.Y. 2009) ....................................................................19

i

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................19

*Hemming v. Alfin Fragrances, Inc.*,
   690 F. Supp. 239 (S.D.N.Y. 1988) .....................................................................10

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...............................................................................19

*Kuriakose v. Fed. Home Loan Mortgage Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ...........................................................19, 20

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ...............................................................................24

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2nd Cir. 2005)..............................................................................24

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)..... 15, 20, 21, 23

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013) .................................................................24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...........................................................18, 19, 20, 22

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ...............................................................................25

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009) .................................................................25

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom.*
   *Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).................... 12, 21, 24

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) ...............................................................................9, 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .............................................................................8, 9

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ...............................................................................8, 9

US_ACTIVE:\44429259\6\60373.0003

*Sinay v. CNOOC Ltd*,
  2013 WL 1890291 (S.D.N.Y. May 6, 2013), *aff'd,*
  2014 WL 350055 (2d Cir. Feb. 3, 2014) ................................................................ 11, 15, 19

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................ 23

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640 (S.D.N.Y. Dec 10, 2008), *aff'd sub nom.*
  *Furher v. Ericsson LM Tel. Co.*, 363 Fed. App'x 763 (2d Cir. 2009) .................................. 20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................ 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................ 2, 8, 16, 17

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011) .................................................... 19

*Woodward v. Raymond James Fin.*, Inc.,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010) .................................................... 21


**STATUTES & RULES:**

15 U.S.C. § 78u-5 ................................................................ 25

15 U.S.C. § 78u-5(c) ................................................................ 1

Fed. R. Civ. P. 9(b) ................................................................ 1, 10

Fed. R. Civ. P. 10b-5 ................................................................ 8, 10, 18

Fed. R. Civ. P. 12(b)(6) ................................................................ 1

iii

Defendants lululemon athletica, inc. ("lululemon" or the "Company") and Christine Day (collectively, "Defendants")[1] respectfully submit this memorandum of law in support of their Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint" or "AC") pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c), and Federal Rules of Civil Procedure 9(b) and 12(b)(6) (the "Motion").

## PRELIMINARY STATEMENT

Lululemon went public in 2007 with a strong brand based on the high quality and technical attributes of its yoga-inspired athletic clothes. Its sales and earnings increased quarter over quarter. It consistently exceeded projections. The stock price went up. In its SEC filings and during investor calls, the Company described the high quality of its product as a competitive advantage and its commitment to quality as the cornerstone of the brand. Then, in early March 2013, the Company discovered that shipments of one of its signature products (black luon yoga pants) suffered from an unacceptable level of sheerness. Lululemon immediately investigated and disclosed the problem, pulled the substandard product from stores, and offered its "guests" (customers) a full refund. The Company took steps—and disclosed them—to strengthen quality control. Despite the limited product pullback and adverse publicity, lululemon continued to experience strong sales and revenue growth, easily beating its record performance in the prior year, but its rate of growth had slowed. Projections were lowered modestly. And the Company's founder made a personal remark that some women's body types "don't actually work" for lululemon yoga pants, which was widely reported. While all of this makes for interesting reading, it does not constitute securities fraud.

Plaintiff has now had two opportunities to attempt to spin the black luon sheerness issue

---

[1] Defendant Dennis J. Wilson, lululemon's founder, has filed a motion and supporting memorandum ("Wilson Mem.") joining in this Motion and moving separately to dismiss the claims against him.

and subsequent fallout into a viable Section 10(b) claim.  This second attempt fares no better than the first, running afoul of the guiding legal principles for securities fraud long-followed in the Second Circuit and this District, and reaffirmed in the many recent decisions arising out of the 2008 financial crisis:  (i) the securities laws are not insurance for investors against business missteps and market reversals; (ii) generalized statements of belief in the integrity of financial controls (or in lululemon's case, product quality controls) are not the stuff of securities fraud without more; (iii) the "more" must be particularized allegations showing falsity at the time of the alleged statement and that speakers acted with deliberate or reckless intent to mislead investors; and (iv) "fraud by hindsight" allegations do not suffice.

The Amended Complaint alleges neither "falsity" nor "scienter."  *First*, Plaintiff again mischaracterizes lululemon's and its officers' public statements during the Class Period, taking them out of context to fashion purportedly definitive "assurances" about lululemon's quality controls, quoting statements piecemeal, and omitting cautionary disclosures.  With or without this spin, the Amended Complaint does not adequately plead that the challenged statements were false and misleading when made, were objectively false opinions not honestly believed by the speaker, or were anything other than non-actionable puffery.  *See* Point I, *infra*.

*Second*, Plaintiff has yet to identify a cogent theory of scienter under *Tellabs*—let alone one at least as compelling as the non-fraudulent inference.  As Plaintiff tells it, after Defendants learned of serious failures in lululemon's quality controls and/or widespread sheerness in its black luon yoga pants, they (i) pumped lululemon's stock price through the same general statements about quality that had appeared in the Company's disclosures for years, and then (ii) shipped hundreds of thousands of see-through pants to lululemon stores hoping that the problem would somehow remain undiscovered despite the product's intended use.  Why Defendants

2

would do this and how it could benefit them is not plausibly alleged.  Nor does the Amended Complaint defeat the more compelling inference that lululemon:  (i) believed it offered quality products and had effective quality controls, (ii) promptly pulled the luon pants from stores upon discovery of the widespread sheer luon issue, and (iii) continued to update investors in real time regarding quality control improvements, and the impact of those improvements on the Company's projected earnings (revised downward in the final weeks of the Class Period for a combination of reasons).  *See* Point II, *infra*.

*Third*, the Amended Complaint fails to plead loss causation because it does not allege how and why any of the purportedly "corrective" disclosures on or around March 18 (luon announcement), June 10 (the resignation announcement of lululemon's CEO, Christine Day), or December 12 (revision of Q4 2013 guidance) "corrected" any earlier alleged misstatements. Indeed, the risk that allegedly materialized on March 18—*i.e.*, a quality shortfall—was expressly disclosed starting on the very first day of the Class Period.  *See* Point III, *infra*.

The Amended Complaint should be dismissed with prejudice.

