UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Lululemon Securities Litigation | ) ) ) Case No. 13-CV-4596 (KBF) ) ) ) ) ) ) ) ) |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Telephone)
(212) 310-8007 (Fax)

*Attorneys for Defendants lululemon athletica, inc., and Christine Day*

March 24, 2014

**TABLE OF CONTENTS**

Page:

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..................................................................................................................................3

I. PLAINTIFF'S OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD ACTIONABLE MISSTATEMENTS..........................................3

II. PLAINTIFF'S OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD SCIENTER...................................................................................7

    A. Plaintiff Fails to Satisfy *Tellabs* ..............................................................................7

    B. Plaintiff Does Not Rebut Defendants' Showing that the Amended Complaint Fails to Plead Motive and Opportunity ................................................8

    C. Plaintiff Does Not Rebut Defendants' Showing that the Amended Complaint Fails to Plead Recklessness .................................................................8

III. PLAINTIFFS' OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD LOSS CAUSATION FOR THE POST-MARCH 2013 DISCLOSURES ................................................................................................................10

CONCLUSION.............................................................................................................................14

## TABLE OF AUTHORITIES

**Cases:**   **Page(s):**

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
    2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom.
    Forsta AP-Fonden v. Agnico-Eagle Mines Ltd*, 533 F. App'x 38 (2d Cir. 2013) .................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................7

*C.D.T.S. v. UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..........................................................................4

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ...............................................................................................11

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) .....................................................................................12

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012) .......................................................................................................5

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
    2013 WL 4505256 (S.D.N.Y. Aug. 23, 2013).........................................................................8

*Dura Pharm., Inc., v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................................10

*ECA, Local 134 IBEW Joint Pension Trust of Chic. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .....................................................................................................4

*In re GLG Life Tech Corp. Sec. Litig.*,
    2014 WL 464762 (S.D.N.Y. Feb. 3, 2014)..............................................................................7

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .......................................................................12

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013).........................................................................14

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010),
    *aff'd*, 430 F. App'x 63 (2d Cir. 2011) ...................................................................................7

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)....................................................................................10

*In re Omnicom Grp., Inc. Sec. Litig*,
    597 F.3d 501 (2d Cir. 2010) ..............................................................................................11, 12

US_ACTIVE:\44449711\4\60373.0003

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s):**

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009) ................................................................................ 11

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ................................................................................................ 10

*Solow v. Citigroup, Inc.*,
   2012 WL 1813277 (S.D.N.Y. May 18, 2012),
   *aff'd*, 507 F. App'x 81 (2d Cir. 2013) .................................................................................. 14

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ........................................................................ 11

**Statutes & Rules:**

15 U.S.C. § 78j-1 ........................................................................................................................ 12

15 U.S.C. § 78u-5 .......................................................................................................................... 7

17 C.F.R. § 229.304 .................................................................................................................... 12

US_ACTIVE:\44449711\4\60373.0003

Defendants lululemon[1] and Christine Day respectfully submit this reply memorandum of law in further support of their motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

All litigants try to fashion a narrative to support their claims.  But not every business misstep can be recast into a viable securities fraud class action.  As demonstrated in Defendants' Brief, lululemon's March 2013 announcement of a pullback of black yoga pants from its stores was a highly public stumble of a growing company, not fraud.  The Company promptly disclosed the problem and offered a full refund to its customers.  Lululemon did not restate its financials.  No senior officer, auditor, or other person with knowledge of the sheerness issue admitted any wrongdoing, let alone systemic quality control failures.  The Company continued to experience significant growth and earnings after March 2013 albeit at a somewhat slower pace due to a combination of causes, as lululemon disclosed in real time.

Plaintiff's narrative of the case is for the most part untethered to the disclosures at issue and a work of fiction.  According to Plaintiff, the March 2013 disclosure of the sheerness issue was merely the first in a series of connected quality control revelations over a 16-month period that "shocked" investors and wreaked "devastating consequences" on the Company.  Opp. at 1-3; AC ¶¶ 8, 117, 124, 127.  This 16-month fraud supposedly began in September 2012 when Defendants made general statements—*as they always had*—concerning the importance of quality to the brand and business model, and lasted through the winter of 2014, when lululemon allegedly admitted "fundamental and widespread" quality control deficiencies "far exceed[ing]"

---

[1] Capitalized terms used but not defined herein have the meaning set forth in the Memorandum of Law in Support of Defendants' Motion to Dismiss, dated February 18, 2014 (ECF No. 48) ("Defendants' Brief" or "Def. Br."). "Ex." citations refer to the exhibits attached to the supporting Declaration of Joseph S. Allerhand, dated February 18, 2014 (ECF. No. 49), and "Reply Ex." citations refer to the exhibits attached to the accompanying Reply Declaration of Joseph S. Allerhand, dated March 24, 2014.  "Opp." or "Opposition" refers to Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint, dated March 13, 2014 (ECF No. 63).

