```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 18, 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
: 
: 
: 
IN RE LULULEMON SECURITIES                     :     13 Civ. 4596 (KBF)
LITIGATION                                     :
:     OPINION & ORDER
: 
: 
: 
: 
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

This putative securities class action was commenced on July 2, 2013.

Following the appointment of lead plaintiff and lead plaintiff's counsel on October 1,

2013, and the filing of a Consolidated Complaint on November 1, 2013, lead plaintiff

filed a Consolidated Amended Complaint ("CAC") on January 15, 2014 with leave of

the Court. In the CAC, lead plaintiff alleges violations of Section 10(b) of the

Securities Exchange Act and Rule 10b-5 thereunder by defendants lululemon

athletica inc. ("lululemon," or the "company"), lululemon founder and director

Dennis J. Wilson, and former chief executive officer ("CEO") Christine McCormick

Day (Wilson and Day are hereinafter referred to as the "Individual Defendants").

(CAC ¶¶ 153-57, ECF No. 28.) Lead plaintiff also alleges violations of Section 20(a)

of the Securities Exchange Act against the Individual Defendants. (Id. ¶¶ 158-61.)

Lead plaintiff alleges that stock declines related to the events at issue resulted in

investor losses of approximately $2 billion. (Id. ¶ 74.)

Boiled down to a summary version, lead plaintiff alleges that if only

lululemon had someone try on its black luon yoga pants before they shipped, it

would have realized they were sheer; similarly, if lululemon had only had someone exercise in certain athletic wear (enough to produce sweat), it would have realized that the colors bled. As a result, lead plaintiff alleges that defendants' various statements referencing, inter alia, the high quality of lululemon's products and the steps the company took to fix the quality issues were materially false or misleading.

This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud. This is not the law. See, e.g., Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477-79 (1977).

On February 18, 2014, defendants moved to dismiss the CAC in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that it fails to adequately allege the key elements of a cause of action under Section 10(b) and Rule 10b-5: falsity, scienter, and loss causation. The motions became fully briefed on March 24, 2014, and the Court held argument on the motions on April 4, 2014.

For the reasons set forth below, defendants' motions to dismiss are GRANTED, and the CAC is DISMISSED in its entirety.[1]

## I.   ALLEGATIONS IN THE CAC

Lead plaintiff, the Louisiana Sheriffs' Pension & Relief Fund, has brought this action on behalf of itself and those who purchased or acquired lululemon stock during the period from September 7, 2012 through January 10, 2014 (the "Class Period"). (CAC at 1.) Lululemon designs and makes athletic apparel. (Id. ¶ 20.)

---

[1] Though lead plaintiff previously requested leave to amend in the event the Court was inclined to dismiss the CAC (see Opp. at 40 n.37, ECF No. 63), at the beginning of the April 4, 2014 oral argument, lead plaintiff's counsel stated that they were they were no longer "planning" to amend. (4/4/14 Tr. at 5, ECF No. 72.) Accordingly, the Court does not address the issue of leave to amend under Rule 15(a)(2).

Among its most popular products are fitness pants made from a proprietary material known as "luon"—an amalgamation of 86% nylon and 14% lycra.  (Id. ¶ 21.)  Before the Class Period, luon athletic pants accounted for at least 17% of the company's sales of women's bottoms and 6% of the company's total sales (or $80 million during 2012).  (Id.)

Lululemon does not manufacture luon or its products—it outsources those functions to third parties on a contract basis.  (Id. ¶ 22.)  For the past ten years, the company's luon garments have been produced by Taiwan-based Eclat Textile Co. ("Eclat").  (Id.)  The company's robust sales of its apparel led to significant growth.  (Id. ¶ 31.)  The price of its stock also rose significantly.  (Id. ¶ 33.)

Defendant Wilson founded lululemon in 1998 and has served as the Chairman of the Board of Directors since that time.  (Id. ¶17.)  Wilson opened the company's first store in 2000, and the company went public in 2007.  (Id. ¶ 20.)  Wilson signed the company's Form 10-K for fiscal year 2012 filed with the SEC during the Class Period.  (Id. ¶ 17.)

Defendant Day joined the company in 2008 and was promoted to CEO in July of that year; her resignation as CEO was publicly announced on June 10, 2013.  (Id. ¶¶ 18, 72.)  Day signed all of the company's Form 10-K's and Form 10-Q's filed with the SEC during the Class Period.  (Id. ¶ 18.)

In basic outline, the CAC tells the following story: lululemon sold its clothing products at price points higher than the competition based on quality as a differentiating factor.  (Id. ¶ 3.)  Prior to the Class Period, the company had

experienced certain quality issues, and it continued to experience quality issues

during the Class Period.[2]  The CAC alleges that, throughout the Class Period,

lululemon had grossly deficient quality controls—primarily the absence of live

model testing—which resulted in a recall of its signature product, black luon yoga

pants, in March 2013 (the "Black Luon Recall," or the "Recall").  (Id. ¶ 1.)  The CAC

also alleges that the company made a number of statements touting the high

quality of its products during the Class Period.  (Id. ¶ 3.)

The CAC alleges that the Black Luon Recall resulted in a diminution in sales

revenue in the range of $40-45 million for the first and second quarters of 2013.  (Id.

¶ 1.)  These and other quality control issues during the Class Period are alleged to

have "halted the Company's rocketing growth, tarnished the Company's brand, and

opened the door for its many competitors to seize market share."  (Id.)  The CAC

alleges that the company "failed to institute the most basic quality control

processes, expend resources necessary to ensure its products were of high quality,

and exercise appropriate oversight over its manufacturing process"—the primary

---

[2] The CAC alleges information regarding the company's quality controls from eleven confidential witnesses, hereinafter referred to as a "CW" followed by the numbers listed in the CAC.  For instance, CW 1, a former Assistant Manager for Specializing and Operations between September 2010 and February 2013, stated that because of the company's high price point, customers found quality issues unacceptable.  (Id. ¶ 30.)  CW 2, a Vice President of Product Operational Solutions at lululemon's headquarters from September 2011 through December 2012, stated that the company failed to make quality control a priority because it was focused instead on growing its stores and expanding reach; CW 2 described quality controls generally as a "catch as catch can" system.  (Id. ¶ 34.)  CW 3, a Sourcing Manager between August 2012 and July 2013, responsible for certain non-yoga lines of apparel, stated that the company did not put in place structures needed for quality procedures.  (Id.)  CW 4 was also a Sourcing Manager from July 2007 through July 2012, who was responsible for managing part of the company's supply chain, for sourcing finished products, and managing factory relationships; CW 4 stated that the company's team was strained due to fast growth and that this negatively impacted quality on certain occasions.  (Id.)  CW 5, the company's Lead Raw Material Developer from July 2011 through January 2013, who found and tested fabrics, also stated that the company's growth had impacted quality, and that the company's quality controls were "very generic," "ineffective," and "ad hoc."  (Id. ¶¶ 34, 61.)

example to which lead plaintiff points is that the company failed to have a person try on its products prior to shipment. (<u>Id.</u> ¶ 2.) The CAC alleges that maintaining high product quality was essential to the company's ability to maintain the value and reputation of its brand. (<u>Id.</u> ¶ 25.)

     A.   <u>Alleged Quality Issues in 2007-2012</u>

Beginning in 2007, prior to the Black Luon Recall, lululemon had suffered from a series of quality failures. (<u>Id.</u> ¶ 36.) In 2007, the company claimed its "Vitasea" apparel contained and released "marine amino acids" that could reduce stress and provide other health benefits to wearers. (<u>Id.</u> ¶ 37.) Third party testing reported in <u>The New York Times</u> disputed these assertions, and Wilson later admitted that the company had not itself tested the Vitasea products but had instead trusted the claims of its suppliers. (<u>Id.</u> ¶¶ 37-38.)

In December 2010, the company had a second high-profile quality issue. (<u>Id.</u> ¶ 40.) Shopping bags utilized by the company were printed using ink that contained high lead content. (<u>Id.</u>) The bags had been made by a supplier in China. (<u>Id.</u>) In response to this issue, Day told customers and investors that such product quality issues would not occur in the future. (<u>Id.</u>)

On June 10, 2011, Day told investors that the company's "Luon has been the same for over 7 years" and that the company was "maniacal about protecting that standard." (<u>Id.</u> ¶ 26.) Day also stated to investors that the company "monitor[s] the quality and feedback on [its Luon] items in particular." (<u>Id.</u>)

In 2011 and 2012, however, the company's quality problems persisted. (Id. ¶ 41.) In late 2011 and early 2012, numerous customers complained that the color dye from the company's garments bled during exercise ("color fastness issues") and that the leaching dye stained skin and hair and caused health concerns.[3] (Id. ¶¶ 41-42.) These problems affected several different fabrics, including luon, and resulted in the company placing warnings on defective items, pulling the items from store shelves, and accepting returns for affected items. (Id. ¶ 41.)