### STATEMENT OF FACTS

Plaintiff now alleges an extended 16-month class period spanning September 2012 through January 2014 (the "Class Period"), trying to connect the disclosure of slowed growth and earnings ("bad news") in the last month of the Class Period with general statements of opinion regarding lululemon's high product quality made more than a year earlier.  The heart of the Amended Complaint, however, remains the March 18, 2013 announcement of the sheer luon issue, and the Class Period statements at issue fall into three distinct periods in relation to that announcement:  (1) alleged misrepresentations about the Company's belief in and commitment to quality in the 6 months before March 2013; (2) alleged misrepresentations about the Company's investigation of the sheer luon issue and its planned remedial efforts announced on

March 18 and in the weeks shortly thereafter; and (3) alleged misrepresentations about the Company's improvements to quality controls, and the financial impact of those improved controls, during the last 8 months of the Class Period.

### A.      Period 1:  September 2012 – February 2013 (Pre-Luon Announcement)

In the same SEC filings in which Plaintiff purports to locate fraudulent statements regarding lululemon's commitment to quality and quality controls, the Company disclosed the very risk that materialized in March 2013:

- "We rely on third-party suppliers to provide fabrics for and to produce our products, and we have limited control over them";

- "We have occasionally received, and may in the future continue to receive, shipments of products that fail to comply with our technical specifications or . . . our quality control standards" and "[i]n that event . . . we risk the loss of net revenue resulting from the inability to sell those products";

- "[I]f defects in the manufacture of our products are not discovered until after such products are purchased by our guests, our guests could lose confidence in the technical attributes of our products and our results of operations could suffer and our business could be harmed"; and

- "If we continue to grow at a rapid pace, we may not be able to effectively manage our growth and the increased complexity of our business and as a result our brand image and financial performance may suffer" and such growth "could result in the erosion of our brand image which could have a material adverse effect on our financial condition."

Ex. 2 at 29, 30; Ex. 3 at 29, 30; Ex. 4 at 10, 11.[2]  Plaintiff ignores these disclosures entirely and, unsupported by any well-pleaded facts, claims that a handful of Defendants' general statements of belief about quality during this period misled investors about the possibility that product quality shortfalls could occur and negatively impact the brand.  *See* AC ¶¶ 94-99, 101-03.

### B.      Period 2:  March & April 2013 (Announcement of Sheer Luon Issue & Related Quality Control Improvements)

On March 18, 2013, lululemon announced that it was pulling its black luon pants from

---

[2] "Ex." citations herein refer to the exhibits attached to the Declaration of Joseph S. Allerhand, dated February 18, 2014, filed in support of this Motion (the "Allerhand Declaration").

stores due to an unacceptable level of sheerness in pants *stocked in stores since March 1, 2013*. Ex. 5.  The Company advised that the luon issue would have a "significant impact" on its financial results.  *Id.*[3]  By the close of trading the next day, the Company's stock price had declined 2.8%.  Ex. 6 ($65.90 to $64.08).  During its March 21 investor call, lululemon announced that it (i) anticipated resulting lost revenue in the range of $12-$17 million for Q1 2013 and a reduction in Q1 2013 EPS of $0.11-$0.12, (ii) anticipated resulting lost revenue for FY 2013 in the range of $57-$67 million and a reduction in FY 2013 EPS of $0.25-$0.27, and (iii) expressly cautioned that it was "operating in real-time to identify the full impact of" the luon issue.  Ex. 7 at 7.[4]

Two weeks later in a press release on April 3, lululemon disclosed that "[a]fter an evaluation" of the issue, it had concluded that "testing protocols were incomplete for some of the variables in fabric characteristics" and that, "[w]hen combined with subtle style changes in pattern, the resulting end product had an unacceptable level of sheerness."  Ex. 8.  This press release outlined the actions the Company was taking "to address what [it] believe[d] [we]re the contributing causes" of the sheerness issue.  Ex. 1, Entry 19.

### C.    Period 3:  June 2013 – January 2014 (Post-Luon Announcement)

On June 10, 2013, the Company reported Q1 2013 revenues of $345.8 million, which exceeded its revised revenue projection announced on March 21.  Ex. 9; Ex. 7 at 7.  The Company increased its FY 2013 revenue guidance by $25 million (1.52%).  Ex. 9.  The

---

[3] Like many retailers, lululemon's "fiscal year ends on the Sunday closest to January 31 of the following year" (Ex. 4 at 2), resulting in fiscal quarters closing at or around the end of April, July, and October.

[4] Significantly, lululemon continued to experience strong revenue and sales growth before, during, and after the March luon announcement.  *See* Ex. 9 (reporting Q1 2013 net revenue increase of 21% and increase in comparable store sales of 7% compared to Q1 2012); Ex. 12 (reporting Q2 2013 net revenue increase of 22% and increase in comparable store sales of 8% compared to Q2 2012); Ex. 14 (reporting Q3 2013 net revenue increase of 20% and increase in comparable store sales of 5% compared to Q3 2012).

Company also reported that comparable sales grew by 7% during Q1 2013.[5]  Ex. 10 at 5.  Ms.

Day explained on the earnings call that lululemon was "continuing to make key investments" in

"owning [its] own technical standards and expertise."  Ex. 1, Entry 21.  She further explained:

> [W]hile we're tightening our processes, we'll always push innovative boundaries
> and we'll continue to disrupt the market.  Taking risks means [we] *will make a*
> *few mistakes along the way*. . . .We're also making incremental investments in the
> areas of testing and quality assurance protocols; raw material teams; increased
> factory oversight, along with training and education delivery that will increase
> expenses . . . included in cost of goods sold.

Ex. 10 at 4, 6 (emphasis added).

Also on June 10, lululemon announced Ms. Day's resignation, effective upon the

appointment of a new CEO.  Ex. 9.  During the call, Ms. Day explained that leaving lululemon

"was a personal decision" and assured investors that she would continue as CEO for "a while,"

focusing on "delivering a strong back half of the year."  Ex. 10 at 7, 9.[6]  Plaintiff's prior

complaint brought the class period to an end with this announcement.  By the close of trading the

next day, lululemon's stock price had declined 17.5%.  Ex. 6 ($82.28 to $67.85).

On September 12, 2013, lululemon announced Q2 2013 revenue of $344.5 million,

meeting its guidance of $340-$345 million previously announced on June 10.  Ex. 12; Ex. 9.

The Company also reported comparable sales growth of 8% in Q2 2013.  Ex. 12.  During the

earnings call, Ms. Day advised that lululemon had "worked [its] way back from the black luon

setback" and stated her belief that the Company was "well on [its] way to finishing 2013 as a

much stronger Company than when the year began."  AC ¶ 121.  But Ms. Day also cautioned

that the Company's "focus[] on quality" "[o]ver the past several months" had "resulted in some

---

[5] "Comparable sales" is a commonly used retail industry metric that compares current quarter sales against sales for
the same quarter in the prior year, for stores that have been open for a year or more.  Lululemon's comparable store
sales metric reflects a comparison of "net revenue at corporate-owned stores that have been open for at least 12
months."  Ex. 4 at 24-25.