1

the sheer luon issue and disclosed that "a substantial percentage of *all* the Company's products failed to meet basic industry standards and were therefore unsalable." Opp. at 2-4.

The problem with Plaintiff's narrative is that there was no disclosure of pervasive quality control deficiencies, but simply of steps taken to strengthen and improve the process. At no time during or at the end of the Class Period did lululemon announce that a "substantial percentage" of its product failed to meet industry standards or could not be sold. The so-called "fundamental premise" of this action (Opp. at 4)—that lululemon experienced a massive breakdown in quality control and hid it for 16 months—is a fraud narrative that has no facts, much less particularized ones, to support it.

There are a number of fatal legal flaws to the Amended Complaint. We focus below on three. First, we briefly reprise an overarching point: the generalized statements of belief in the quality of lululemon's products at the start of the alleged Class Period are simply not actionable as a matter of law. And there is nothing alleged, much less in a particularized fashion, to show that Defendants' statements were false and misleading in any material way. *See infra* Point I.

Next, we show that even if Plaintiff had adequately pleaded actionable misstatements concerning quality (which it has not), Plaintiff has not come close to carrying its pleading burden on the critical element of scienter. Plaintiff never even attempts to meet the *Tellabs* challenge of alleging a theory of fraud at least as compelling and cogent as the competing, non-fraudulent theory that Defendants set forth in their Brief: lululemon (i) believed it offered quality products, (ii) pulled the sheer luon pants from store shelves upon discovery of the issue, and (iii) promptly disclosed the problem and issued revised earnings projections that, in hindsight, proved remarkably accurate and which Plaintiff does not allege were false or misleading when made. And Plaintiff fares no better in trying to satisfy the "motive and opportunity" and "conscious

2

misbehavior" test by alleging insider trading, relying on an assortment of confidential witnesses (none of whom support Plaintiff's "fundamental premise" of "widespread quality control deficiencies"), and by relying on a mystery expert's conclusion that lululemon failed to employ the supposedly industry-wide standard of "live model" testing after garments are manufactured but before shipment to stores. *See infra* Point II.

Finally, even if the Court were to conclude that Plaintiff has a viable claim of fraud concerning product quality, as a matter of logic and pleading, all of the alleged "corrective" disclosures *after* the March 2013 black luon announcement have no connection to the fraud that Plaintiff alleges. These disclosures, and resulting stock drops, have been bootstrapped to the black luon sheerness issue for the sole reason of extending the Class Period and thereby increasing exponentially the potential damages for stock price declines that have nothing to do with the quality issue underlying the Amended Complaint. Plaintiff's claims predicated on these post-March 2013 disclosures must be dismissed for failure to plead loss causation. *See infra* Point III.

Plaintiff's second attempt at fashioning a coherent and sweeping theory of securities fraud for a 16-month Class Period fails and should be dismissed with prejudice.

## ARGUMENT

### I. PLAINTIFF'S OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD ACTIONABLE MISSTATEMENTS

With respect to the pre-March 2013 statements of belief concerning product quality, Plaintiff's Opposition sets up a straw man argument—statements about quality may sometimes be material (Opp. at 13-14)—and simultaneously disregards Second Circuit precedent showing that generalized statements about quality and belief in a core product are inactionable "puffery." Specifically, the Second Circuit's decision in *ECA, Local 134 IBEW Joint Pension Trust of*

*Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009), and this Court's decision in *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *1-2, 4-5 (S.D.N.Y. Dec. 13, 2013), show that general statements about "integrity," "controls," and "discipline" are not the stuff of securities fraud.  Def. Br. at 15-16.  Plaintiff's Opposition does not dispute that *ECA*'s holding controls this case, but rather argues that Defendants' statements are actionable because they concerned lululemon's "core competencies" and "supposed competitive advantages" (Opp. at 14), and that such statements "cannot be immaterial" (Opp. at 3).  Plaintiff is wrong.