Two other quality issues occurred prior to the Class Period: one in the spring of 2012 relating to swimwear that had both color fastness and sheerness issues, and another in June 2012 concerning elasticity in the waistband of men's athletic shorts.[4] (Id. ¶ 44.)

The CAC alleges that the company's executives—and the Individual Defendants—were informed about each of these quality control breakdowns. Specifically, CW 2, a Vice President of Product Operational Solutions at the company's headquarters from September 2011 to December 2012, stated that once the severity of the quality issues became clear, Day received regular reports about them. (Id. ¶¶ 34, 46.) According to CW 2, Day was "well aware" of the color

---

[3] CW 1, a former Assistant Manager for Specializing and Operations between September 2010 and February 2013, stated that "color fastness was a huge issue for a long time," and impacted "all [Lululemon's] colored pants." (Id. ¶ 41.) CW 7, a Women's Designer at headquarters from June 2011 through May 2012 (prior to the Class Period), stated that the dye bleeding issue was a significant problem for the company that affected a large amount of product. (Id.) CW 8, the company's Technical Operator of its ecommerce website from 2011 through March 2013, stated that the company did not know about the color fastness issues until weeks after the products had been on store shelves and they had received customer complaints (including a complaint from one woman who reported that the color dye in her lululemon clothing had bled onto her and her baby). (Id. ¶ 42.)
[4] CW 9, a merchant in the company's Men's Division from January 2012 through September 2012 (prior to the Class Period), stated that the company did not catch the elasticity issue before the shorts were shipped to stores; the CAC alleges that as with the luon yoga pants, live model testing would have revealed this problem. (Id. ¶ 45.)

6

fastness issues by late 2011. (Id. ¶ 43.) According to CW 1, a former Assistant Manager for Specializing and Operations between September 2010 and February 2013, Day "made a commitment" to resolve the color fastness issues. (Id.) CW 10, a Quality Control Manager in the company's Hong Kong office from September 2009 through July 2013, stated that when a quality control issue impacted numerous items or required product not to ship or be removed from shelves, it would be elevated to Day. (Id. ¶¶ 46, 53.) CW 5, the company's Lead Raw Material Developer from July 2011 through January 2013, stated that Day had access to all company and partner reports regarding the quality of lululemon's products prior to shipment. (Id. ¶¶ 34, 46.)

With respect to defendant Wilson, according to press reports and as stated by CW 2, Wilson would "dip[] in and out of daily affairs" at the company, and "his fingerprints are all over the company's policies and principles." (Id. ¶ 46.) CW 5 stated that Wilson "still ha[d] his hands in the pot," and that Wilson's aim was to "dominate" and not to do so "through design but not good business sense." (Id. ¶ 139.)

The CAC alleges that, after the color fastness issue became public, the company apologized for these problems in a July 2012 letter from Chief Product Officer Sheree Waterson that was posted on the company's Facebook page. (Id. ¶ 47.) The letter stated that quality is the company's hallmark, that the company had put "stringent testing procedures in place" to rectify the problem, and that all of the company's products now met the company's performance requirements. (Id.) The

letter also stated that it had "brought in the leading fabric and dye expert, along with additional on-site quality inspection at every stage to identify potential causes" of its color fastness issues. (Id.) The CAC does not allege that the company did not take any of the steps described in this July 2012 letter.

On the first day of the Class Period, September 7, 2012, Day told investors that "[i]n the end, quality is our key differentiating factor. It is what [lululemon] stands for and what [lululemon] will always stand behind." (Id. ¶ 25.) She also stated that the company may have "pushed" the color limit too far, the company's products were created with the "highest quality suppliers and manufacturers," and that the company "stood behind" the quality of its products. (Id. ¶¶ 47, 96.) She further stated that the company was investing in additional people and equipment and was focused on its capability to deliver quality products every step of the way, and that she was "very comfortable now" with the product and the ability to maintain quality. (Id. ¶ 48.) On September 7, 2012, the company also filed with the SEC its Form 10-Q for the second quarter of 2012. (Id. ¶ 98.) In that document, the company stated that it was the "leader in technical fabrics and quality construction." (Id.)

During the Class Period, the CAC also alleges that the company's website contained statements concerning the importance of quality to the company, that its quality was the "highest in the industry," and that "[q]uality is at the heart of everything we do." (Id. ¶ 94.)

On December 6, 2012, the company issued its earnings for the third quarter of 2012 and reported a 37% net increase in revenue. (Id. ¶ 101.) During a conference call with investors to discuss those results, Day stated that the company was not pursuing "growth at any cost."[5] (Id.) Lululemon also reported its quarterly financial results to the SEC that day on Form 10-Q. (Id. ¶ 102.) The December 6, 2012 Form 10-Q again stated that the company was the "leader in technical fabrics and quality construction." (Id.)

According to CW 6, a Quality Assurance Manager in IT at headquarters from September 2008 through August 2013, in the winter of 2012-2013, Day stated to employees that the company's growth had led to a sacrifice in quality. (Id. ¶ 35.)

B.     2013 Quality Issues and the Black Luon Recall

Quality issues persisted. In February and March 2013, customers began to complain that certain brightly colored luon yoga pants would become see-through or sheer when worn (the "sheerness issue"). (Id. ¶ 50.) Lululemon discounted the price of the product and recommended that customers try them on prior to purchase. (Id.)

In a March 18, 2013 press release issued after the close of trading that day, the company announced the Black Luon Recall due to the sheerness issue. (Id. ¶ 51.) In the press release, Day referred to the Recall as an "inconvenience," stated that "[i]t is always our first priority to protect the quality of our fabrics that keep our guest [sic] so loyal to our products," and stated that "[w]e will accept nothing

---

[5] The text of Day's full statement indicates that this comment was made in response to a question about international sales growth. (See Allerhand Decl. Ex. 28 at 12, ECF No. 49.)

less than the very highest quality that we are known for." (Id. ¶ 107.) The same day, the company posted an FAQ on its website, which stated that "the quality of our products are paramount" and "we are committed to providing the highest quality products to our guests." (Id.)

In the press release, the company stated that it had not been aware of the widespread product defects in its black luon bottoms until March 11, 2013. (Id.) The CAC alleges that this statement was false and misleading because of two statements attributed to CWs. First, according to CW 5, the company's Lead Raw Material Developer from July 2011 through January 2013, the black luon sheerness issue had "definitely" been "percolating" for a while, and the company's luon pants were "see through before it came out [publically]." (Id. ¶ 54.) Second, according to CW 1, a former Assistant Manager for Specializing and Operations between September 2010 and February 2013, in October 2012, Day "acknowledged" internally that the company had a "sheer luon" issue that she attributed to excess demand "not being able to keep up." (Id.)[6]

Following the announcement of the Recall, the company reduced its expected revenue guidance for the first quarter of 2013 by from $350-$355 million to $333-$343 million. (Id. ¶ 51.) Three days later, the company announced that it expected to lose $57-$67 million in revenue and $0.25-$0.27 in earnings per share ("EPS") during the 2013 fiscal year, a negative 12% impact on its 2013 EPS guidance. (Id.)

---

[6] Additionally, CW 11, who worked in a store for the company from October 2009 through August 2013, alleges that, in the winter of 2012-2013, corporate managers informed store managers about widespread sheerness issues. (Id. ¶ 54.)

On March 21, 2013, the company filed its Form 10-K for fiscal year 2012 with the SEC.  (Id. ¶ 109.)  In that document, the company stated that it worked with a "leading independent inspection, verification, testing and certification company" to "conduct[] a battery of tests before each season on our fabrics."  (Id. ¶ 27.)  The company emphasized that it worked with vendors who were committed to quality and ethics, and that its "core values" included "developing the highest quality products."  (Id. ¶¶ 27, 109.)  The company stated that "[d]elivering quality to our customers is a critical factor in our market place differentiation and removing items that do not meet our standards is key to maintaining our brand reputation."  (Id. ¶ 109.)  The company also warned that its "future success [was] substantially dependent on the continued service of our senior management," including Day, the company's CEO.  (Id. ¶ 74.)

In a conference call with investors later that day, Day stated that the company had identified certain discrete "gaps" in the company's quality controls.  (Id. ¶ 111.)  Day stated that the company had a "dedicated team" working with its suppliers to identify and resolve the problem.  (Id.)  In response to a question about the company's quality controls, Day stated that "the only way that you can actually test for the issue is to put the pants on and bend over," which the company had not done.  (Id.)

The CAC alleges that the Recall was necessary because the company did not have sufficient quality control procedures in place including, for example, not requiring live model testing for each product shipment.  (Id. ¶ 52.)  CW 10, a

Quality Manager in the company's Hong Kong office from September 2009 through July 2013, stated that the company did not regularly employ "industry standard testing" whereby a live model tries on sample products from every shipment to ensure that all visible flaws are detected before the products are shipped and sold.[7] (Id. ¶ 53.) CW 3, a Sourcing Manager between August 2012 and July 2013, stated that the company "did not conduct live model testing with every shipment of product and did not test a certain sample size from each batch," and described the company's live model testing as "random at best." (Id.)