[6] Ms. Day continued as lululemon's CEO through January 20, 2014.  Ex. 11 at 3.

US_ACTIVE:\44429259\6\60373.0003

short-term pain . . . driven primarily by late deliveries of fall product," which were "a hang over

from the disruption caused earlier in the year with the luon issue," and that the Company

"*anticipate[d] this knock-on effect to continue to impact timing of product deliveries in Q3 and

through the balance of the year.*" Ex. 13 at 5 (emphasis added).  The Company also explained

that "working back through all of our other [non-luon] fabrics to make sure we are hitting the

quality standards we want  . . . will affect us for a period of time," (Ex. 13 at 9) and advised that

the investments it was making to improve quality processes would cost approximately $5 million

in the second half of 2013.  *Id.* at 14.  The Company lowered its FY 2013 revenue guidance by

$30 million (-1.83%).  Ex. 12; Ex. 9.

On November 5, 2013, the Company received widespread negative press and guest

feedback following Mr. Wilson's personal remark during an interview with Bloomberg that

some women's bodies "don't actually work" for lululemon's yoga pants.  AC ¶ 77.

On December 12, 2013, lululemon announced its financial results for Q3 2013 and

provided an updated outlook for Q4 2013.  The Company's Q3 2013 revenues of $379.9 million

exceeded its previously announced guidance of $370-$375 million. Ex. 14; Ex. 12.  The

Company also reported comparable sales growth of 5% in Q3 2013.  Ex. 14.  During the

December 12 call, however, lululemon lowered its FY 2013 revenue guidance by $25 million

(-1.53%) and lowered its Q4 2013 revenue guidance from the $564.7-$574.7 million projected in

September[7] to $535-$540 million (-6.0%), explaining that a combination of causes—including

"supply chain issues," "overall traffic trends" (due in part to recent negative press attention), and

"a weaker Canadian dollar"—contributed to its lowered Q4 2013 guidance, which "assume[d] a

---

[7] On September 12, lululemon projected FY 2013 revenue of $1.625-$1.635 billion, implying Q4 2013 revenue guidance of $564.7-$574.7 million based on Q3 YTD results and Q3 2013 projections.  Ex. 12.

US_ACTIVE:\44429259\6\60373.0003

continuation of the weaker-than-expected performance that [the Company had] seen quarter-to-date." Ex. 15 at 4, 5, 10.  At the close of trading that day, lululemon's stock price had declined 11.6%.  Ex. 6 ($68.35 to $60.39).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "'[L]abels and conclusions'" and "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice. *Id.* (citation omitted).  To state a Section 10(b) claim, "plaintiffs must adequately allege that in connection with the domestic purchase or sale of a security, defendants made one or more materially false statements or omissions, with scienter, and that these acts are causally related to plaintiffs' loss." *C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (citations omitted).  Plaintiff must also "comply with the requirements of Federal Rule of Civil Procedure 9(b), as well as the [PSLRA]," which respectively require "that plaintiffs allege with particularity the circumstances constituting the fraud" *and* "that plaintiffs identify the alleged false statements and reasons why those alleged statements are misleading, and that they allege sufficient facts to set forth a 'strong inference of scienter.'" *Id.* at *3 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).[8]

## I.    PLAINTIFF FAILS TO PLEAD ACTIONABLE FALSE STATEMENTS OR OMISSIONS

As this Court explained in *C.D.T.S.*, "falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made."  2013 WL 6576031, at *3 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip*

---

[8] Because Plaintiff fails to state a claim for a primary violation under Section 10(b) and Rule 10b-5, its control person claim under Section 20(a) also fails.  *See Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004).

*Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)).  "To state a claim, plaintiffs must do more than

assert in a conclusory fashion that statements were or must have been false—they must allege

facts supportive of how and why this is the case."  2013 WL 6576031, at *3 (citing *Rombach*,

355 F.3d at 174).  Moreover, in pleading falsity, a plaintiff may not engage in the tactic Judge

Friendly identified years ago as "fraud by hindsight."  *See Denny v. Barber*, 576 F.2d 465, 470

(2d Cir. 1978).  Put simply, "that a statement true when made later becomes untrue—or is later

shown to be untrue—does not constitute falsity."  *C.D.T.S.*, 2013 WL 6576031, at *3 (citing *San

Leandro*, 75 F.3d at 812-13).  Finally, where a plaintiff asserts the falsity of a statement of belief

or opinion, the plaintiff must plead that it "was both objectively false *and* disbelieved by the

defendant at the time it was expressed."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir.

2011) (emphasis added).[9]

### A.  Plaintiff Fails to Plead That Defendants' Statements Were False

#### 1.  *Period 1:  Statements Issued Before the Luon Announcement*

In this early part of the Class Period, Plaintiff attacks Defendants' general statements

regarding lululemon's commitment to quality, most of which had appeared in the Company's

disclosures for years.[10]  In challenging these statements, Plaintiff butchers the context, omitting

words indicating a statement of opinion and belief, or transforming cautionary, forward-looking

language into a purportedly definitive declaration of fact.  (For the Court's convenience, Exhibit

1 to the Allerhand Declaration sets forth the alleged misstatements in context.)  For example:

- With respect to the challenged language in lululemon's Form 10-Qs, Plaintiff omits the
  key prefatory words "*We believe that our brand is recognized as*," which clearly show
  the Company's purported statement about being a "leader" in quality to be an *opinion*

---

[9] *See also City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (*Fait*'s "reasoning applies under Sections 10(b) and 20(a) of the 1934 Act").

[10] *Compare* Ex. 1, Entries 3, 7, *with* Ex. 16 at 25, *and* Ex. 17 at 29.  *Compare also* Ex. 1, Entry 4, *with* Ex. 18 at 4. *Compare also* Ex. 1, Entry 5, *with* Ex. 19 at 14.

US_ACTIVE:\44429259\6\60373.0003

about industry recognition.  AC ¶¶ 98, 102; Ex. 1, Entries 3, 7 (emphasis added).
Plaintiff has not alleged that the market did not, in fact, recognize lululemon as a leader
in quality (objective falsity) or that the Company did not hold its stated belief (subjective
falsity), as Plaintiff must under *Fait*.  *See supra* p. 9.