Expressly rejecting an identical argument that the defendant investment bank's statements about its "integrity and risk-management practices" could not be immaterial because "the significance of a bank's reputation is undeniable," the Second Circuit in *ECA* explained: "Plaintiffs conflate the importance of a bank's reputation for integrity with the materiality of a bank's statement regarding its reputation.  *While a bank's reputation is undeniably important, that does not render a particular statement made by a bank regarding its integrity per se material.*"  *ECA*, 553 F.3d at 206 (emphasis added).  No one disputes that lululemon's reputation for offering quality products is important to the brand just as a reputation for integrity is important to a financial institution.  Like the bank's statements about its risk management in *ECA*, however, the statements at issue here were "so general that a reasonable investor would not depend on it as a guarantee that [lululemon] would never take a step that might adversely affect" product quality.  *Id.* at 206.

Even if viewed as material and not puffery, Plaintiff has failed to show that Defendants subjectively disbelieved their own statements of opinion and belief about quality, as required under *Fait*.  Def. Br. at 9-10, 16.  Plaintiff's only response is that "nobody could legitimately hold an 'opinion'" that a company could assure "superior," "lead[ing]," or "highest in the

4

industry" quality without "live model" testing product samples from every shipment, and that Plaintiff's scienter allegations satisfy *Fait*'s subjective falsity requirement. Opp. at 20-21. As explained *infra* pp. 5-6, no pleaded facts support "live model" testing as the industry standard. In any event, Plaintiff's scienter allegations, which, as Plaintiff's Opposition makes clear, are based on a theory of "reckless conduct" (Opp. at 24 ("Defendants' Reckless Conduct Raises A Strong Inference Of Scienter")), do not satisfy *Fait*'s subjective falsity standard. *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68-69 (2d Cir. 2012) (affirming dismissal of Section 10(b) claims based on opinion statements where the complaint was "devoid even of conclusory allegations that defendants did not believe in their statements of opinion" and stating that allegations that defendants "*should* have" been aware of facts contradicting their opinions "alone would not suffice to state a securities fraud claim after *Fait*").

Even setting aside Plaintiff's failure to deal with *ECA* and *Fait*, Plaintiff cannot explain how any of Defendants' statements concerning quality were in any way false or misleading. Plaintiff's primary allegations in this respect—a lack of "live model" testing and a handful of conclusory CW allegations—are without factual support and, even if accepted as true, say nothing of the falsity of Defendants' March 2013 or later statements.

*"Live Model" Testing.* Plaintiff's "falsity" case depends almost entirely on the allegation from its mystery expert that Defendants recklessly misled investors with their statements about quality because lululemon, unlike all others in the retail industry, did not conduct live model testing after goods were produced by third-party manufacturers but before shipment to stores. Opp. at 4-5, 8, 14-15, 16-17, 20, 24, 32-33, 39. Defendants' Brief explained that no pleaded facts, particularized or not, support this mystery expert's conclusion that such testing is "industry standard," and therefore this allegation does not show that lululemon's quality controls were

5

deficient. Def. Br. at 11. Unable to identify any facts on which this expert might have based his or her conclusion, Plaintiff instead asserts that the testing is just "common sense" and directs the Court to (i) the "shocked reactions of analysts who are specialists in the industry" and (ii) "Day's own admission that the Company failed to perform" live model testing. Opp. at 17 n.4. But the Amended Complaint identifies no analysts who state that live-model testing *after* production is the norm. And Ms. Day's March 21 "admission" that lululemon did not perform such post-manufacturing live model testing indicates that it is *not* standard or "common sense": Ms. Day explained that she did not know of *any* manufacturer who performed such live model testing, that the black luon pants "passed all initial testing that we're aware of," that the sheerness issue was "a very complex thing to test for," and that "the only way that you can actually test for the issue is to put the pants on and bend over." Ex. 1, Entries 15, 16.

*CW Allegations.* Defendants' Brief demonstrated that the majority of Plaintiff's CW allegations are conclusory opinions offered in hindsight about lululemon's quality controls. Def. Br. at 20-23 & n.25. Plaintiff's Opposition simply repeats these unspecific, hindsight assessments—pejorative labels like "ad hoc" and "catch as catch can"—with the equally conclusory assertion that the CWs "reported that the undisclosed deficiencies in Lululemon's quality controls were widespread, existed well before they began to manifest with the Black Luon Recall, and known by Defendants." Opp. at 16-17; *see also id.* at 28 (repeating conclusory allegations about product testing). These allegations require factual support, not repetition.