The CAC alleges that the market reacted with surprise to the Black Luon Recall. (Id. ¶ 55.) Analysts reported on continuing quality control issues, and that these issues might not be amenable to a quick fix. (Id.) The company stated that it had "used the same manufacturing partner on key fabrics since 2004. . . . [and the defect] is not the result of changing manufacturers or quality of ingredients. [Lululemon is] working closely with them to understand what happened during the period this fabric was made." (Id. ¶ 56.) The supplier, Eclat, stated in response that shipments it made to the company were in full compliance with the company's production guidelines. (Id. ¶ 57.)

On March 21, 2013 and April 3, 2013, the company stated that its "testing protocols were incomplete for some of the variables in fabric characteristics," which caused an "unacceptable level of sheerness." (Id. ¶ 58.) Day stated that the

---

[7] In support of the allegation that live model testing is an "industry standard," the CAC points to an unidentified "industry expert in production and manufacturing, who has acted as a manufacturing executive at several global apparel companies and who teaches university courses in apparel production and management." (Id. ¶ 52.) According to this individual, it is "standard industry practice" to subject product samples to a battery of tests, including a "live model examination." (Id.)

company lacked "rigorous testing and quality processes" to test for "modulus (stretch), weight, and tolerances," and adequate mechanisms to determine whether the lycra chips to make luon were stale. (Id. ¶ 60.) The company also stated that it had inadequate personnel monitoring Eclat's work. (Id. ¶ 62.)

The CAC alleges that, according to former company employees (CWs 3, 4, and 5), the company had devoted too few resources to overseeing its quality control functions when they worked there.[8] (Id. ¶¶ 34, 63.) In addition, the CAC alleges that the company did not disclose the type or nature of Eclat's and SGS's (a third party testing company) quality control testing. (Id. ¶ 64.) According to CW 3, the company's monitoring of Eclat was "very, very lax," and, according to CW 5, the company knew that both Eclat and SGS did not perform certain tests. (Id. ¶¶ 64-65.) According to CW 5, the company knew in the spring of 2012 that SGS often failed to inspect or test its black luon bottoms and other products before they shipped to stores, and that the problem grew so bad that the company internally decided to fire SGS. (Id. ¶ 65.)

In an April 3, 2013 press release, the company announced that Chief Product Officer Sheree Waterson would be leaving. (Id. ¶ 66.) The company also announced that it had instituted additional testing procedures and devoted additional resources to quality control. (Id. ¶¶ 67-68.) The company stated that "[o]ur stand for differentiation is the quality of our product." (Id. ¶ 113.)

---

[8] CW 3 was a Sourcing Manager from August 2012 through July 2013, CW 4 was a Sourcing Manager from July 2007 through July 2012, and CW 5 was the company's Lead Raw Material Developer from July 2011 through January 2013. (Id. ¶ 34.)

On April 12, 2013, the company announced another recall of a different type of luon pants ("Candy Stripe Wunder Under Crops") due to sheerness.  (Id. ¶ 69.)

C.    Day's Resignation Announcement and Events in 2013-2014

On Friday, June 7, 2013, Day formally told the Board that she planned to resign.  (Id. ¶ 89.)  On Monday, June 10, after the close of trading, Day publicly announced that she would be leaving the company.  (Id. ¶¶ 72, 117.)  Day announced her departure during a conference call with investors, during which she also discussed the company's first quarter financial results.  (Id. ¶ 120.)  Day stated that the company was implementing a "back in black" program to get its luon products back into stores and that, as a result, the company had continued to grow on a comparable store basis of 7%.  (Id.)  Day also stated that "the silver lining to [the Recall] was the big leap forward in our transition to owning our own technical standards and expertise," and that the company "really reinvented [its] whole quality control process end-to-end to make sure [it] was delivering a great pant." (Id.)  In the following two days of trading, the company's stock price dropped by approximately 22%, which eliminated $2 billion in market capitalization.  (Id. ¶ 74.)

On August 30, 2013, Wilson told the press that "we probably weren't growing that quality-control part of the company as fast as the company."  (Id. ¶ 35.)

On September 12, 2013, the company announced its second quarter 2013 financial results; during a call with investors, Day stated that the company had worked its way back from the setback related to the Black Luon Recall.  (Id. ¶ 121.) Day stated that the company continued to grow while maintaining high quality

14

standards, and that the company's comparable store sales had increased by 8%
during the quarter. (Id.) Day also stated that the company was "well on our way to
finishing 2013 as a much stronger company than when the year began," and that
the financial impact of the Recall and the company's quality control corrections
would be fully realized and behind it by the beginning of fiscal year 2014. (Id.)

On October 31, 2013, the press reported another and different quality issue
with the company's products—pilling, or when small balls of fabric accumulate on
the surface of clothes. (Id. ¶ 76.) The CAC notes that an investor website reported
that customers no longer trusted the company "to produce the kind of clothing that
the company had become popular for." (Id.) In a November 2, 2013 Wall Street
Journal article, however, the company stated that it did not have a broader problem
with product quality. (Id.)

On November 5, 2013, during an interview with Bloomberg, Wilson remarked
that a wearer's body type might impact the performance of the clothing; the CAC
alleges that, in doing so, Wilson "blamed women's body shapes, instead of the
Company's inadequate quality controls." (Id. ¶ 77.) A backlash to this comment
ensued, and, on December 9, 2013, the company announced that Wilson would be
stepping down as Chairman of the Board. (Id. ¶ 78.)

On December 12, 2013, the company announced that it was cutting its
earnings guidance for the fourth quarter 2013 by $30 million, or nearly 5%, because
it expected its same store sales figure to be "flat" for the first time in seventeen
consecutive quarters. (Id. ¶ 81.) The company attributed this decline in sales to its

15

"increased focus on quality" and "a slow down in traffic to our stores" as a result of the events of 2013, including the Recall and Wilson's comments. (Id. ¶ 82.) The company also stated that sales would be impacted in the third and fourth quarters of 2013 as well as into 2014. (Id.) The company also announced that it was putting new procedures and resources in place to improve on quality control. (Id. ¶ 83.)

On January 13, 2014,[9] the company revised its fourth quarter revenue and EPS projections downward due to a meaningful drop in sales. (Id. ¶ 85.) The company announced that it expected EPS for the fourth quarter of 2013 to be in the range of $0.71 to $0.73, instead of the previous December 12, 2013 range of $0.78 to $0.80, a drop of nearly 10%. (Id.) The company also announced that it anticipated net revenue to be in the range of $513 million to $518 million, a drop of approximately $22 million or nearly 5% since the company's December 12, 2013 announcement. (Id.) The next day, in a presentation at an industry conference, the company stated that it was on the "path to implementing what will become best-in-class quality assurance at Lululemon." (Id. ¶ 86.)

D.    Stock Sales by Wilson during the Class Period

During the Class Period, Wilson sold over two million shares of company stock for more than $184 million. (Id. ¶¶ 17, 87.) Wilson entered into a Rule 10b5-1 trading plan in December 2012 (the "Wilson Trading Plan" or the "Plan"). (Id. ¶ 88.)

The CAC alleges that Wilson's stock sales were "suspiciously timed" because a "significant portion"—1,000,000 shares for a profit of $81 million—were on June 4-7, 2013. (Id. ¶¶ 89, 91.) On June 7, Wilson sold over 607,000 shares for

---

[9] The Court notes that the Class Period alleged in the CAC ends on January 10, 2014. (Id. at 1.)

approximately $50 million. (Id. ¶ 89.) The CAC also alleges that Wilson's January

2013 sales "occurred shortly after the Company informed its store managers that it

was first having sheerness issues with its Luon pants." (Id. ¶ 90.)

The CAC also alleges that Wilson's stock sales were "suspicious in amount"

because Wilson sold 2.3 million shares through 17 transactions in two clusters

during January 2013 and May-early June 2013, when under Wilson's prior Rule

10b5-1 trading plan (entered into in June 2010), Wilson sold three million shares

over the course of two years in 105 separate transactions. (Id. ¶ 91.)

###### E.   Stock Sales by Day during the Class Period

During the Class Period, Day sold almost 600,000 shares of company stock

for more than $40 million. (Id. ¶¶ 18, 92.) Day did not trade pursuant to a Rule

10b5-1 trading plan. (Id. ¶ 92.) The CAC alleges these stock sales were

"suspiciously timed" because Day sold nearly 83,000 shares for $6.2 million on

September 24-25, 2012, 71,000 shares for $5.2 million on December 10-14, 2012,

and 41,000 shares for $2.9 million on September 18, 2013. (Id. ¶¶ 92-93.)

## II.   MOTION TO DISMISS STANDARD

On a motion to dismiss, this Court accepts as true all well-pleaded factual

allegations, Ashcroft v. Iqbal, 556 U.S. 662, 678-80 (2009), and draws all reasonable

inferences in lead plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc.,

624 F.3d 106, 108 (2d Cir. 2010). To withstand dismissal, a "complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era. . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. (internal punctuation omitted); see also Fed. R. Civ. P. 8(a)(2).