- Plaintiff characterizes Ms. Day's statements on the September 7, 2012 earnings call
  regarding the Company's "comfort[]" with its ability to "maintain quality" as a false
  "reassur[ance]" that lululemon "had addressed and corrected its quality control
  deficiencies." AC ¶ 96.[11]  Ms. Day made no such assurance or representation. Ex. 1,
  Entry 4.  Indeed, Ms. Day expressly cautioned investors during this call that quality
  control problems occasionally occur, explaining that the product is "*made by humans and
  therefore not always perfect.*" *Id.* (emphasis added).[12]

- Plaintiff also mischaracterizes Ms. Day's statements on the December 6 earnings call
  concerning "a healthy business model" and forswearing "growth at any cost" as a
  "reassur[ance]" that lululemon was "not sacrificing quality in pursuit of growth" and was
  "putting into place processes to prevent serious problems from occurring."  AC ¶ 101.
  But Plaintiff omits that Ms. Day was asked to address lululemon's plans for *international
  expansion*.  *See* Ex. 1, Entry 8.  Her answer had nothing to do with the quality issues
  alleged here and merely stated Ms. Day's opinion that it is not advisable to build a "loss-
  leading market" and then "clean[ ] it up afterwards," and that in pursuing international
  expansion, lululemon was not employing a "growth at any cost" model.  *Id.*

- Plaintiff omits that the challenged statements about "assured quality" (*see* AC ¶ 94)
  appeared on the "careers" (Ex. 1, Entry 2) and "education" (Ex. 1, Entry 1) pages of
  lululemon's website.  Thus, they were clearly directed at jobseekers or customers and not
  to investors "in connection with" the sale or purchase of a security, as required under
  Section 10(b).  *See Hemming v. Alfin Fragrances, Inc.*, 690 F. Supp. 239, 244-45
  (S.D.N.Y. 1988) (statements directed toward the "consumers of a product" and not
  "investors in a corporation" are not actionable under Rule 10b-5).

Irrespective, the Amended Complaint does not plead, much less plead with the

particularity required by Rule 9(b), that any of these early Class Period statements were false

when made.  For the most part, Plaintiff generally relies on the tautology that because lululemon

sold substandard yoga pants in March 2013, the Company's prior statements regarding the

---

[11] Ms. Day was discussing a color bleeding issue previously disclosed earlier in 2012. Ex. 1, Entry 6.

[12] Plaintiff omits nearly identical language in challenging the statement on the Company's website that "[q]uality is
at the heart of everything we do."  *Compare* AC ¶ 94, *with* Ex. 1, Entry 1 ("Because our products are made for
humans, by humans, sometimes products don't quite turn out the way we imagined.").

US_ACTIVE:\44429259\6\60373.0003

quality of its products were false when made.[13]  But this type of fraud by hindsight pleading has

long been held insufficient to establish falsity.  *See C.D.T.S.*, 2013 WL 6576031, at *3-4

(conclusory allegations that statements touting risk controls "had to have been false" because

risk controls failed to prevent a problem did not adequately plead a Section 10(b) claim).[14]

Similarly, Plaintiff quotes lululemon's statements concerning the causes of quality shortfalls that

it discovered as a result of its investigation into the sheerness issue and asserts, *ipse dixit*, that

this information rendered its earlier statements false when made.[15]  But "ex post" "reports,

filings, and statements . . . [a]t most . . . amount to a *later* realization that risk controls were not

catching certain conduct and could be improved upon."  *C.D.T.S.*, 2013 WL 6576031, at *4.

     Plaintiff attempts to shore up these hindsight conclusions with a mystery "expert's"

conclusion that lululemon had sub-"industry standard" quality controls because it did not

conduct "live model" testing on its product shipments.  AC ¶¶ 52-53, 132.  But this conclusory

assertion of an undisclosed expert cannot substitute for well-pleaded facts demonstrating

contemporaneous falsity.  And regardless, Plaintiff's after-the-fact insistence that lululemon

could have—or even should have—discovered quality shortfalls sooner using different controls

does not plead falsity.  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y.

2004) ("'allegations of garden-variety mismanagement' are not actionable under section 10(b)")

---

[13] *See* AC ¶¶ 94-99, 101-03.

[14] *See also Sinay v. CNOOC Ltd*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013) (allegations based on hindsight "are classically insufficient to support a strong inference of scienter"), *aff'd*, 2014 WL 350055 (2d Cir. Feb. 3, 2014).

[15] *Compare, e.g.*, AC ¶¶ 5, 58, 95(c), 97(c) (Defendants allegedly knew "testing protocols were incomplete" at the start of the Class Period), *with* Ex. 8 (disclosing that "*[a]fter an evaluation*" of the black luon issue announced on March 18, lululemon had found that certain "testing protocols were incomplete") (emphasis added).  *Compare also* AC ¶¶ 95(d), 97(d) (alleging contradictory information of "gaps" in the quality control process and "revised specifications" for modulus), *with* Ex. 1, Entry 17 ("There are a couple of gaps that we found in [the luon manufacturing process]"), *and* Ex. 1, Entry 19 ("lululemon's quality team is assessing all luon products in the production pipeline according to newly implemented rigorous testing and quality processes that includes revised specifications for modulus (stretch), weight and tolerances").

11

(citation omitted), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

Plaintiff's confidential witness ("CW") allegations likewise fail to plead falsity.  As discussed in Point II, *infra* (addressing scienter), the CWs largely set forth conclusory assertions and personal opinions—all offered in hindsight—about the adequacy of lululemon's quality controls.[16]  Fatal to Plaintiff's claim, none of them allege with particularity "that Defendants had knowledge of *specific* contradictory information" concerning any widespread quality issues or quality control deficiencies that rendered Defendants' general statements about quality false, let alone that any such "information was available *at the same time* that Defendants made the challenged statements."  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphasis added) (dismissing complaint for this reason), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).  *See infra* at pp. 19-23.