*March 2013 and Later Statements.* Finally, Plaintiff alleges nothing showing the falsity of Defendants' March 2013 or later statements concerning the "extent and financial ramifications" of the Company's alleged quality shortfalls. Opp. at 16. Plaintiff does not contend that any financial projections were actionable nor could it under the forward-looking

6

statement safe harbor. Def. Br. at 25 (citing 15 U.S.C. § 78u-5). Further, even if accepted as true, the only purportedly contradictory information alleged—post-manufacturing "live model" testing and the conclusory CW allegations described above—says nothing of undisclosed "deficient quality controls" (Opp. at 16) at the time of the alleged misstatements in June or September 2013.[2]

## II.   PLAINTIFF'S OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD SCIENTER

### A.   Plaintiff Fails to Satisfy *Tellabs*

As noted at the outset, Plaintiff never engages in the required *Tellabs* analysis and offers no competing overall theory of fraud at least as cogent and compelling as the non-fraudulent theory of what happened. After reading Plaintiff's 40-page brief, one still is left to wonder why the management of a successful and growing brand would risk everything on knowingly producing and shipping one of their signature products—black luon yoga pants—to stores when their intended use would easily and immediately reveal that the pants were sheer. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462-63 (S.D.N.Y. 2010) (finding no "strong inference of scienter" where "common sense caution[ed] against" such an inference) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). It is obvious why Plaintiff avoids the *Tellabs* analysis.

---

[2] Ms. Day reported on March 21, 2013 that lululemon did not do live model testing on product shipments. Ex. 1, Entry 15. *See In re GLG Life Tech Corp. Sec. Litig.*, 2014 WL 464762, at *6 (S.D.N.Y. Feb. 3, 2014) ("'Where allegedly undisclosed material information is in fact readily accessible in the public domain . . . a defendant may not be held liable for failing to disclose this information.'") (citation omitted). And as set forth in Defendants' Brief, the CWs (most of whom were not employed by lululemon in June and all of whom had left the Company by September) offer no internal information contradicting Defendants' public statements in June or September 2013. Def. Br. at 23 & n.28.

7

### B. Plaintiff Does Not Rebut Defendants' Showing that the Amended Complaint Fails to Plead Motive and Opportunity

In response to Defendants' showing that Ms. Day's trading during the Class Period was not "unusual" because it was consistent with her pre-Class Period practice (in both timing and amount) (Def. Br. at 18-19), Plaintiff's Opposition offers two arguments. Both fail. First, Plaintiff contends that the "sheer amount of profit" Ms. Day earned from her sales "alone is sufficient to support a strong inference of scienter." Opp. at 33. That is not the law in this District. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 2013 WL 4505256, at *24 (S.D.N.Y. Aug. 23, 2013) ("Insider trading gives rise to a strong inference of scienter '*only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information*.'") (citations omitted) (emphasis added).[3] Second, Plaintiff argues that Ms. Day sold a large number of shares "just weeks before" the luon announcement in March 2013. Opp. at 33-34; AC ¶ 92. This is not true. The referenced sales occurred in December 2012—months before the announcement. AC ¶ 92. Indeed, as discussed in Defendants' Brief, Ms. Day sold no shares in the months leading up to the alleged corrective disclosures. *See* Def. Br. at 18-19; Ex. 23, Entries 47-71 (showing no trades for 2-3 months before March 18, June 10, and December 12, 2013, and January 13, 2014).

### C. Plaintiff Does Not Rebut Defendants' Showing that the Amended Complaint Fails to Plead Recklessness

Plaintiff does not dispute that a failure to plead motive requires "correspondingly greater" allegations of recklessness or that recklessness involves "highly unreasonable" and "extreme" conduct. Def. Br. at 19. Defendants previously demonstrated the Amended Complaint's failure to clear that pleading bar (Def. Br. at 20-24), and Plaintiff's Opposition serves only to highlight

---

[3] *See also* Reply Memorandum of Law in Further Support of Defendant Dennis J. Wilson's Motion to Dismiss the Consolidated Amended Class Action Complaint, dated March 24, 2014, at pp. 4-5.

8

the deficiencies of its pleading.