III.   SECTION 10(B) AND RULE 10B-5 STANDARDS

Claims for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder sound in fraud. As a result, allegations supporting such claims must meet the requirements of Rule 9(b) of the Federal Rules for Civil Procedure as well as the Private Securities Litigation Reform Act ("PSLRA"). See Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). When these standards are combined with the more general standards applicable to Rule 12(b)(6) motions to dismiss under Twombly and Iqbal, it is clear that plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed. ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

For claims of securities fraud under Section 10(b) and Rule 10b-5, plaintiffs must adequately allege each of the following elements: (1) that the defendants either made one of more misstatements of material fact, or omitted to state a material fact that the defendants had a duty to disclose (2) with scienter (3) in connection with the purchase or sale of securities; (4) that one or more plaintiffs relied upon the misstatement or omission; and (5) that such reliance was the proximate cause of a plaintiff's loss (loss causation). See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998).

Plaintiffs must plead with particularity not only which statement(s) were fraudulent, but also when and where the statements were made, why the statements were fraudulent, and the maker of the statement. See 15 U.S.C. § 78u-4(b)(1); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). In Janus Capital Group v. First Derivative Traders, the Supreme Court stated that "[o]ne makes a statement by stating it"—"[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 131 S. Ct. 2296, 2302 (2011).

A.   Actionable Misstatement or Omission

The first element of a Section 10(b) and Rule 10b-5 securities fraud claim requires an actionable misstatement or omission. With respect to misstatements,[10] there are two components to this requirement: the statement must be false, and the

[10] The Court also discusses the requirements for actionable omissions in Section III.A.1, infra.

19

statement must be material.  Neither immaterial false statements nor material true statements are actionable.  See Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988).

      1.    Falsity

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made.  See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812-13 (2d Cir. 1996) (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified predictions as to the company's future performance").  A statement believed to be true when made, but later shown to be false, is insufficient.  Id.  In such a circumstance, there is a lack of actionable falsity.  Put another way, without contemporaneous falsity, there can be no fraud.  Id.; see also Novak, 216 F.3d at 309 (fraud by hindsight is not actionable).  "[F]alsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made."  San Leandro, 75 F.3d at 813; see also C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013).

The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why that is so."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (emphasis added); accord Kleinman v. Elan Corp., plc, 706 F.3d 145, 152-53 (2d Cir. 2013).

Where a plaintiff asserts the falsity of a statement of belief or opinion, the plaintiff must plead that it "was both objectively false and disbelieved by the defendant at the time it was expressed." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011); see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012) (stating that Fait's "reasoning applies under Sections 10(b) and 20(a) of the 1934 Act"). "Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." In re IBM Corp. Sec. Litig., 163 F.3d at 107 (citations omitted).

Similar to the falsity of statements, omissions are only actionable if a defendant is under a duty to disclose information and fails to do so. See Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013). "To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. Section "10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." Kleinman, 706 F.3d at 152 (citing Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011)). Disclosure is not required simply because an investor might find the information relevant or of interest. Kleinman, 706 F.3d at 153 (citing Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002)).

A duty disclose under Rule 10b-5 may arise either "(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid

rendering existing statements misleading by failing to disclose material facts." Thesling v. Bioenvision, Inc., 374 F. App'x 141, 143 (2d Cir. 2010) (citing 17 C.F.R. § 240.10b-5(b)). "[T]he lack of an independent duty is not [necessarily] a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues." Caiola v. Citibank, N.A., N.Y., 295, F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); see McKenna v. SMART Technologies, Inc., No. 11 Civ. 7673 (KBF), 2012 WL 1131935, at *13 (S.D.N.Y. Apr. 3, 2012) (holding that where defendant's statement "put [a] question . . . 'in play,'" defendant is "required to make full disclosures to ensure the accuracy of [its statements]").

     2.   Materiality

Additionally, to be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must be material. Basic, 485 U.S. at 238. That is, there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction. Id.; Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994); In re Espeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 279 (S.D.N.Y. 2006).

Material facts are those that may affect the desire of investors to buy, sell, or hold securities. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001). As the Supreme Court has stated, "[t]he question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." TSC Indus., Inc. v. Northway, Inc.,

426 U.S. 438, 445 (1976).  Courts have been "careful not to set too low a standard of materiality, for fear that management would bury the shareholders in an avalanche of trivial information." Matrixx, 131 S. Ct. at 1318 (internal quotation marks and citations omitted).  "When contingent or speculative future events are at issue, the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity." Castellano, 257 F.3d at 179 (internal quotation marks and citations omitted).  No single fact or event is determinative of the materiality inquiry. Id.

"[R]osy predictions," or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable. See, e.g. Novak, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); see also Rombach, 355 F.3d at 174 (unfocused expressions of puffery and corporate optimism not actionable).  Such statements, or "puffery," are not actionable because they are "too general to cause a reasonable investor to rely upon them."[11] See, e.g., ECA, 553 F.3d at 206 (general statements regarding a reputation for integrity and highly disciplined risk-management processes constituted non-actionable puffery); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (holding statements that company would not "compromise its financial integrity," touting its "commitment to create earnings opportunities," and that these "business strategies

---

[11] There are aspects of the concept of puffery that also bear on the issue of actionable falsity under the securities laws, because courts (and investors) are often unable to evaluate whether such vague and general statements are in fact "true" or "false."

[would] lead to continued prosperity," "consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."); C.D.T.S., 2013 WL 6576031, at *1-2, 4-5 (statements regarding effective risk management were aspirational puffery).

    B.    <u>Scienter</u>

    Scienter is the mental state embracing an intent to deceive, manipulate, or defraud by the maker of a statement. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319, 323 (2007). When deciding a motion pursuant to Rule 12(b)(6), a court must decide whether all facts taken together—that is, collectively—give rise to a strong inference that a maker of a statement acted with scienter. <u>Id.</u> at 323. The question is not, therefore, whether any individualized statement "scrutinized in isolation" meets this standard. <u>Id.</u> A plaintiff adequately alleges scienter "only if a reasonable person would deem the inference of scienter <u>cogent and at least as compelling as any opposing inference one could draw from the facts alleged</u>." <u>Id.</u> at 324 (emphasis added).

    Facts giving rise to a strong inference of scienter can be alleged by (1) pleading the motive and opportunity of the maker of a statement to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001); <u>accord</u> <u>Novak</u>, 216 F.3d at 311. Motive and opportunity require plausible allegations that the maker of a statement could, and had the likely prospect of, realizing concrete benefits by the misstatement. <u>See</u> <u>Shields</u>, 25 F.3d at 1130. Allegations limited to the type of

24

"corporate profit" motive possessed by most corporate directors and officers do not suffice.  See Kalnit, 264 F.3d at 139.  "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  ECA, 553 F.3d at 198.

Assertions of conscious misbehavior or recklessness can also satisfy the scienter requirement of Section 10(b) and Rule 10b-5.  Where a plaintiff fails to plead motive, its allegations regarding conscious misbehavior or recklessness "must be correspondingly greater."  Kalnit, 264 F.3d at 142 (internal quotation marks and citation omitted).  Conscious misbehavior generally consists of deliberate, illegal behavior.  Novak, 216 F.3d at 308.  Recklessness requires allegations that a defendant's conduct was "highly unreasonable and constituted "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009); see also Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000); Novak, 216 F.3d at 308; Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (recklessness can be found in instances of "[e]gregious refusal to see the obvious, or to investigate the doubtful").

Plausible allegations that a defendant had facts at his disposal contradicting material public statements, but then ignoring such facts or proceeding despite them, can be sufficient to plead recklessness.[12]  See Novak, 216 F.3d at 308-309.

_____

[12] When a plaintiff alleges that a defendant had "knowledge of facts or access to information contradicting their public statements," "the falsity and scienter [pleading] requirements are

25

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309. "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012). Allegations of corporate mismanagement, however, are not actionable. See Santa Fe Indus., 430 U.S. at 477-79; In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) ("allegations of garden-variety mismanagement are not actionable under section 10(b)") (internal quotation marks and citation omitted), aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006).

Allegations in a complaint regarding scienter, including allegations about the knowledge defendants had or should have had, must be viewed together. See Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 197-98 (S.D.N.Y. 2010) (citing Tellabs, 551 U.S. at 323).

C.    Loss Causation

Pleading loss causation is also an essential element of a Section 10(b) and Rule 10b-5 claim for private plaintiffs, but this requirement is not meant to impose a great burden. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005). Although it is well-settled that Rule 9(b) and the PSLRA's heightened pleading standards apply to allegations regarding the misstatements underlying the fraud, the Second Circuit has not yet determined whether these standards apply to

---

essentially combined." In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d at 282, 292 (citations omitted). Though the Court discusses these requirements separately infra, it notes that much of its analysis as to these elements is therefore overlapping.

allegations of loss causation. <u>Acticon AG v. China N. East Petroleum Holdings Ltd.</u>, 692 F.3d 34, 38 (2d Cir. 2012). A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient. <u>Dura</u>, 544 U.S. at 346-47.