### 2.    *Period 2:  Statements Regarding the Sheer Luon Issue*

In a transparent effort to extend the Class Period beyond its natural ending point (*i.e.*, the March 2013 announcement of the sheer luon issue, under Plaintiff's theory of fraud), Plaintiff challenges several disparate statements made during this period.  *First*, Plaintiff alleges that on March 18, Defendants "attempted to downplay" or "minimize" the sheer luon issue and to "fram[e] it as a minor, discrete issue," or (as Plaintiff twists Ms. Day's apology to customers) a "mere 'inconvenience.'"[17]  AC ¶ 107; *see also id.* ¶¶ 111-12 (Defendants "minimized" the luon issue).  This claim is not plausibly alleged in light of the Company's express statement in the very same press release that it "expect[s] this issue will have a significant impact on [its]

---

[16] When plaintiffs allege that defendants had "knowledge of facts or access to information contradicting their public statements," "the falsity and scienter [pleading] requirements are essentially combined."  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 282, 292 (S.D.N.Y. 2006) (citations omitted).

[17] Ms. Day's words in context: "We regret any inconvenience this has caused for our guests."  Ex. 1, Entry 9.

financial results." Ex. 5 at 1.  *Second*, Plaintiff attempts, but fails, to demonstrate the falsity of

lululemon's statement in its March 21 Form 10-K that it partners with "a leading independent

inspection, verification, testing and certification company, which conducts a battery of tests."

AC ¶ 109.  The lone allegation of falsity in this regard is CW5's claim that in the spring of 2012,

SGS (the leading independent testing company employed by lululemon (AC ¶ 27)) "often failed

to inspect" luon or "other products," causing friction between it and lululemon that they

apparently resolved, but that, in CW5's opinion, SGS "didn't really fix the issues."  *Id.* ¶ 65.

The assertion is conclusory and, even if accepted, describes a testing issue that occurred well

outside of the Class Period and says nothing about the tests SGS was conducting in March 2013.

Indeed, CW5 was not even employed by lululemon in March 2013.  *See id.* ¶ 34.

Plaintiff characterizes lululemon's April 3 update concerning the workstreams it was

implementing to address the potential causes of the sheerness issue as an "assurance[]" that no

quality control problems would occur in the future, which "assurance[]" was allegedly false

because "quality control problems" continued.  *Id.* ¶¶ 113-14; Ex. 1, Entry 19.  There was no

such "assurance" and in any event, Plaintiff fails to allege any particularized facts detailing—as

of April 3 or any time thereafter—what specific "quality control problems continued" at

lululemon or how the April 3 disclosure of newly initiated remedial measures concealed this

information.  AC ¶ 113.

### 3. *Period 3: Statements Concerning Quality Control Improvements*

In an effort to expand the Class Period even further, Plaintiff newly alleges in its

Amended Complaint that lululemon continued to mislead investors about product quality and

control improvements on June 10 and September 12.

With respect to the June 10 disclosures, Plaintiff claims that Ms. Day falsely stated that

lululemon had implemented "a 'back-in-black' strategy to get lululemon product back in stores

US_ACTIVE:\44429259\6\60373.0003

and that *as a result*, the Company had continued to grow on a comparable store basis of 7%" because, according to Plaintiff, "broad[]" "quality control problems continued" that "were not fully addressed by the Company's purported remedial measures."  AC ¶ 120.  *First*, there are no pleaded facts supporting Plaintiff's conclusory assertion that an undisclosed quality problem continued as of June 10.  *Second*, Ms. Day was not describing a completed remedial program; rather, in words Plaintiff omits, Ms. Day described the "soft launch" of the "back in black" strategy, explaining that "we're getting back into stock gradually . . . and we'll not be fully back in stock until the end of Q2."  Ex. 10 at 6, 7.  And at no point did Ms. Day suggest that the 7% comparable sales growth that lululemon had achieved for Q1 2013 was a result of the nascent "back in black" strategy.  Ex. 1, Entry 20.  *Third*, Plaintiff omits from its discussion of the June 10 call (AC ¶ 120) Ms. Day's statements making clear that quality control improvements were *ongoing*.  *See supra* at pp. 5-6; Ex. 1, Entry 21.  Viewed in context, Ms. Day's statements hardly constitute an assurance that lululemon's remedial efforts were fully implemented or that all quality control issues were fully behind it, as Plaintiff's allegations insist.  *See* AC ¶ 120.

With respect to the September 12 disclosures, Plaintiff asserts that Ms. Day "declared" that "the Company's quality control corrections would be fully realized and behind Lululemon by the beginning of fiscal year 2014."  *Id.* ¶ 121.  Then, Plaintiff asserts that this "declar[ation]" was false at the time it was made on September 12 because three months later the Company downwardly revised Q4 2013 guidance and discussed the status of ongoing quality control improvements.  *Id.* ¶ 124.  To begin with, Ms. Day made no such declaration on September 12.  *See* Ex. 13.  Indeed, Plaintiff conveniently omits the Company's explanation that:

> [O]ver the past several months, we've focused on quality and getting luon back into our stores. . . . [This] resulted in some short-term pain. . . . driven primarily by late deliveries of fall product. . . . These late deliveries are a hang over from the disruption caused earlier in the year with the luon issue. . . . *We anticipate this*

14

> *knock-on effect to continue to impact timing of product deliveries in Q3 and through the balance of the year.*

*Id.* at 5 (emphasis added).[18]  This hardly constitutes a declaration that all quality control problems would be behind the Company by the end of January 2014 (the end of lululemon's fiscal year).  Moreover, there is not a single particularized allegation, from a CW or otherwise, demonstrating what contradictory information existed as of September 12 that rendered Ms. Day's actual statement false.  *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (dismissing complaint where "allegations [did] not establish what specific contradictory information the Individual Defendants received or when they received it"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).[19]

### B.   Many of the Alleged Misstatements Constitute Non-Actionable Puffery or Opinion Statements

Separately, Plaintiff's Section 10(b) claim fails because numerous of the challenged statements are non-actionable "puffery" that is "too general to cause a reasonable investor to rely upon them."  *See  ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009).  Plaintiff challenges as false such statements as "lululemon's assured quality level is the highest in the industry" (AC ¶ 94), "the quality of our products are paramount" and "our first priority [is] to protect [] quality" (*id.* ¶ 107), and "[we believe that our brand is recognized . . . as a] leader in technical fabrics and quality construction" (*id.* ¶ 98; Ex. 1, Entry 3).[20]  But the Second Circuit and this District have consistently and repeatedly held that

---

[18] Plaintiff again mischaracterizes the Company's reported 8% comparable sales growth during Q2 2013 as being a "result" of lululemon's "focus[] on strengthening [its] product operations function."  AC ¶ 121.  No one on the September 12 call characterized the reported growth in this manner.  *See* Ex. 13 at 4.