**_Pre-March 2013 Statements_.** To argue scienter with respect to Defendants' pre-March 2013 statements, Plaintiff's Opposition relies primarily on (i) CW allegations, and (ii) the assertion that Defendants' post hoc assessments of lululemon's quality controls and implementation of remedial measures constitute "admissions" of wrongdoing.

First, Defendants' Brief identified Plaintiff's CWs' consistent failure to explain *what* specifically the reports Ms. Day allegedly received described (did they report widespread problems or routine customer complaints or nothing negative at all?). Def. Br. at 12-13, 20-23. Plaintiff's Opposition simply repeats the Amended Complaint's empty assertions—*e.g.*, Ms. Day "was regularly notified" of quality control issues and "regularly received reports" (Opp. at 25-26)—which are meaningless absent specific allegations describing the contemporaneously available information (whether contained in reports or otherwise) that contradicted Ms. Day's public statements of her opinion.

Second, Plaintiff's Opposition (at 30) continues the Amended Complaint's inexcusable practice of using Defendants' post hoc statements about improvements in lululemon's quality controls to allege that Defendants knew their earlier statements were false. Def. Br. at 11 & n.15. It is a basic tenet of our jurisprudence that fixing one's sidewalk cannot be used as an admission that the homeowner was negligent in the upkeep beforehand, and the same principle applies here. None of lululemon's statements constitute an "admission" of wrongdoing or proof that prior statements of belief about the quality of lululemon's product were dishonest or recklessly made. As Defendants' Brief made clear, this District and Circuit have long recognized that disclosed "improvements" to controls (whether financial or operational) do not in and of themselves prove that prior statements as to the efficacy of the controls were fraudulent.

9

Def. Br. at 23 & n.29.[4]  It bears repeating that while lululemon transparently disclosed its efforts to improve quality controls, it never made any disclosure that supports Plaintiff's "fundamental premise" that there had been "widespread quality control deficiencies."  Opp. at 4.

*Statements During March 2013 and After.*  Plaintiff's only scienter arguments relating to this period—Defendants' alleged "downplaying" of the luon issue and Ms. Day's resignation—fail for the reasons stated in Defendants' Brief (at 12-13, 24).  And Plaintiff offers *no* rebuttal to Defendants' contention that *none* of the CWs ascribe "any contradictory knowledge to Defendants" concerning "the challenged statements regarding lululemon's efforts to improve its quality controls and the projected financial impact of those efforts on the Company's bottom line."  Def. Br. at 23.

### III.  PLAINTIFFS' OPPOSITION CONFIRMS THE AMENDED COMPLAINT'S FAILURE TO PLEAD LOSS CAUSATION FOR THE POST-MARCH 2013 DISCLOSURES

To survive this Motion, Plaintiff must plead facts demonstrating a "causal connection between the material misrepresentation and the loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *see* Opp. at 38-40.  In order to inflate the alleged damages by including stock declines unrelated to the March black luon announcement, Plaintiff argues "that Lululemon's stock price declined through a series of partial disclosures that revealed material new information regarding the true state of the Company's quality controls, and that, ultimately, the full truth of Defendants' fraud was revealed on January 13, 2014."  Opp. at 38.  As discussed

---

[4] Plaintiff also does not dispute that remedial actions undertaken after discovery of a problem "weaken[] rather than strengthen[] an inference of scienter" as to prior related statements. Def. Br. at 23 (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010); *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *20 (S.D.N.Y. Jan. 14, 2013); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 388 n.213 (S.D.N.Y. 2013)). Plaintiff instead argues that lululemon's remedial efforts somehow do not count because they were not "proactive[]" like those in the cases that Defendants cite. Opp. at 25 n.16. It is unclear how any "remedial" measure—reactive by definition—can be "proactive" (a word that does not appear in *Slayton*, *Agnico-Eagle*, or *Longtop*).

in Defendants' Brief (at 24-25) and below, none of the post-March 2013 disclosures involving Ms. Day's resignation and revised earnings projections are adequately pleaded "corrective" disclosures. Although these additional disclosures are crucial inflection points for Plaintiff's damages analysis (Reply Ex. 2), they are not even facially, much less causally, related to the fraud that Plaintiff alleges.