"To plead loss causation adequately, a plaintiff must allege (a) the foreseeability of the loss—i.e., that 'the risk that caused the loss was within the zone of risk concealed by the misrepresentations or omissions,' and (b) that disclosure of the risk that had concealed the purported misrepresentations negatively impacted the value of the securities at issue." <u>George v. China Auto. Sys., Inc.</u>, No. 11 Civ. 7533 (KBF), 2012 WL 3205062, at *8 (S.D.N.Y. Aug. 8, 2012) (quoting <u>Lentell</u>, 396 F.3d at 172-73).

"[W]here . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." <u>Lentell</u>, 396 F.3d at 177. Accordingly, adequately pleading loss causation requires more than merely alleging that a company's shares declined substantially in value proximate to the revelation of the falsity of some prior statement. <u>See Dura</u>, 544 U.S. at 343.

A plaintiff can make this showing "by alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). Such a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." Cent. States Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72, 75 (2d Cir. 2013) (internal quotation marks omitted) (quoting In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511 (2d Cir. 2010)). "A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." Omnicom, 597 F.3d at 512.

## IV.   SECTION 20(A) CONTROL PERSON LIABILITY STANDARD

Section 20(a) of the 1934 Act imposes liability on "control persons."  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To sustain a claim of control person liability under Section 20(a), plaintiffs must prove by a preponderance of the credible evidence that (1) there was a primary violation by a controlled person, (2) the "controlling" defendant controlled the primary violator, and (3) the defendant who is alleged to be the controlling

person was, in some sense, a culpable participant in the controlled person's fraud. See ATSI, 493 F.3d at 108.

Courts in the Second Circuit have found that a primary violation combined with a sufficient level of control constitutes culpable participation. See, e.g., SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) ("plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant"); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007); In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).

## V.   DISCUSSION

Lead plaintiff alleges that defendants collectively, and Wilson and Day individually, misled investors by making repeated claims as to the quality of lululemon's products in the face of evidence that such claims were untrue. According to lead plaintiff, defendants' actionable false and misleading statements to investors include the following:

- Statement #1: The company's quality level was the "highest in the industry" (CAC ¶ 94) [from the company's website];

- Statement #2: The company was the "leader in technical fabrics and quality construction" (id. ¶¶ 98, 102) [from the Form 10-Qs filed on September 7 and December 6, 2012];

- Statement #3: "Quality" was the company's "key differentiating factor" from its peers (id. ¶¶ 96, 113) [from the September 7, 2012 investor call and April 3, 2013 press release];

29

- Statement #4: "[D]elivering quality to our customers is a critical factor in our market place differentiation" (id. ¶ 109) [from the Form 10-K for fiscal year 2012 filed on March 21, 2013];

- Statement #5: "Quality of our products is paramount" and "superior" (id. ¶¶ 107, 109) [from the March 18, 2013 FAQ and the Form 10-K for fiscal year 2012 filed on March 21, 2013];

- Statement #6: The company's products were created using the "highest quality suppliers and manufacturers" (id. ¶¶ 48, 96) [from the September 7, 2012 investor call]; and

- Statement #7: The company "partner[ed] with a leading independent inspection, verification, testing and certification company" to "conduct a battery of tests" on its products and that the company's ability to offer "superior products" was due to its "close collaboration" with "third-party suppliers" (id. ¶ 109) [from the Form 10-K for fiscal year 2012 filed on March 21, 2013].

(Opp. at 13, ECF No. 63.)[13]  Lead plaintiff asserts that these statements are "irreconcilable with Lululemon's actual and undisclosed quality control practices, and are thus actionable." (Id.)

---

[13] The Court focuses on these seven statements because they are the statements that lead plaintiff focuses on in its opposition brief. Additional statements of a similar nature are referenced elsewhere in the CAC, and were referenced at oral argument; for the same reasons set forth infra, they are also not actionable.

The Court disagrees.  The CAC fails to adequately allege (A) that defendants made[14] materially[15] false or misleading statements; (B) that those false or misleading statements were made under circumstances giving rise to a strong inference of scienter; and (C) loss causation.

A.    Falsity

In order to adequately plead falsity, lead plaintiff must allege that the identified statements were either false at the time they were made or failed to contain other information that would have made them not misleading.  That is, lead plaintiff must allege that lululemon's product quality was not "superior," that the company was not a "leader in technical fabrics and quality construction," that the company did not "deliver quality," and so forth.  Defendants argue that the CAC's allegations as to falsity are fatally deficient; defendants argue that the excerpts included in the CAC are taken out of context and that, in context, they are at most

---

[14] The only statements for which the CAC alleges Wilson was the "maker" are those contained in the March 21, 2013 Form 10-K that Wilson signed—Statements #4, #5, and #7.  (CAC ¶ 17.)  Wilson thus cannot be found liable for any other statements, because there are no particularized allegations that he had any role in shaping their content.  See Janus, 131 S. Ct. at 2302; see also In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *9-11 (S.D.N.Y. Sept. 28, 2012); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012); In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012); City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417-18 (S.D.N.Y. 2011).

[15] Though the Court need not reach the issue of materiality in light of the other grounds for dismissal of the CAC described herein, it notes that many of the alleged misstatements, in context, are likely also not actionable because they are mere puffery or expressions of corporate optimism.  See Rombach, 355 F.3d at 174; San Leandro, 75 F.3d at 811-12; Lasker, 85 F.3d at 59; see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig., No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) ("general statements about [the company's] risk management practices and controls," including statements that it was "committed to best practice" and "maintain[ed] the strong control and financial governance frameworks," all "constitute[d] 'puffery'").  While analysts may have been focused on the quality of lululemon's products so that they could approximate the potential impact on the company's sales (see 4/4/14 Tr. at 22-24; Opp. at 15), this fact does not necessarily render a particular statement of belief or opinion about the quality of the company's products material.  See ECA, 553 F.3d at 206.  Nevertheless, the Court declines to reach the issue of whether the CAC adequately pleads materiality.

non-actionable statements of opinion or belief. Defendants also argue that many of these statements contain cautionary or forward-looking language and, since the future is unknowable, similarly are not be false.

The Court agrees. The Court summarizes the seven statements highlighted in lead plaintiff's opposition brief discusses falsity as to each.[16]

      1.   The Statements

The webpage quoted in Paragraph 94 of the CAC (Statement #1), located on the "Careers" portion of the company's website, states that the quality of lululemon's products is the "highest in the industry." (Allerhand Decl. Ex. 1 at Entry 2, Ex. 27, ECF No. 49.) The page also states that "it's our job to ensure every product is made to its truest form" and "[i]f a garment doesn't pass our standards at any point in production, it's back to the drawing board." (Id. Ex. 27.) Paragraph 94 also quotes another webpage, located on the "Education" portion of the company's website, that states that "[q]uality is at the heart of everything we do." (Id. Ex. 1 at Entry 1, Ex. 26.) That page also states the following: "Because our products are made for humans, by humans, sometimes products don't quite turn out the way we imagined. If we made too much or we have products with visual or minor functional defects, we make them available through our factory outlets and the occasional

---

[16] In the interest of space, the Court does not quote all of the relevant language in each of the documents the CAC alleges contain false and misleading statements. The Court refers to the Declaration of Joseph S. Allerhand and the accompanying exhibits for the full documents. (Exhibit 1 contains a comparison of each statement and additional language in the document; the remaining exhibits attached to the Allerhand Declaration include the documents themselves.) There are numerous additional quotes this Court could include to add to its overall determination of lack of falsity, including accompanying cautionary and forward-looking statements. See Slayton v. Am. Express Co., 604 F.3d 758, 765-66 (2d Cir. 2010) (describing PSLRA safe harbor for forward-looking statements).

warehouse sale.  For products that just don't make the grade (i.e. the function is compromised) we work with deBrand to reuse and recycle the product."  (Id.)

In context, the company's website posits a belief in high quality compared to unnamed others in the "industry," along with clear acknowledgements that product defects do occur.  In fact—and important with regard to the amount of attention lead plaintiff devotes to the Black Luon Recall in the CAC—the website implies that such defects occur and with enough regularity to have an established policy as to how they are handled, with actions ranging from sales in outlet stores to total removal from all shelves into the recycle bin.  In context, it is unreasonable to read these statements on the company's website regarding product quality as guarantees of no product defects.

Statement #2, from the company's Form 10-Q's filed on September 7 and December 6, 2012, is also extracted from relevant context.  In both Form 10-Qs, the statement lead plaintiff focuses on—that the company is the "leader in technical fabrics and quality construction"— in fact appears after a clear statement of belief as to recognition by third parties (note the passive voice):  "We believe that our brand is recognized as premium in our offerings of run and yoga assortment, as well as a leader in technical fabrics and quality construction."  (Id. Ex. 2 at 13, Ex. 3 at 12 (emphasis added).)  When read in context, this statement is undeniably a reference to a belief as to what third parties think about the company and its products, not an assertion or guarantee by the company as to a fact.  As is the case both with this statement of belief and the others alleged as actionable by lead

33

plaintiff, the CAC is "devoid even of conclusory allegations that defendants did not believe in their statements of opinion . . . at the time they made them."  CBS Corp., 679 F.3d at 68-69 (citing Fait, 655 F.3d at 112).