[19] The Amended Complaint also discusses several post-Class Period statements (AC ¶¶ 127-30), which "ha[ve] significance . . . only when [they] actually do *confirm* what defendant knew or should have known"  at the time of the alleged misstatement.  *Sinay*, 2013 WL 1890291, at *8.  Plaintiff makes no attempt to allege what these January 2014 disclosures confirmed regarding Defendants' knowledge during the Class Period.

[20] *See also* AC ¶¶ 94, 96, 98, 101, 102, 107, 109, 113, 120-21 (all identifying similar statements); Ex. 1, Entries 1-4,

statements regarding a company's commitment to and/or leadership in integrity, controls, and

discipline are "puffery." *See, e.g.*:

- *ECA*, 553 F.3d at 205-06 (statements regarding J.P. Morgan's "standard-setting reputation for integrity" and "'risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process,'" which plaintiffs alleged "were misleading because [J.P. Morgan's] poor financial discipline led to liability in the WorldCom litigation and involvement in the Enron scandal"—particularly because "they related to the integrity and risk-management practices of an investment bank" and "the significance of a bank's reputation is undeniable"—were "'precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (citation omitted);

- *C.D.T.S.*, 2013 WL 6576031, at *1-2, 4-5 (statements touting "disciplined and effective risk management and control systems," "significant improvements in the . . . measure[ment] and manage[ment] [of] risk care," and a "new risk culture" constituted "aspirational puffery found inactionable by courts"); and

- *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) ("general statements about [the company's] risk management practices and controls," including statements that it was "committed to best practice" and "maintain[ed] the strong control and financial governance frameworks," all "constitute[d] 'puffery'").

Moreover, to the extent that these statements crossed the line from puffery into

expressions of belief or opinion,[21] Plaintiff fails to plead that any of the statements of opinion

were objectively false or that the Company or Ms. Day did not genuinely believe them and,

accordingly, fails to plead falsity under *Fait*. *See supra* p. 9; *CBS Corp.*, 679 F.3d at 68-69

(affirming dismissal of fraud claims because the complaint was "devoid even of conclusory

allegations that defendants did not believe in their statements of opinion").

## II.   PLAINTIFF FAILS TO PLEAD SCIENTER

The Amended Complaint should also be dismissed for failure to plead scienter—"a

mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319

---

7-9, 11-14, 18, 22, 23, 25-26.

[21] *See* AC ¶¶ 96, 98, 101, 102, 109, 113, 120, 121; Ex. 1, Entries 3, 4, 7, 8, 12, 14, 18, 23, 26.

US_ACTIVE:\44429259\6\60373.0003

(citation omitted).  In determining if Plaintiff has met its burden of pleading "an inference of scienter *at least as likely as any plausible opposing inference*," the Court

> must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Id.* at 314 (emphasis added).

Here, Plaintiff posits the following theory of fraud:  sometime before the start of the Class Period, Defendants allegedly became aware of a major sheerness problem in the black luon pants or of severe deficiencies in quality controls.  Instead of disclosing this information, as the Company ultimately did in March 2013, Defendants continued to tout lululemon's quality controls and the belief that lululemon offered high quality products that allowed it to charge higher prices than its competitors.  Defendants purportedly did so despite knowing that lululemon was on a path toward shipping see-through yoga pants to its stores (with the inevitable customer, investor, and media outcry), but hoping nonetheless that they would get away with this "fraud" because no one would notice.

There is, of course, an alternative theory:  lululemon sells athletic wear at higher prices because consumers recognize it as a quality brand.  Lululemon knows this and discloses in its SEC filings that quality is mission critical and that lululemon has processes in place to ensure that quality.  Lululemon is also a young company that is not immune to growing pains.  When it experienced problems with respect to certain colors bleeding, the Company apologized and addressed it publicly.  *See* Ex. 20.  In March 2013, lululemon experienced a serious problem when black luon yoga pants made their way into customers' hands despite suffering from an unacceptable level of sheerness.  The Company immediately pulled the product from stores, offered a refund to affected customers, promptly moved to rectify the root causes it identified in

17

its quality controls, and continued to keep investors apprised in real time about its efforts to improve those controls as well as the projected and actual costs to the Company.  This theory offers something that Plaintiff's version lacks:  plausibility.

Even setting aside the implausibility of the story alleged in the Amended Complaint, Plaintiff fails to plead (i) "that the defendants had both motive and opportunity to commit the fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### A.   Motive and Opportunity

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the defendants] 'benefitted in some concrete and personal way from the purported fraud.'"  *ECA*, 553 F.3d at 198 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  Here, Plaintiff attempts to show "motive" by alleging stock sales by Mr. Wilson and Ms. Day during the Class Period.  However, "no inference of scienter may be drawn from insider trading activity unless it is found that such activity is 'unusual.'"  *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (citation omitted). None of the alleged trading activity was "unusual."[22]

Ms. Day's Class Period trading activity was consistent with her practice of exercising stock options as they vested and immediately selling an identical number of shares on a quarterly basis in March, June, September, and December, following quarterly or annual filings by lululemon with the SEC.  *Compare* Ex. 21 (Class Period trades), *with* Ex. 23 (trades from 2010-2013).  Ms. Day's Class Period sales were also consistent with her sales activity in each of the three years leading up to the start of the Class Period.  *See* Ex. 22 (showing sales of 98.34% of

---

[22] All of Mr. Wilson's trading activity occurred pursuant to a 10b5-1 trading plan, and his Class Period sales constituted only a very small portion of his lululemon stock holdings.  *See* Wilson Mem. at 7-11.

US_ACTIVE:\44429259\6\60373.0003

the shares she held or acquired during the Class Period, sales of 90.67% of such shares in 2012, sales of 93.48% of such shares in 2011, and sales of 81.89% of such shares in 2010). *Cf. In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) ("[i]nsider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices") (citations omitted).[23]  And the timing of the alleged trades further undermines any fraudulent intent as Ms. Day sold no stock for months leading up to the March 18 announcement of the black luon sheerness issue, the June 10 announcement of her resignation, or the Company's announcements regarding its financial projections on December 12, 2013.[24]  Ex. 23.