*Ms. Day's June 10, 2013 Resignation Announcement.* Plaintiff continues to insist that Ms. Day's resignation for personal reasons announced on June 10—almost 3 months after the black luon announcement—revealed some additional, previously concealed "truth" about lululemon's product quality woes, and that Ms. Day, who continued to serve as the CEO for another 7 months until her successor was hired, was part of the "fallout" of the March luon issue, whatever that means. Opp. at 39-40; AC ¶ 117. But the Second Circuit and courts in this District have repeatedly rejected such attempts to transform an officer's resignation into a corrective disclosure. *See* Def. Br. at 24-25 (citing *In re Omnicom Grp., Inc. Sec. Litig*, 597 F.3d 501 (2d Cir. 2010)).[5] Unable to distinguish this authority,[6] Plaintiff posits that an officer's resignation can be a "'red flag' of serious operational issues" and cites *In re Winstar Communications,* 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006). Opp. at 39. But *Winstar* bears no resemblance to this case. There, a resignation was not even at issue, much less pleaded as a corrective disclosure; the Court simply stated the unremarkable hypothesis that "'the market may learn of possible fraud [from] a number of possible sources: *e.g.* . . . resignation of CFOs or

---

[5] *See also Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) (dismissing claim to the extent based on alleged partial corrective disclosures of CEO's resignation, restatement of previously disclosed earnings, and revision of previous earnings guidance that were not related to the fraud).

[6] *Omnicom's* requirement that a corrective disclosure reveal "'some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint'" applies with equal force at the pleading stage. *Cent. States Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (quoting *Omnicom*, 597 F.3d at 511). *Cf.* Opp. at 40 n.35 (arguing that *Omnicom* is an inapplicable summary judgment decision).

auditors.'" Opp. at 39 (citation omitted).[7] But, here, all Plaintiff has to rely on is media speculation (from one journalist, one analyst and a blogger) that Ms. Day's resignation was a result of the sheer luon issue. Opp. at 39-40 (citing AC ¶¶ 69-74, 117-119). The media's "conclusory suspicions" as to the reasons for the resignation "do[] not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512.[8]

Simply put, no one disputes that lululemon's stock suffered a substantial decline when the market learned that its widely admired CEO would be resigning. That stock drop, however, is not causally connected to the Amended Complaint's "fundamental premise" of undisclosed, widespread quality problems.

***December 12, 2013 Earnings Call.*** Plaintiff argues that the truth about the lack of quality controls was further revealed on December 12 when lululemon admitted "widespread and significant" quality control deficiencies and that "a substantial percentage of *all* the Company's products failed to meet basic industry standards and were therefore unsalable." Opp. at 2, 40. This allegation crosses from fiction into fantasy. During the December 12 Q3 2013 earnings call, lululemon's CFO (John Currie) explained that while certain supply chain improvements were ongoing (as previously disclosed in June and September),[9] "for now, we've enhanced our back end quality control filters . . . to ensure that faulty product doesn'not make it to our stores" and, as a result, "some styles have been rejected by our quality filters and not released to stores."

---

[7] Further, a resigning auditor is expressly required to file a report outlining any disagreement with the registrant company. *See* 15 U.S.C. § 78j-1 (requiring auditors to file a report following a resignation); 17 C.F.R. § 229.304 (requiring a registrant to file the resigning accountant's letter outlining disagreement as an exhibit to the report or registration statement containing this disclosure). And if the auditor's reason for resignation does not suggest fraud, no inference of fraud will be drawn from the resignation. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 474 (S.D.N.Y. 2008) (auditor's resignation did not provide an inference of fraud where auditor's Item 304 letter stated no disagreement with company).

[8] *See also Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud as required by *Dura*").

[9] *See* Ex. 10 at 8, 10-11; Ex. 13 at 8-9, 12-14.

12

Reply Ex. 1, Entry 2. This disclosure clearly pertains to the recent results of supply chain improvements and thus does not reveal the falsity of any earlier statement.

Plaintiff also contends that, on December 12, lululemon "stunned investors when it revealed" that "[p]recisely because of these quality issues, the Company was forced to cut its earnings estimate for 2013 by a total of 12%." AC ¶ 8.[10] This is entirely misleading. Lululemon disclosed on December 12 that it was reducing the upper range of its FY 2013 EPS guidance by *one cent*—from the $1.94 to $1.97 range announced on September 12 (Ex. 12) to the $1.94 to $1.96 range announced on December 12 (Ex. 14). The projected 12% hit to FY 2013 EPS as a result of the luon pullback was announced nine months earlier, on March 21, 2013. Reply Ex. 4.[11] Further, Mr. Currie stated that the downward revision of guidance was based on a recent "slowdown in traffic in our stores" due to a "combination of causes." Def. Br. 7-8; Reply Ex. 1, Entry 2. This announcement does not "correct" any alleged misstatements made months earlier.