Statement #3, which refers to quality as a key differentiating factor, comes from statements by Day on the September 7, 2012 investor call and in the April 3, 2013 press release.  (Allerhand Decl. Exs. 8, 24.)  Again, both documents also contain important context.  On the September 7, 2012 investor call, in the sentence immediately preceding Day's reference to quality as a differentiating factor, she notes (as does the company's website) that while the company's products are "made by humans and therefore not always perfect, we will do what it takes to make it right when we fall short."  (Id. Ex. 24 at 4.)  In the April 3, 2013 press release, Day's reference to quality as a differentiating factor is immediately followed by the following acknowledgement (also attributed to Day): "We have been building capacity in the product organization, and we recognize that continued investment in this segment of the business is required to support our future."  (Id. Ex. 8 at 7.)  In context, these statements are not guarantees of absolute quality at all times; they are statements of goals or beliefs, along with explicit recognition of the possibility of product defects and the need for continued investment in these aspects of the business.

Statement #4, from the Form 10-K for fiscal year 2012 filed on March 21, 2013, contains a similar statement regarding quality as a differentiating factor.  (Id. Ex. 4 at 23.)  Here, too, the statement is surrounded by important additional

34

language.  The statement appears in a discussion of the Black Luon Recall, and is followed by a statement regarding the recent additions of personnel in "Quality Control" and other groups that the company "expect[s]" to "solidify" its "quality consistency."  (Id.)  The CAC does not allege any facts that tend to show that the company did not believe this expectation at the time.  See CBS Corp., 679 F.3d at 68-69; Fait, 655 F.3d at 112.

Statement #5—that the company's products have superior quality—also must be considered in the context of the surrounding statements in the corresponding documents.  The reference to "paramount" quality in the March 18, 2013 FAQ is found in the context of surrounding statements regarding product quality issues, the company's discovery of those issues and concern due to its commitment to quality, and its attempts to remediate the issues.  (Allerhand Ex. 29 at 1-2.)  Specifically, the FAQ notes that, because quality is "paramount," the company gathered its "internal experts and leaders immediately to get an understanding of the issue."  (Id. Ex. 29 at 1.)  With this surrounding contextual language, paramount equates to "importance," not attained perfection.  The reference to "superior" quality in the Form 10-K for fiscal year 2012 is offered as a statement of the company's belief (that the CAC does not allege was not genuinely held).  The section in which "superior" is found begins with the statement "[w]e believe the following strengths differentiate us from our competitors and are important to our success," and the relevant sentence states that "[w]e attribute our ability to develop superior products to a number of factors . . . ."  (Id. Ex. 4 at 2-3.)

35

Statement #6, from the September 7, 2012 investor call, refers to using the highest quality suppliers and manufacturers.  As is described above with respect to Statement #3, Day also noted that the company's products are made by humans and are thus not always perfect on this call.  (Id. Ex. 24 at 4.)  There is no way to interpret the entirety of Day's statement, with its references to imperfections as, instead, a guarantee of no defects in the company's products.

Statement #7, from the Form 10-K for fiscal year 2012, refers to the company working with a third party to inspect and test its products, and that this partnership contributes to the company's ability to provide "superior products." First, the Court notes that lead plaintiff attempts to juxtapose statements concerning the company's "superior" products with statements concerning third-party testing that appear three pages later in the Form 10-K as if the two comprise a single "statement."  (See id. Ex. 4 at 4, 7.)  Second, the CAC fails to allege any facts which indicate that the company did not partner with a third-party testing company, or that it did not conduct tests before each season on a variety of performance characteristics.

### 2.    The CWs

Despite the fact that the context of each of these statements reveals their intended limitations, lead plaintiff argues that the allegations attributed to the CWs render the statements excerpted in the CAC false or misleading because the CWs "reported that the undisclosed deficiencies in Lululemon's quality controls were widespread, existed well before they began to manifest with the Black Luon

Recall, and [were] known to Defendants." (Opp. at 16.) Implicit in this statement, as defendants note, is a concession that none of the CWs are alleged to have been involved in the March 2013 discovery and disclosure of the sheer luon issue, the subsequent investigation, or any of the related updates to investors. Rather, lead plaintiff relies on the CWs in order to allege that defendants' statements were false and misleading under the following theory: every time defendants spoke publicly about the high quality of the company's products or the fact that the company performed quality control testing during the Class Period, such statements were false and misleading because they failed to also disclose other quality control issues and types of product testing that were not being performed. Neither the law nor the allegations attributed to the CWs support such a theory of liability.

No CW sets forth facts that suggest that any of the alleged statements were false <u>when they were made</u>. The Second Circuit has made clear that "where plaintiffs rely on confidential personal sources," those individuals must "provide an adequate basis for believing that the defendants' statements were false." <u>Novak</u>, 216 F.3d at 314. Notably, none of the CWs is alleged to be the "maker" of any of the alleged misstatements, and it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion. <u>See</u> <u>CBS Corp.</u>, 679 F.3d at 67-69 (affirming dismissal of Section 10(b), Rule 10b-5, and Section 20(a) claims based on opinion statements where the complaint was "devoid even of conclusory allegations that defendants did not believe in their statements of opinion," and stating allegations

that defendants "should have" been aware of facts contradicting their opinions "alone would not suffice to state a securities fraud claim after Fait").

At most, the CWs suggest that the company received complaints about quality issues prior to the Black Luon Recall (e.g., color fastness, sheerness, and waistband elasticity), that the company's growth outpaced its quality control functions, and that the company could have done more in terms of quality control (specifically, more extensive live model testing). (CAC ¶¶ 34, 35, 41-46.) Putting aside the general allegations by CWs 1 and 5 that (1) Day "acknowledged" a "sheer luon issue" in October 2012 (id. ¶ 54), and (2) the black luon sheerness issue had been "percolating" before it was acknowledged publicly (id.), the CAC does not contain the kind of required specific factual allegations (by CWs or otherwise) that suggest if, when, or how Wilson, Day, or any of the makers of the statements knew about the issue (or its magnitude) at any time prior to March 11, 2013. Simply put, these allegations do not render the statements described herein, considered in context, false or misleading.

The CWs do not allege that the company failed to do anything at all with respect to quality control, or that the company was not doing that which it said it was doing (e.g., partnering with SGS to conduct testing, and dedicating additional resources to quality control as issues arose). The CWs also do not allege that the company conducted no live model testing, which the CAC alleges to be the "industry standard"; CWs 3 and 10 allege only that the company did not use live model testing for every shipment, that such testing was not "regular" but rather "random

38

at best," and that such testing was done on "a new style" but not on "regular luon that we'd been running for awhile." (Id. ¶ 53.)  Even accepting these allegations as true, as the Court must, they do not substitute for well-pleaded allegations of contemporaneous falsity—that the makers of the statements about product quality knew their statements were false or misleading at the time they were made.  In fact, the first alleged public reference to live model testing was Day's statement on the March 21, 2013 investor call that the company had not always conducted such testing.  (Id. ¶ 111.)

Lead plaintiff also relies heavily on the allegations of CW 5, the company's Lead Raw Material Developer from July 2011 through January 2013, to demonstrate that the company's statements about third-party testing in its Form 10-K for fiscal year 2012 were false or misleading.  In particular, lead plaintiff points to the allegations that, in the spring of 2012: (1) the company knew SGS often failed to inspect or test its black luon bottoms and other products; (2) the company had decided internally to fire SGS; and (3) the company ultimately continued to use SGS, though SGS "didn't really fix the issues." (Id. ¶ 65; Opp. at 16, 4/4/14 Tr. at 11-12.)  Even accepting these allegations as true, as the Court must, this alleged testing issue by CW 5 occurred well before the Class Period and says nothing about the testing SGS was conducting in March 2013.[17]  These

---

[17] In fact, CW 5 left the company in January 2013, two months before the Black Luon Recall in March 2013.  (See CAC ¶ 34.)

allegations do not render the company's statements about its quality control testing—on March 21, 2013—false or misleading.[18]

In sum, the CAC fails to plead that the alleged statements were either false or misleading, as is required for liability under Section 10(b) and Rule 10b-5.

B.    Scienter

Not only does the CAC fail to adequately plead that any of defendants' statements were actionably false or misleading, it also fails to adequately plead that these statements were made with the requisite scienter. That is, that the facts in the CAC taken together give rise to a strong inference that the makers of the statements—Wilson, Day, or the company more generally—knew that their statements were false or misleading when made, or recklessly disregarded that possibility. Tellabs, 551 U.S. at 323-24; Novak, 216 F.3d at 308-309.