### B.     Conscious Misbehavior or Recklessness

Where, as here, the plaintiff fails to plead motive, its allegations regarding conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142, 143 (2d Cir. 2001).  To plead conscious misbehavior, Plaintiff must allege with particularity that Defendants engaged in "deliberate illegal behavior." *Novak*, 216 F.3d at 308.  The bar for pleading recklessness is equally high:  Plaintiff must plead particularized facts demonstrating at the least that Defendants' conduct was "'highly unreasonable and [] represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Sinay*, 2013 WL 1890291, at *7 (citing *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 336 (S.D.N.Y. 2011).  "An allegation that a defendant merely ought to have known is not sufficient to allege

---

[23] Ms. Day's sales increased slightly during the Class Period following the announcement of her resignation on June 10, 2013, as a "'normal and expected' consequence of [her] retirement, not as part of an unsubstantiated conspiracy to defraud." *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 2013 WL 4505256, at *24-25 (S.D.N.Y. Aug. 23, 2013) (citations omitted) (collecting cases). *See* Ex. 22 (showing Class Period sales slightly higher than prior years in terms of percentage).

[24] *See City of Taylor*, 2013 WL 4505256, at *24 (stock sales are unusual only "at times calculated to maximize the personal benefit from undisclosed inside information") (citation omitted); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) ("Whether trading was unusual or suspicious turns on factors including . . . whether sales occurred *shortly before corrective disclosures*.") (emphasis added).

19

recklessness." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012).

> 1.     *Period 1:  Statements Issued Before the March Luon Announcement*

Plaintiff attempts to plead that Defendants knew that their general statements of opinion about lululemon's quality made in connection with the Company's quarterly earnings releases on September 7 and December 6, 2012 were false by pointing to (i) CW allegations, (ii) the sheer luon announcement, and (iii) prior disclosures of unrelated quality issues.  These allegations fail.

The Second Circuit has made clear that "where plaintiffs rely on confidential personal sources," those CWs must "provide an adequate basis for believing that the defendants' statements were false."  *See Novak,* 216 F.3d at 314.  In that regard, "Plaintiff must specifically identify the reports or statements that contradict the Individual Defendants' alleged misrepresentations" and must allege "facts indicating that [the CW] was in a position to have knowledge regarding communications with [the Company's] senior management or the conclusions reached by . . . management."  *Local No. 38*, 724 F. Supp. 2d at 459, 460-61 (citations and internal quotation marks omitted).  CWs who were "employed in rank-and-file positions" and who "had no contact with the Individual Defendants" will not suffice.  *Id.* at 460; *see also Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec 10, 2008), *aff'd sub nom. Furher v. Ericsson LM Tel. Co.*, 363 Fed. App'x 763 (2d Cir. 2009).

The CWs cited in the Amended Complaint are all many levels removed from Ms. Day and Mr. Wilson and, with the exceptions of CWs 1 and 6 discussed *infra*, none are alleged to have had any direct contact with Ms. Day, Mr. Wilson, or any senior officer or board member. For the most part, the CWs simply set forth their own opinions that lululemon grew too fast at the expense of quality and quality controls, but they tellingly fail to "establish what specific contradictory information the Individual Defendants received or when they received it" (*Local*

*No. 38*, 724 F. Supp. 2d at 461) and fail to "specify[] the content of [any internal] reports or the connection between those reports and the misstatements at issue in this case." *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010).[25]  Indeed, there is no allegation that any of these CWs' opinions were even brought to the attention of Ms. Day (or any other member of senior management) or Mr. Wilson.  *See PXRE*, 600 F. Supp. 2d at 537-38.[26]

The only CWs who claim any contact whatsoever with Ms. Day—CWs 1 and 6—do not supply the missing element of scienter.  CW1, a purported "former Assistant Manager for Specializing and Operations at Lululemon between September 2010 and February 2013" (AC ¶ 30) claims that, "as early as October 2012 . . . Day 'acknowledged' internally at the Company's annual manager conference . . . a 'sheer luon' issue" (*id.* ¶ 54).  Various inconsistencies call this allegation into question:  the referenced store manager conference occurred in August, not October (*see* Ex. 24 at 3), and, of the 700 or so attendees at the conference (*id.*) and the 11 CWs alleged in the Amended Complaint, Plaintiff was able to drum up only one CW who purports to recall even a mention of an unquantified "sheer luon issue" at the conference.  And CW6, a purported former employee in lululemon's IT department, merely alleges that, in the "winter of 2012-2013," Ms. Day purportedly "admitted internally to employees" "in so many words" that "quality was sacrificed" due to growth.  AC ¶ 35.  Neither CW1 nor CW6 details what specific, contradictory information Ms. Day was aware of at the time of the alleged misstatements, or any facts suggesting the contemporaneous existence of a widespread sheerness problem or other

---

[25] *See, e.g.*, AC ¶¶ 34, 54, 61, 63 (ascribing to CWs 2, 3, 4, and 5 conclusions such as "the Company failed to make quality control a priority," lululemon had "catch as catch can" quality controls, the Company was "a house of cards; it just grew too fast," and the Company had an "understaffed" or "inexperienced" "quality team").  CW5 also opines that lululemon's Hong Kong team "'did not have the manpower' to oversee the Company's quality control testing," but Plaintiff does not specify how CW5's opinion rendered any of Defendants' statements false.

[26] Even where the CWs otherwise mention Ms. Day or Mr. Wilson, the allegations are conclusory, and not inconsistent with any statements about lululemon's commitment to quality in the first 6 months of the Class Period. *See* AC ¶¶ 46, 139 (general, conclusory allegations from CW10, CW5, and CW2 that Ms. Day "had access" to or received "regular reports" about quality control information and that Mr. Wilson "still ha[d] his hands in the pot").

21

quality issue, as opposed to *ad hoc* customer complaints routine to any retailer.[27]

Grasping at straws, Plaintiff argues that "Defendants were on notice" of the Company's "serious quality control issues" because of a handful of prior quality issues dating back to 2007 (AC ¶¶ 37, 40-43, 45) that had nothing to do with luon. *Id.* ¶ 135. Plaintiff does not allege that any of these issues continued into the Class Period or explain how quality shortfalls that occurred and were disclosed long before the Class Period could possibly put Defendants on "notice" that their Class Period statements concerning quality were false.