*January 13, 2014 Revised Financial Projections*.[12] According to Plaintiff, on January 13, lululemon "again shocked the market" by downwardly revising its Q4 2013 EPS guidance by seven cents and "disclosing that same store sales would not only be 'flat,' but would actually substantially *decrease* because of the Company's ongoing quality control issues and inability to

---

[10] Alternatively, Plaintiff also points to lululemon's reduction of Q4 2013 guidance on December 12. Opp. at 11. Lululemon did not previously provide Q4 2013 EPS guidance. However, the FY2013 projection and Q3 2013 projections announced in September implied a projected Q4 2013 EPS of $0.84 to $0.87. Ex. 12. On December 12, lululemon announced its Q4 2013 projection of $0.78 to $0.80—$0.07 less than the Q4 2013 projection impliedly derived by calculations of the financial projections announced in September. Ex. 14.

[11] On March 21, 2013, lululemon disclosed that the luon issue would have an estimated negative impact on FY 2013 EPS of $0.25 to $0.27 (12% of its implied FY 2013 EPS projection pre-luon issue). Reply Ex. 4.

[12] Even though the alleged Class Period ends on Friday, January 10, 2014, in a footnote of its Opposition, Plaintiff contends that because lululemon issued its Monday, January 13 press release before the market opened, "[a]ccordingly, the Complaint alleges that investors who purchased Lululemon stock through the close of the market on Friday, January 10 . . . were thus misled." Opp. at 39 n.34. Thus, we address herein the insufficiency of Plaintiff's loss causation allegations predicated on lululemon's January 13, 2014 disclosures.

13

manufacture products that met industry standards." Opp. at 11. In stark contrast to Plaintiff's description of this disclosure, Mr. Currie actually stated:

> We were on track to deliver on our sales and earnings guidance through the month of December; however, since the beginning of January, we have seen traffic and sales trends decelerate meaningfully. Based on this recent performance and assuming these trends continue through the remainder of January, we are reducing our outlook for the fourth quarter. . . . As we end 2013, we are starting to see the results of the significant investments we made throughout this past year to strengthen and enhance our back-of-house product operations structure. While we realize that it will require continued investment and time to get to best-in-class status, with our new leadership in place we are very focused on building on this stronger foundation to execute our long-term growth strategies.

Reply Ex. 3; Reply Ex. 1, Entry 3. That is the sum total of lululemon's disclosures on January 13. There was no disclosure of a quality control failure, no disclosure of some new product pullback, and no disclosure related to luon or sheerness. The Company could not have been any clearer: it reduced Q4 2013 guidance by $0.07 on January 13 because of the decelerating sales and traffic trends that lululemon had experienced *since the beginning of the month*. Accordingly, the January 13, 2014 downward revision of its Q4 2013 projections does not come close to constituting a corrective disclosure of earlier alleged misstatements about quality.[13]

In sum, "[r]ather than relate back to Defendants' alleged misrepresentations, the events and dates Plaintiff identifies" after the March 2013 black luon announcement "relate to other negative information about the company, thereby insufficiently establishing loss causation." *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *9 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir. 2013).

## CONCLUSION

Plaintiff has now had two opportunities to respond to Defendants' arguments for

---

[13] Because the subsequent disclosure on Tuesday, January 14 is not within the Class Period, it "cannot be a corrective disclosure sufficient to establish loss causation." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013). Regardless, there is nothing "corrective" about Mr. Currie's statements that day (which again, Plaintiff flatly mischaracterizes). *See* Reply Ex. 1, Entry 4.

dismissal.  The Amended Complaint should be dismissed with prejudice.

Dated: March 24, 2014
       New York, New York

                                              Respectfully submitted,

                                              /s/ Joseph S. Allerhand
                                              Joseph S. Allerhand
                                              Caroline Hickey Zalka
                                              Layne S.R. Behrens
                                              Robert S. Ruff III
                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, NY 10153
                                              Telephone: (212) 310-8000
                                              Facsimile: (212) 310-8007

                                              *Attorneys for Defendants lululemon athletica, inc., and Christine Day*