Lead plaintiff includes a section in the CAC entitled "Summary of Scienter Allegations." (CAC ¶¶ 131-41.) In that section, lead plaintiff alleges that defendants knew or recklessly disregarded knowing that certain statements were false and misleading, because defendants knew or recklessly disregarded knowing that the company's product quality was not "superior" and that the company did not employ "highest in the industry" quality standards. (Id. ¶ 131.) The CAC alleges nine "facts" that purportedly give rise to the required strong inference of scienter under Tellabs. Even when considered together, as is required, these allegations of

---

[18] The Court notes that the CWs do not allege any internal information contradicting defendants' public statements in June 2013 or later; in fact, all of the CWs had left the company by August 2013.

scienter fail.  The Court discusses each of the alleged facts giving rise to a strong inference of scienter in turn.

First, the CAC alleges the fact that the sheerness issues causing the Black Luon Recall were so obvious and widespread supports a strong inference of scienter because this defect could have been detected by having a live model try on sample pairs of pants for every shipment.  (Id. ¶ 132.)  This frankly makes little sense.  It is not clear how a failure to conduct one particular type of testing as frequently as lead plaintiff alleges should have been the case leads to an inference of intent to deceive, let alone the "cogent and compelling" inference required by Tellabs, 551 U.S. at 324.

Considered as a recklessness argument a type of recklessness, this argument fares no better.  To adequately plead recklessness, the CAC must allege that defendants' conduct was so highly unreasonable as to constitute an extreme departure from the standards of ordinary care.  See Rothman, 220 F.3d at 90; Novak, 216 F.3d at 308; Chill, 101 F.3d at 269.  The CAC alleges that other quality control testing was conducted, including some live model testing, and that some of this testing was conducted by a third-party testing company.  (CAC ¶¶ 53, 65.)  Though the CWs offer their thoughts and opinions as to various quality issues experienced by the company prior to 2013, they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue.  See Novak, 216 F.3d at 309, 314; In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009); see also Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund

41

v. Am. Express Co., 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010); Woodward v. Raymond James Fin., Inc., 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010).  The CAC also does not allege that any of the proffered opinions by the CWs as to the company's quality controls were brought to the attention of any of the makers of the statements at issue.  See In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d at 537-38.  Though, in hindsight, additional live model testing may have prevented the sheerness issues that caused the Black Luon Recall, the allegations in the CAC concerning the Recall do not meet the standard for recklessness.

Second, the CAC alleges the fact that the Black Luon Recall concerned a core product supports a strong inference of scienter.  (CAC ¶ 133.)  To the extent the Court follows this argument, it appears to be that because black luon yoga pants were so important to revenue, when quality issues arose that impacted these products, defendants downplayed those quality issues in order to mislead the marketplace and maintain a higher stock price.[19]  This is unsupported by any allegations in the CAC—conclusory, factual, or otherwise.  As is discussed in Section V.A.2, supra, the CWs do not allege that any of the makers of the alleged false and misleading statement did not believe the truth of those statements.  Instead, the CAC sets out a chronology of product issues preceding the Class Period, and then occurring throughout the Class Period, of which the CAC alleges Day was

---

[19] The CAC's allegations as to the inference of scienter raised by the Individual Defendants' stock sales is discussed in greater detail with respect to the ninth fact, infra.

aware.[20]  Day's awareness of these quality problems supports the more reasonable inference that Day believed the statements she made at the time that she made them—she believed quality was critical to the company's success, she believed that quality was a key area of focus for the company, she believed (and acknowledged) that errors were possible, and she believed that the company needed to and did do more, and she hoped and expected that these issues would be resolved.  See Shields, 25 F.3d at 1129-30 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.")

Third, the CAC alleges that the centrality of product quality and quality control programs to the company as demonstrates defendants' scienter.  (CAC ¶ 134.)  This is a reformulation of lead plaintiff's "core product" argument, and is not an indicator of scienter.  Allegations as to the importance of quality and quality control are merely allegations of what could theoretically motivate a company to take actions with regard to its brand.  See Kalnit, 264 F.3d at 139 ("Insufficient motives . . . include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation.") (citing Novak, 216 F.3d at 307-08.)  It is more reasonable and likely that a publicly traded company, which touts quality as a centerpiece, will want to rectify any quality issues as quickly as possible since quality issues would be (and were) immediately

---

[20] Lead plaintiff relies on statements from the CWs that Day received or had access to regular reports about quality issues, was aware of certain quality issues, and committed to resolve those issues.  (CAC ¶¶ 34, 43, 46, 53-54.)

apparent and directly affected sales. It is far less likely (and certainly not cogent and compelling) that the need for quality in order to maintain its brand would lead a company to make intentionally false statements regarding its remediation of quality problems, since doing so could only result in inevitable discovery with defective products on the shelves.

Fourth, the CAC alleges that the product quality issues the company experienced prior to the Black Luon Recall put defendants on notice of problems with the company's quality control procedures. (Id. ¶ 135.) According to lead plaintiff, defendants then falsely assured investors that the company had remediated these quality control issues when, in fact, it had not. (Id.) For example, lead plaintiff points to Day's statement to investors on the September 7, 2012 that she was "very comfortable" with the company's ability to maintain product quality going forward. (Id. ¶¶ 48, 135.) The CAC also alleges that both Waterson and Day stated publicly (in July and September 2012, respectively) that the company had taken steps to remediate its quality control processes in light of, inter alia, the color fastness issues it had experienced. (Id. ¶¶ 47-48.) It does not allege that these steps were not in fact taken. Rather than supporting the requisite strong inference of scienter, the allegations in the CAC about quality control problems prior to the Black Luon Recall support a lack of such fraudulent intent or recklessness. See Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010) (ordering an investigation and implementing remedial efforts following the discovery of a

problem is "a prudent course of action that weakens rather than strengthens an inference of scienter") (citation omitted).

Indeed, to the extent the allegations in the CAC about past quality control problems put the company on notice of potential issues, they also put the market on notice that statements concerning the superior quality of the company's product had to be understood in this context.  It defies credulity to believe that if the fix were simply that which lead plaintiff asserts—requiring a live model to try on samples from all product shipments—defendants would purposely have avoided implementing it.  Given the alleged financial impact of the quality issues, it would have been financially irrational not to have employed live models.  See Shields, 25 F.3d at 1129-30 ("The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.").

Fifth, the CAC alleges the company's "attempt to pin the blame for the [R]ecall on Eclat supports a strong inference of Defendants' scienter."  (CAC ¶ 136.) This theory also fails.  With respect to Eclat, the CAC alleges that, following the Black Luon Recall, the company stated that it had used the same manufacturing partner on key fabrics since 2004, that it had changed neither ingredients nor manufacturers since that time, and that it was working with Eclat determine what happened.  (Id. ¶ 56.)  The CAC does not allege that any of these statements were untrue.  In the context of a company known to obtain product from third-party suppliers, stating publicly that it would communicate with one of those regarding

45

product issues that had arisen is hardly strong evidence of an intent to deceive; rather, it suggests "a prudent course of action that weakens rather than strengthens an inference of scienter." Slayton v. Am. Express Co., 604 F.3d at 777 (citation omitted).

Sixth, the CAC alleges that the company's statements that it worked closely with Eclat and SGS in order to ensure product quality, while also knowing that Eclat and SGS were not performing the "necessary" quality tests, supports a strong inference of scienter. (CAC ¶ 137.) This argument lacks any basis in the CAC. The CAC does not allege that the company asserted that specific tests were being performed when they were not—that is, lying about what tests were occurring. The CAC also does not allege that any of the makers of the statements believed that specific tests (live model tests) were necessary at the time the statements were made. Rather, the allegation is that the failure to conduct live model testing for all product shipments was so egregious that the only explanation is that the company knew that investors expected it to do so but made a determination both not to perform tests and not to inform the market of that fact.[21] The Court rejects this inference as far short of the cogent and compelling inference of scienter required by Tellabs, 551 U.S. at 324, and certainly far less compelling that the alternative inference—that the company's quality controls had evolved over the years in order to catch certain issues (color fastness) more effectively than others (sheerness), and that the company thought it could improve its quality controls faster and more

---

[21] As is discussed in greater detail supra, the CAC fails to allege that the failure to conduct live model testing on all product shipments meets the standard for recklessness.

comprehensively than it did.  At most, these allegations speak to areas of corporate mismanagement, not securities fraud.  See Santa Fe Indus., 430 U.S. at 477-79; In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d at 376.

Seventh and eighth, the CAC alleges that Day, Wilson, and other senior executives had involvement in the company's "deficient quality control procedures" but nevertheless misled investors regarding quality control.  (CAC ¶¶ 138-40.) Again, this theory fails.  Lead plaintiff asks the Court to infer from allegations that Day received reports about quality problems and had access to information about those problems that she did not, or could not, believe in what she said publicly about the company's products at the time she was saying it.  Similarly, lead plaintiff asks the Court to infer from the allegations that Wilson would "dip[] in and out of daily affairs," and that "his fingerprints are all over the company's policies and principles," that Wilson had knowledge that the statements in the Form 10-K for fiscal year 2012 about the company's quality and quality controls were false and misleading.  As is described above, the CAC neither supports these inferences nor sets forth facts concerning the specific "reports or statements" containing the alleged contradictory information.  See Novak, 216 F.3d at 309, 314; Kuriakose, 897 F. Supp. 2d at 184.  Though the CAC makes clear that the Black Luon Recall was a much bigger problem for the company than prior quality control issues it faced, this fact alone does not transform the events that preceded it into evidence supporting a strong inference of scienter.