### 2.    Period 2:  Statements Regarding the Sheer Luon Issue

Plaintiff also fails to plead scienter with respect to Defendants' statements concerning the specifics of the decision to pull the luon pants from stores and subsequent investigation of the sheerness issue. *See* AC ¶¶ 56, 107-11, 113. Not a single CW is alleged to have been involved in the March 2013 discovery and disclosure of the sheer luon issue, the subsequent investigation, or any of the related updates to investors. Thus, *a fortiori*, Plaintiff cannot and does not describe any CW "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" to be contradictory. *Novak*, 216 F.3d at 314. Additionally, Plaintiff appears to suggest that the Company knew that statements in its March 21 Form 10-K concerning its "core values" and quality testing were false because the Company knew that quality testing was not occurring. In support of this assertion, Plaintiff relies on conclusory CW assertions untethered to any specific person's knowledge, any specific facts, or—except for a single allegation from CW5—any specific time during the Class Period. *See* AC ¶¶ 64-65 ("the Company knew that Eclat was not conducting testing on its black Luon bottoms"; "the Company's monitoring of Eclat was 'very, very lax.'"). And although CW5

---

[27] Plaintiff's CW allegations similarly fail to plead scienter as to Mr. Wilson. *See* Wilson Mem. at 11-12.

claims, without elaboration, that Eclat sent the Company "[in]accurate" "test reports on its Luon products" "in September or October 2012" (*Id.* ¶ 64), Plaintiff fails to "'specifically identify the reports or statements containing this information'" (*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (citation omitted)) and does not plead "what specific contradictory information the Individual Defendants received" as of March 21 (*Local No. 38*, 724 F. Supp. 2d a t 461).

### 3.    Period 3:  Statements Concerning Quality Control Improvements

Plaintiff also fails to plead scienter as to the challenged statements regarding lululemon's efforts to improve its quality controls and the projected financial impact of those efforts on the Company's bottom line.  *See supra* pp. 13-15; AC ¶¶ 120, 121.  The CW allegations Plaintiff offers up cannot ascribe any contradictory knowledge to Defendants.  Only four CWs worked at lululemon as of June 10 and neither their allegations nor their job positions relate to the quality control improvements, the Company's financial results, or disclosures to investors.[28]  And by September, not a single CW worked at lululemon and thus could not possibly possess information bearing upon the accuracy of Defendants' statements.  Thus, it is unsurprising that Plaintiff fails to allege "what specific contradictory information the Individual Defendants received or when they received it" during this period.  *Local No. 38*, 724 F. Supp. 2d at 461. Further, the Second Circuit has held that a company's investigation and implementation of remedial efforts following the discovery of a problem is "a prudent course of action that weakens rather than strengthens an inference of scienter."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (citation omitted).[29]

---

[28] *See* AC ¶ 34 (CW 3); *id.* ¶ 35 (CW 6); *id.* ¶ 53 (CW 10); *id.* ¶ 54 (CW 11).

[29] *See also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *20 (S.D.N.Y. Jan. 14, 2013) (finding that defendant's "quick action" to close its mine upon receiving information that its mine posed safety threats and investment of "significant resources" in remediation of the mine "militates against a finding of scienter"), *aff'd sub*

Plaintiff's attempt to plead scienter based on Ms. Day's resignation also fails.  The Amended Complaint alleges only that Ms. Day's resignation was "abrupt[]," "sudden," "suspicious[]," and "follow[ed] the Company's worst product quality disaster in its history."  AC ¶ 138.  In fact, the resignation occurred months after the March 18 announcement, and the Amended Complaint does nothing to link Ms. Day's resignation with any purported fraud.  Indeed, it is a matter of public record that Ms. Day continued in her position as CEO until January 20, 2014, a fact hardly supportive of Plaintiff's musing that she was a "victim" of the sheer luon issue.  *See PXRE*, 600 F. Supp. 2d at 545 (resignation does not demonstrate scienter absent "factual allegations linking [the] resignation . . . to the alleged fraud").[30]

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

The Second Circuit's standards for pleading loss causation are familiar.  The Complaint "must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2nd Cir. 2005) (citation omitted).  *First*, Plaintiff does not plead loss causation in connection with the March 18 announcement because "substantial indicia of the risk that materialized [were] unambiguously apparent on the face of the disclosures alleged to conceal the very same risk."  *Lentell*, 396 F.3d at 177.[31]  *See supra* p. 4.  Nor does Plaintiff plead

---

nom. *Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 388 n.213 (S.D.N.Y. 2013) (granting defendant's motion to dismiss and noting that "drawing an adverse inference from [defendant's] attempts to strengthen Longtop's financial controls would be inconsistent with the policy animating Federal Rule of Evidence 407, which prohibits using subsequent remedial measures as evidence of liability").

[30] *See C.D.T.S.*, 2013 WL 6576031, at *7 (resignation of two high-ranking executives did not demonstrate scienter where there were "a number of other, more plausible reasons why personnel may have been demoted and resigned, some of which may be related to significant trading loss but are not suggestive of intentional fraud").

[31] *See also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (affirming dismissal when defendant "provided 'substantial indicia of the risk that' [the company] would file for bankruptcy," so the risk was not concealed) (citation omitted).

how the March 18 announcement "even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged" on September 7 or December 6. *Cent. States, S.E. & S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 2013 WL 5911476, at *2 (2d Cir. Nov. 5, 2013) (citation omitted).

*Second*, as discussed above, Plaintiff speculates that Ms. Day was a casualty of the black luon issue (AC ¶¶ 117-19) and attempts to recover for the stock price drop on June 10 following the resignation announcement. But Plaintiff does not specify what new, fraud-related information Ms. Day's resignation revealed. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-14 (2d Cir. 2010) (granting summary judgment because there was no causal link between a director's resignation and "resultant negative publicity suggesting possible accounting malfeasance," and the alleged fraud).[32]

*Third*, although Plaintiff relies on lululemon's December 12, 2013 revision of its Q4 2013 guidance and discussion of ongoing control improvements as the final "corrective" disclosure (AC ¶¶ 124-26), Plaintiff does not allege that lululemon's earlier financial projections—clearly protected "forward-looking" statements (*see* 15 U.S.C. § 78u-5 ("projection of revenues"))—were fraudulent. And Plaintiff fails to plead how lululemon's December 12 disclosures revealed any earlier alleged misstatement to have been false when made.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

---

[32] *See also Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, . . . would not alert investors to any improprieties so as to allege loss causation.")

Dated: February 18, 2014
         New York, New York

                                              Respectfully submitted,


                                              _____/s/ Joseph S. Allerhand_____
                                              Joseph S. Allerhand
                                              Caroline Hickey Zalka
                                              Layne S.R. Behrens
                                              Robert S. Ruff III
                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, NY 10153
                                              Telephone: (212) 310-8000
                                              Facsimile: (212) 310-8007

                                              *Attorneys for Defendants lululemon
                                              athletica, inc. and Christine Day*

US_ACTIVE:\44429259\6\60373.0003