Ninth, the CAC alleges that the "suspicious timing and amounts" of Wilson's and Day's stock sales during the Class Period give rise to a strong inference of scienter. (CAC ¶ 141.) As discussed below, the Court disagrees. Stock sales may support allegations of scienter when those trades are suspicious in timing or amount. See In re Keryx Biopharm., Inc., Sec. Litig., No. 13 Civ. 755 (KBF), 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011). "While 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (citations omitted). Though the proceeds of the alleged stock sales are, by any measure, considerable, more is required in order for these trades to give rise to a strong inference that Wilson and Day acted with an intent to deceive through their public statements during the Class Period.

With respect to Wilson, the CAC alleges that Wilson's sales were suspicious in timing because a "significant portion"—1,000,000 shares for a profit of $81 million—were on June 4-7, 2013, and on June 7, Wilson sold over 607,000 shares for approximately $50 million. (CAC ¶¶ 89, 91.) The CAC also alleges Wilson's January 2013 sales were suspicious because they "occurred shortly after the Company informed its store managers that it was first having sheerness issues with its Luon pants." (Id. ¶ 90.) The CAC alleges Wilson's sales were suspicious in amount because he sold 2.3 million shares through 17 transactions in two clusters

48

during January 2013 and May-early June 2013 (which is alleged to be different than his trading under a prior Rule 10b5-1 trading plan). (Id. ¶ 91.)

Trades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter. Glaser, 772 F. Supp. 2d at 592 (quoting In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)); In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007). Lead plaintiff correctly notes that the fact that Wilson traded pursuant to the Plan, by itself, is not "a cognizable defense to scienter allegations" on this motion because it was entered into during the Class Period. China Auto., 2012 WL 3205062, at *9. Yet, the CAC pleads no facts that even remotely suggest that Wilson entered into the Plan "strategically" so as to capitalize on insider knowledge of the company's allegedly undisclosed quality control issues. The CAC does not allege Wilson had any non-public information about product quality issues at the company from the beginning of the Class Period (on September 7, 2012) through the execution of the Plan (in December 2012). The CAC also does not allege that Wilson or any other Board members became aware of the sheerness issues that resulted in the Black Luon Recall until months after he executed the Plan. At most, the CAC alleges broad allegations about Wilson's involvement in the company more generally (see CAC ¶¶ 46, 139), which are insufficient.

Accordingly, the Court does consider the terms of the Plan and its impact on the inference of scienter raised by Wilson's Class Period trading. Though the CAC alleges that the Plan does not limit Wilson's discretion regarding the size of his

trades (subject to a ceiling on the total amount of sales permitted) (id. ¶ 89), the Plan itself states that Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") had sole discretion to sell up to 5.4 million shares at or above a stock price of $81.25 per share between January 10, 2013 and January 2, 2014, subject to a maximum of one million shares in any single calendar month.[22] (See Tannenbaum Decl. ¶¶ 2-4, Ex. 1, ECF No. 52.) Thus, it is undisputed that Merrill Lynch could only have sold shares on the days on which it did so—days on which the stock price hit $81.25; by contrast, lululemon stock was trading between $66.60 and $73.75 in December 2012. (Id. ¶¶ 3-4, Ex. 6.) In light of the Plan, which the CAC does not allege Wilson violated, as well as the lack of allegations concerning Wilson's knowledge of quality control issues, Wilson's trading is not suspicious as to timing or amount so as to raise a strong inference of scienter.[23]

With respect to Day, the CAC alleges that her stock sales (which were executed pursuant to a Rule 10b5-1 trading plan) were suspiciously timed because they followed her allegedly false and misleading statements to investors about the company's quality control problems. (CAC ¶ 92.) This argument fails. Not only do the dates of her stock sales fail to match up closely with her allegedly false and

---

[22] The Plan also permitted Merrill Lynch to sell an additional 300,000 shares after January 2, 2014 at a price below $81.25 per share. (See Tannenbaum Decl. ¶ 2, Ex. 1.)

[23] Wilson's trading during the Class Period is also not suspicious when considered in context of his overall holdings of lululemon stock. "[D]ollar amount cannot be considered in isolation. Rather the percentage of stock holdings sold may be indicative of unusual trading." See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75 (2d Cir. 2001). It is undisputed that, despite Wilson's trading, he retained over 94% of his pre-Class Period holdings. (Tannenbaum Decl. Ex. 2, Entries 120, 146.) Courts have found larger sale percentages than that sold by Wilson not to be suspicious. See Rothman, 220 F.3d at 94 (9.9%); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (11%); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d at 291-92 (17.4% and 10.9%).

misleading statements,[24] but Day had an established practice of exercising stock options as they vested and selling a matching number of shares on a quarterly basis. (See Allerhand Decl. Exs. 21, 22, 23.)  The chart of stock sales in Paragraph 93 of the CAC shows that that this is also what happened during the Class Period. See In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d at 270 ("Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information.") (citations omitted).  Though Day's sales increased following the announcement of her resignation on June 10, 2013,[25] such sales are a "normal and expected" consequence of retirement rather than an "an unsubstantiated conspiracy to defraud." City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc., No. 12 Civ. 3553 (NRB), 2013 WL 4505256, at *24-25 (S.D.N.Y. Aug. 23, 2013) (citations omitted) (collecting cases).

In sum, the CAC asserts a myriad of theories in support of the required cogent and compelling inference of scienter under Tellabs.  Even when considered together, they are insufficient to survive the instant motions to dismiss.

C.    Loss Causation

On top of the CAC's deficiencies with respect to its allegations of falsity and scienter, lead plaintiff also fails to adequately allege loss causation—that the allegedly false and misleading statements caused lead plaintiff's losses.  See

---

[24] For example, Day sold stock on September 24 and 25, 2012, more than two weeks after the September 7, 2012 investor call. (Id. ¶¶ 92-93.)

[25] In June 2013, Day sold shares on June 12, 13, and 28, 2013 (see CAC ¶ 93), after she announced her resignation publicly and after (as the CAC alleges) the company's stock price had dropped significantly upon the market's reaction to the news.

Lentell, 396 F.3d at 174.  One theory, which lead plaintiff has discarded in the current CAC, is that investors so believed that the company had guaranteed quality that when the Black Luon Recall occurred in March 2013, the market realized the company's prior statements about quality were false, which resulted in stock sales at declining prices.  In other words, that the company had guaranteed "no recalls."  However, even after the Recall, the company continued to experience growth.  (CAC ¶¶ 120-21.)  Hence, the Class Period alleged in the CAC does not end with the Recall (March 2013)—it continues for another ten months.

Instead, lead plaintiff posits a theory that connects the Recall to Day's departure, and Day's departure to the materialization of a risk lead plaintiff concedes was disclosed in company filings as to the importance of key executives, which caused the stock price to decline.  (Id. ¶ 74.)  But the announcement of Day's departure occurred on June 10, 2013, and the Class Period was still continuing.  Lead plaintiff does not allege that the announcement of Day's resignation itself revealed any fraud.  See Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation.").

Lead plaintiff then argues that, when Day's statement on the September 7, 2012 investor call that she was comfortable with the company's current product quality was followed by announcements in March and April 2013 that the company was working to fix the quality issues it was then facing (primarily, the Recall),

investors realized they had been misled and fled the company's stock.  Notably, there is no assertion that defendants revealed pervasive quality control issues, or that earlier earnings statements were fraudulent.  Rather, the argument is that the announcement of ongoing fixes caused the company's stock to drop over the course of nearly a year and a half.  Instead, "[r]ather than relate back to Defendants' alleged misrepresentations, the events and dates Plaintiff identifies relate to other negative information about the company, thereby insufficiently establishing loss causation." Solow v. Citigroup, Inc., No. 10 Civ. 2927 (RWS), 2012 WL 1813277, at *9 (S.D.N.Y. May 18, 2012), aff'd, 507 F. App'x 81 (2d Cir. 2013).

The number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed.  The CAC fails to allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell, 396 F.3d at 175 (citation omitted).

D.    Section 20(a) Control Person Liability

As set forth above, control person liability requires an underlying primary violation of Section 10(b) of the Securities Exchange Act. See ATSI, 493 F.3d at 108.  Having failed adequately to plead such a violation, lead plaintiffs' claim for Section 20(a) control person liability by the Individual Defendants also fails.

53

VI.    CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are

GRANTED and the CAC is DISMISSED.

The Clerk of Court is directed to close the motions at ECF Nos. 47 and 50,

and to close this action.

SO ORDERED.

Dated:      New York, New York
            April 18, 2014

KATHERINE B. FORREST
United States District Judge

54